IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DAVID EARL STOCKMAN, Individually and on Behalf of All Others Similarly Situated, §§§§§§§§§§§§§§ | |
| Plaintiff, | Civil Action No. |
| vs. | |
| FLOTEK INDUSTRIES, INC., JERRY D. DUMAS, SR. and LISA G. MEIER, | JURY TRIAL DEMANDED |
| Defendants. | |

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Flotek Industries, Inc. ("Flotek" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of Flotek between May 8, 2007 and January 23, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff David Earl Stockman, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Flotek during the Class Period and has been damaged thereby.

7.      Defendant Flotek is incorporated in Delaware and maintains its headquarters at 2930 West Sam Houston Parkway North, Suite 300, Houston, TX 77043. The Company supplies drilling and production related products and services to the energy and mining industries in the United States and internationally.

8.      (a)      Defendant Jerry D. Dumas, Sr. ("Dumas") is, and was at all relevant times, the Chairman, Chief Executive Officer and President of Flotek.

        (b)      Defendant Lisa G. Meier ("Meier") was, at all relevant times, Chief Financial Officer and Vice President of Flotek.

        (c)      Defendants Dumas and Meier are referred to herein as the "Individual Defendants."

9.      During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Flotek, were privy to confidential and proprietary information concerning Flotek, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Flotek, as discussed in detail below. Because of their positions with Flotek, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly

disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Flotek's business.

11.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Flotek's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Flotek common stock would be based

upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Flotek common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Flotek's business, operations and management and the intrinsic value of Flotek's common stock; (ii) allowed Defendants Dumas and Meier and other Company insiders to collectively sell 657,946 shares of their personally-held Flotek common stock for gross proceeds in excess of $19.4 million; and (iii) caused plaintiff and members of the Class to purchase Flotek common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Flotek between May 8, 2007 and January 23, 2008, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Flotek common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Flotek or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

- 4 -

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Flotek;

(c)    whether the price of Flotek common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.    Defendant Flotek "manufactures and markets innovative specialty chemicals, downhole drilling and production equipment, and manages automated bulk material handling,

loading and blending facilities. It serves major and independent companies in the domestic and international oilfield service industry."

21.     The Company operates in three segments: Chemicals and Logistics, Drilling Products, and Artificial Lift.

22.     The Chemicals and Logistics segment offers a range of oil gas field specialty chemicals used for drilling, cementing, stimulation, and production. This segment designs, project manages, and operates automated bulk material handling and loading facilities for oilfield service companies. It also develops, produces, and distributes specialty chemical products and services for drilling and production of natural gas.

23.     The Drilling Products segment manufactures, sells, rents, and inspects specialized equipment for use in drilling, completion, production, and workover activities. The Company's downhole drilling tools are used in the oilfield, mining, water-well, and industrial drilling sectors. The Company markets its drilling products primarily in the Gulf of Mexico, Mid-Continent and Rocky Mountain regions of the United States.

24.     The Artificial Lift segment provides artificial lift equipment, which includes the Petrovalve line pumping system components, including electric submersible pumps, gas separators, production valves, and services to support coal bed methane and traditional oil and gas production. The Company's products address the needs of coal bed methane and traditional oil and gas production to efficiently move gas, oil and other fluids from the producing horizon to the surface. Several of the Company's artificial lift products help improve well performance.

25.     On March 13, 2007, Flotek issued a press release announcing its financial results for the fourth quarter and year end of 2006, the period ended December 31, 2006. For the quarter, the Company reported revenues of $33.3 million and net income of $3.9 million, or $0.41 per diluted share. Commenting on the announcement, Defendant Dumas stated, in pertinent part, as follows:

I am pleased with our operating and financial performance, and our ability to appreciably grow revenues in all three core segments. Despite a hefty increase in professional fees and effective tax rate, we met the expectations of our shareholders. We have brought together a first-rate collection of companies and will continue to focus on integrating them in 2007 to maximize profit.

26.     Following the press release, Defendants conducted a conference call with investors and analysts. With regard to the Company's outlook for 2007, Defendant Dumas stated, in pertinent part, as follows:

As I look into this year of '07 I am excited about certain strategic developments. Our chemical logistics division, our group under Material transition is MTI signed a multi million dollar, multi year contract to build and operate a liquid chemical facility which is expected to be completed in the third quarter of this year. They will provide services related to the delivery, the storage, the packaging, the blending of certain liquid chemicals which is expected to double the revenues for this group and increase our strategic partnership with a major pumping service company that we will be operating with providing them as an additional solutions provider. With regard to our specialty chemicals group, I look for the emphasis on R&D and marketing to the major service companies to support our growth. We have completed our production facility to serve the United States. and we have completed the set up of our Netherlands operation to support the needs of the Middle East and Europe. We are currently looking at beef stock suppliers in that part of the world to improve our logistics. The drilling tool groups will focus on integration this year. We have brought together an excellent group of companies. Most recently in January of '07, the acquisition of Tram Drilling Tools which put us into a strong position into the Gulf of Mexico and along the Louisiana Gulf Coast where previously we had a very modest position. We are going to work very hard to put all of these together into a seamless operation and I think that you will see in '07 the results of these companies culturally and operationally being pulled together successfully and being able to utilize the various facilities where we could consolidate if needed. In 2006, we terminated negotiations as I mentioned earlier but we will continue to look for acquisitions that are strategic to our growth and we will also walk away with those who do not meet our shareholders requirements. Our business operations and our prospects for future revenue remain strong. We have not seen a slow down in any of our three operating segments. As a matter of fact, we have been able to witness strong market penetration in all three of our segments and based on our performance projections, we are providing earnings guidance of $2 of diluted earnings per share for '07 without the addition of any acquisitions.

*         *         *

<Q - Bo Mckenzie>: I guess the one thing that would stand out to me is that with Q4 as strong as it was and what appears to be further growth going into Q1 in terms of any chemicals and no real slowing in the U.S. recount so far that we have seen, I

- 7 -

would guess that the case for somewhat better than $2 might be there.  Is there any reason for not taking guidance up at this juncture?

<A - Jerry Dumas, Sr.>:  Yeah, there's a reason, I'm not gonna do it.

<Q - Bo Mckenzie>:  That's an answer not a reason.

<A - Jerry Dumas, Sr.>:  Well, I think that the answer is, in a serious manner, is that we have taken a look at what we can do this year and we believe that we can be very straightforward with our shareholders and our investors that we will be able to deliver $2 per share diluted earnings and as the year progresses, we will take a look at where we are.

With regard to the Company's guidance, Defendant Meier added, in pertinent part, as follows:

We have utilized the majority of our NOL's available and do not anticipate significant tax relief on a go forward basis.  As discussed at several investor conferences this year, we project the company will generate revenues of $160 million dollars with diluted earnings per share of $2.  These projections include the purchase of Triumph and Cavo.  We will be filing our 10K on Friday of this week and we will file a detailed AK on the acquisition of Triumph early next week.

27.    The statements referenced above in ¶¶25 and 26 remained alive and uncorrected throughout the Class Period.

28.    The Class Period begins on May 8, 2007.  On that date, Flotek issued a press release announcing its financial results for the first quarter of 2007, the period ended March 31, 2007.  For the quarter, the Company reported revenues of $35.1 million and net income of $3.7 million, or $0.39 per fully diluted share.  Commenting on the announcement, Defendant Dumas stated, in pertinent part, as follows:

All three segments delivered solid results despite weather related slowdowns in Oklahoma and the Rocky Mountains. Our Chemicals and Logistics division has seen continued growth in sales of our proprietary specialty chemicals, especially our line of biodegradable micro-emulsion products which are used extensively in well stimulation, cementing and production. We are actively integrating Triumph Drilling Tools into our existing drilling tool segment and have begun the process of rolling out Rental Tool Management Software (RTMS) to better utilize our extensive inventory of rental tools. With the appointment of a new Artificial Lift division president, focus will be on expanding the geographic footprint and complete product line offering of our coal bed methane production products and services. Across all divisions a strict emphasis remains on lowering costs and increasing revenue per employee.

29.     Following the press release, Defendants conducted a conference call with investors and analysts. With regard to the Company's outlook for 2007, Defendant Meier stated, in pertinent part, as follows:

> In talking with many of you we would like to clarify what we consider to be the key drivers of our business. Flotek is a technological driven company that responds to meet the needs of our customers. We are focused on patented and proprietary and mechanical and chemical solutions to enhance production and returns for our customers. We are speaking across all three of our lines to become a specialized solutions provider while maintaining above average profit margins. As something [inaudible] builds, this means more activity which in turn leads to increased sales falling into our patented and proprietary chemicals and growing tools. With that in mind, we are actively evaluating acquisitions to complement our existing operations. As discussed at several investor conferences this year, we project the company will generate revenues of $160 million and diluted earnings per share of $2.00.

30.     In response to the Company's financial results and confirmed guidance for 2007, the price of Flotek stock rose $1.88 per share, or 9%, to close at $21.90 per share on May 9, 2007.

31.     On August 2, 2007, Flotek issued a press release announcing its financial results for the second quarter of 2007, the period ended June 30, 2007. For the quarter, the Company reported revenues of $37.8 million and net income of $4.9 million, or $0.25 per fully diluted share. Commenting on the announcement, Defendant Dumas stated, in pertinent part, as follows:

> Our team's successful execution of our strategy has enabled the Company to significantly improve product sales, rental revenue and services revenue in the markets we compete. Gross profit as a percentage of revenue increased across the Company which reflects our relentless focus on growing revenue while maintaining costs. Net income more than doubled in the second quarter of 2007 compared to 2006, and increased 31% above first quarter 2007, despite severe weather in many of our operating areas. We estimate inclement weather deferred approximately $2 million in sales. Our outlook for the remainder of 2007 is positive.

32.     Following the press release, Defendants conducted a conference call with investors and analysts. With regard to the Company's outlook for 2007, Defendant Meier stated, in pertinent part, as follows:

> <Q - Sara Millenium Partners>: Quick thing, I missed the beginning of the call, were there any comments on the '07 forecast? I know there were some comments in the press release or in general that you were feeling positive about '07. Now that we are

- 9 -

halfway through the year, what has sort of happened to make you feel pretty confident in the dollar estimates that you have given or guidance rather?

<A - Lisa Meier>:  We are holding to our original guidance.  I think what we are seeing as positive momentum is that even with two months of rain and weather impacting in the 2nd quarter and then winter storms in the 1st quarter, we have got the revenue base generating from enough different sources both geographically as well as the underlying business drivers.  Should a few of those factors turn to our favor, I think we will be pleasantly surprised. Should the year maintain where it is, we are confident that we will meet our original expectations.  We spoke a little bit to the go forward on CAPEX.  We have had a very heavy CAPEX program for the 1st six months of the year.  We expect that to settle back on the back half.  That was driven by projects as well as motor orders.

<Q - Sara Millenium Partners>: Gotcha, and you have gone over weather before. Did you say year to date how much weather has impacted earnings?

<A - Lisa Meier>:  I would think year to date that is a $3 to $4 million dollar number.  We ballparked approximately $2 million in the second quarter.  There probably was $1 million to $2 million in the 1st quarter because of the ice storm in January.  I mean different things Mother Nature has thrown at us.  So I think about $4 million.

<Q - Sara Millenium Partners>: $4 million in total value.

<A - Jerry Dumas, Sr.>: $4 million in total revenue.  If you look at our margins, you can figure out what most of it dropped to the bottom line, which would give you an idea of the cents per share that we hopefully delayed rather than lost.

<Q - Sara Millenium Partners>: So, we should be seeing that in either the third or fourth quarter hopefully.

<A - Jerry Dumas, Sr.>:  We are very confident that a vivid portion of that was delayed, and it will pick it up.

33.     In response to these statements and announcements, the price of Flotek stock rose

$1.45 per share, or 5%, to close at $31.94 per share on August 2, 2007.

34.     The statements referenced above in ¶¶25, 26, 28, 29, 31 and 32 were each materially

false and misleading when made because they misrepresented and failed to disclose the following

adverse facts, which were known to defendants or recklessly disregarded by them:

(a)     that the Company was experiencing weakness in its Rocky Mountain sales

region due to its decision to not cut prices to the level of its competitors;

- 10 -

(b)     that the Company's operating profit margins were being negatively impacted as customers increasingly opted to rent equipment instead of purchasing it;

(c)     that sales in the Company's chemicals division were declining due to a decrease in fracing[1] activity; and

(d)     as a result of the foregoing, defendants' positive statements concerning the Company's guidance and prospects were lacking in a reasonable basis at all relevant times.

35.     On October 31, 2007, Flotek issued a press release announcing its financial results for the third quarter of 2007, the period ended September 30, 2007.  For the quarter, the Company reported revenues of $41.7 million and net income of $5.0 million, or $0.26 per fully diluted share. Commenting on the announcement, Defendant Dumas stated, in pertinent part, as follows:

> The drop in Rocky Mountain wellhead gas prices and associated drop in gas drilling and production delayed sales in our chemical, drilling and artificial lift divisions. Despite this, we are on track and performing at or above plan and making progress on several strategic initiatives. Based on our performance we reiterate our guidance of $1.00 per share on a fully diluted basis for 2007.

36.     Following the press release, Defendants held a conference call with investors and analysts.  With regard to the Company's financial results for the third quarter, Defendant Dumas stated, in pertinent part, as follows:

> Sequentially, third quarter operating margins decreased due to the decrease in gross profit margins in our Chemical and Logistic division, which we will be glad to discuss in detail at the question-and-answer period. All three of our segments were affected by the lower gas prices in the Rocky Mountains.
>
> *      *      *
>
> Sales of our green chemicals as a percentage of total sales decreased from 72% in the second quarter to 69% in the third quarter due to decreased frac activity as a result of

---

[1]     Fracing is used to stimulate production in oil and gas wells.  In fracing, fluid is pumped into the well at pressures high enough to fracture the oil/gas bearing formation. The fracture provides an easier path for fluids in the formation to flow back to the wellbore.

lower gas prices, particularly in the Rocky Mountains. The Rocky Mountains region makes up approximately 20% of our total Chemical sales.

\*       \*       \*

Year-over-year operating profit margins are lower due to a shift in our revenue mix from sales to rentals and services, which are more people intensive, plus $700,000 more in depreciation and amortization expense. Artificial Lift sales decreased from 5.8 million in the third quarter of '06 to 4.3 million in the third quarter of '07. Low gas prices and pipeline capacity constraints significantly reduced coal bed methane production and drilling activity in the Powder River Basin in the third quarter of '07 versus 2006. There were about 25% less drilling rigs operating in the third quarter compared to the quarter in '06.

With regard to the Company's third quarter results and why the fourth quarter would be different, Defendant Dumas stated, in pertinent part, as follows:

&lt;Q - Bo Mckenzie&gt;: Hey guys. Jerry, you talked about 16 million I believe in the microemulsifier in Q3; what's kind of current rate being going here so far in Q4?

&lt;A - Jerry Dumas, Sr.&gt;: It's picking up a little bit. The -- we saw in fact a matter, we recognized that there was a delay or a bit of a pause if you will in the third quarter. In fact the matter if you noted when I made the comment that our production I mean that our sales were up 10%, but that our microemulsion was only up 5%.

&lt;Q - Bo Mckenzie&gt;: Right.

&lt;A - Jerry Dumas, Sr.&gt;: We saw a pause in the fracing work. But that seems to some how or another, based on what we're seeing right now, that pause seems to have been eliminated. People seem to be going about their business again. But we clearly had a reduction in their proprietary chemicals, which is our -- primarily our microemulsion. And that was the reason we have a small decrease in the gross profit margin in the chemical group. But we do not consider that a trend. It was only a short-term adjustment. There was a lot of comments made by various operators that they were going to shut in some gas or we're going to do this or we're going to do that; and as a result there was a pause in their activity of frac work.

&lt;Q - Bo Mckenzie&gt;: All right. Then back over on the drilling product side, kind of looking forward, correct me if I'm wrong, but other than Spidle, a lot of the drilling product stuff is down here, Gulf Coast, Texas, places like that. Where do you guys stand in terms of the final integration with Triumph, the RTMS and stuff like that to kind of get the last of the consolidation benefits out? Are we in a position that we should look for Q4, see a little better margins than we saw in Q3 and kind of ultimately given the final combination of this business together; or still a little bit more time on that?

&lt;A - Jerry Dumas, Sr.&gt;: Bo, we are going to continue to work on it. I hope that we will see and I think we will see an improvement in the fourth quarter over the third

quarter. There are two things happening in the downhole motor business right now. I beg your pardon. And the downhole too, not only the motors. There clearly has been a little bit of a slow down in drilling. And if you look at the State of Wyoming, they are down about 40 sum odd rigs. So the amount of rigs that we are able to service or have the opportunity to do business with is down significantly. Number two, we are running into some price cuttings in the Rocky Mountains. And at this point, we made a decision; we were not going to cut prices. No question about it, we knew what we did. And we knew that we were absolutely going to lose some market share, because we've actually seen price discounts up to 28% and we made a decision to ignore that and it has cost us some revenue. However, we are now firing a shot across the bow of some of these people and we're beginning to see our business pick up again. So based on that, we are going to point out to some people that we are not going to sit here and take this and without having to show them that our strength. Because we're arguably as strong as anybody in that business. So we'll be firing a shot across the bow of some of these price cutters.

<p style="text-align:center">*      *      *</p>

<Q - Joe Hill, Wachovia Capital>: Hi guys. Jerry, what was the weekly run rate of sales for the emulsion chemical in the third quarter and what's the current run rate?

<A - Jerry Dumas, Sr.>: The current run rate is just one month. Yeah, in fact, Lisa and I looked that this morning. We went back and we get a weekly sales report. And we saw a drop in September from August of about 20%. It has now picked back-up into from September it's picked back up and we are probably going to have a -- not probably, we clearly will have a record month in October of which about -- in the chemical sales. So there seems to be a movement back to doing more fracing plus we are being able to get more people to utilize the product than the ones that we have before. So the run rate dropped about 20%. In the month of October, it has recovered, and we have every belief that it will continue to be recovering.

<Q - Joe Hill, Wachovia Capital>: So, if you take what you are seeing in October and to substitute that for September how big of a difference would that have made for your chemicals revenues in the third quarter?

<A - Jerry Dumas, Sr.>: Well, I can tell you it would have made about 1.5% in gross profit margin, because that's what we got hammered on, because that's why we were down as we mentioned previously. With respect to revenues, the revenues probably in September versus what we see in October if we were successfully to extrapolate that over a quarterly basis would be -- assuming we are extrapolating it and that that happens about a 1.5 million to $2 million more sales in the fourth quarter than we had in the third quarter.

<Q - Joe Hill, Wachovia Capital>: Okay. And it sounds like operators are more willing to go ahead and complete wells now given the Rockies Express pipeline coming on in January.

<A - Jerry Dumas, Sr.>: Joe, what we know is that -- in fact when it occurred I visited with our people, and I said I see that July numbers were moving up. We had

<p style="text-align:center">- 13 -</p>

the second largest month that we had in and it looked like August is going to be better. And do you see this as a trend? And their comment is no, I don't think so. Because we were beginning to hear from our customers that we sell of the microemulsion to that some of the operators are taking a pause, a time out, on some of fracing and sure enough, we had about a $1.5 million drop in sales in the chemical division in September over August. Then we had a pickup in October. I am certainly hopeful and right now it appears that we are still moving forward, so we could have about a $2 million increase in sales in the chemical division or more in the fourth quarter. Because it appears that they are beginning to do a little more fracing. But in addition to that, we are seeing a couple of other companies begin to use the product at an accelerating rate now. Now, I am not talking about at a rapid rate, but a consistent move forward in the utilization besides the major user of that product.

With regard to the perceived disappointing results and the Company's stance on its 2007 guidance,

Defendant Dumas stated, in pertinent part, as follows:

Our business operations and prospects for future revenue remain strong. We have not seen a reduction in demand for our products and services due to the quality of the service of our products, but as I mentioned we have had some reduction because of the gas price that affected the drilling operation and because we had pipeline problems and we also have other issues that reduced the activity in the Powder River in our coal bed methane operations that reduced the rig count by 25%.

Based on all of this activity, based on the performance of projections and the third quarter performance, we are right on our plan as we have anticipated this year and we have consistently indicated to our share holders that we would have a guidance of $1 per share diluted earnings and without any addition of any acquisitions.

At this point, I want to point out that we continue to stand firm on that guidance.

\*       \*       \*

<Q - Steven Jackson, Elinix Technologies>:  I am good. I am an investor and I was curious, I noticed the stock was down today about 20%, could you shed some light on that?

<A - Jerry Dumas, Sr.>: Well, you know Steven, I am going to be very candid about that. Lisa and I in every venue that we have attended and every opportunity we've had we have made it perfectly clear that our plan this year given the growth, given the cost of doing business as a public company particularly Sarbanes-Oxley and the acquisition activities we're going through and the growth we are going through in all of our segments we've said consistently that we would be fully diluted at $1 per share. That is about a 75 or 80% increase from last year.

Without being disrespectful but just being very candid about it I think there has been some, if I can borrow Alan Greenspan's comment, some irrational exuberance about our stock and our expectations. I would tell anybody that we are a fundamentally sound company. We made a significant increase in profitability and in revenue

growth compared to a lot of other companies in this area and we feel very bullish that we will continue to meet our plan. And as I said come in with $1 per share and we have consistently said to people when we've been asked if we're going to change our guidance, no we're not. We consistently believe that we will make $1 per share fully diluted.

37.    In response to the Company's earnings announcement, the price of Flotek common stock fell $14.35 per share, or 28%, to close at $36.45 per share, on November 29, 2007, on heavy trading volume. Defendants, however, continued to conceal the full extent of the problems at the Company.

38.    Then, on January 23, 2008, Flotek issued a press release announcing that the Company was revising its previously announced guidance for the year ending December 31, 2007. With regard to the Company's lowered guidance, the press release stated, in pertinent part, as follows:

The Company expects revenues for the 2007 year to be approximately $158 million, generating earnings in the range of approximately $0.88 to $0.92 per diluted share, as compared to prior guidance of $1.00 per diluted share, and actual earnings of $0.61 per diluted share in 2006. The revised guidance is preliminary and subject to audit. Flotek expects to release final results for the fourth quarter and year ending December 31, 2007 on March 12, 2008.

During the fourth quarter, which historically has been one of Flotek's strongest quarters, revenues were lower than anticipated due to a general slowdown in North American fracturing activity and drilling activity, accompanied by weather disruptions in the mid-continent region. Monthly revenue in October was the highest in the history of the Company, with results slowing significantly in the subsequent holiday months. In addition, general and administrative expenses are expected to be approximately 30% higher in the fourth quarter of 2007 than in the third quarter of 2007, related to increases for completing Sarbanes-Oxley initiatives, computing systems upgrades/conversions, and final implementation of the RTMS (rental tool management system). All of these administrative upgrades are expected to create enhanced control and efficiency during 2008.

Defendant Dumas, commenting on the lowered guidance, stated, in pertinent part, as follows:

The growth fundamentals of our core businesses remain sound, and the pace of North American oilfield service activity seems to be strengthening in January. We believe the business line additions of the last several years will continue contributing to growth in 2008 and beyond as these businesses are integrated and ramp-up matures. We have made a significant investment in 2007 to strengthen our internal controls

and expand our information technology processing capability. We anticipate the costs associated with these initiatives to level off in 2008.

39.     In response to these announcements, the price of Flotek common stock fell $7.60 per share, or 30%, to close at $17.86 per share, on January 24, 2008, on heavy trading volume.

40.     On March 17, 2008, Defendants held a conference call with investors and analysts to discuss the Company's fourth quarter and full year results for the period ending December 31, 2007. For the year, the Company reported net income of $16.7 million, or $0.88 per fully diluted share. With regard to the Company's 2007 results, Defendant Dumas stated, in pertinent part, as follows:

> THOMAS ESCOTT: Okay. On the tool business, obviously there's been a lot of price pressure and margin compression in the downhole tools segment. With the addition of Teledrift, is that going to be enough to help hold profit margins stable to better in '08, or are margins there continuing to deteriorate kind of gradually through the year?

> JERRY DUMAS: I think, from a strategic point of view or from a strategy and then a tactical activity execution of that strategy, we've made a decision that we're going to, as opposed to what we did in '07, we're going to meet the competition with our dumb iron business. On the other hand, the Teledrift product line and the CAVO motor line, which have not been hammered, have not had that kind of pressure, will certainly contribute to the profitability of our downhole tool business. Without question, we're going to continue to see pricing pressure on the dumb iron section of our downhole tool. The other thing we're working on as rapidly as we can is to bring as many new tools into our inventory, specifically jars and motors and sharp subs, which will eliminate the sub-rent and more than approximately double our margins when we only product ourselves.

41.     The market for Flotek common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Flotek common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Flotek common stock relying upon the integrity of the market price of Flotek common stock and market information relating to Flotek, and have been damaged thereby.

42.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Flotek common stock, by publicly issuing false and misleading statements and

omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

43.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Flotek's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Flotek and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

44.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Flotek, their control over, and/or receipt and/or modification of Flotek's allegedly materially misleading misstatements and/or their associations with

- 17 -

the Company which made them privy to confidential proprietary information concerning Flotek,

participated in the fraudulent scheme alleged herein.

45.    Defendants were further motivated to engage in this course of conduct in order to

allow defendants Dumas and Meier and other Company insiders to collectively sell 657,946 shares

of their personally-held Flotek common stock for gross proceeds in excess of $19.4 million.  The

insider trading during the Class Period is set forth more fully in the following chart:

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| LISA BROMILEY-MEIER | 5/11/2007 | 7,200 | $23.46 | $168,912 |
| | 5/11/2007 | 2,400 | $23.42 | $56,208 |
| | 5/11/2007 | 2,000 | $23.38 | $46,760 |
| | 5/11/2007 | 1,200 | $23.80 | $28,560 |
| | 5/11/2007 | 1,000 | $23.53 | $23,530 |
| | 5/11/2007 | 800 | $23.77 | $19,016 |
| | 5/11/2007 | 800 | $23.65 | $18,920 |
| | 5/11/2007 | 400 | $23.55 | $9,420 |
| | 5/11/2007 | 400 | $23.75 | $9,500 |
| | 5/11/2007 | 200 | $23.78 | $4,756 |
| | 5/11/2007 | 200 | $23.45 | $4,690 |
| | 5/11/2007 | 200 | $23.55 | $4,710 |
| | 5/11/2007 | 200 | $23.47 | $4,694 |
| | 5/14/2007 | 5,400 | $22.45 | $121,230 |
| | 5/15/2007 | 2,600 | $22.31 | $58,006 |
| | 8/13/2007 | 5,000 | $32.30 | $161,500 |
| | 12/20/2007 | 5,000 | $35.20 | $176,000 |
| | 12/21/2007 | 5,000 | $36.10 | $180,500 |
| | | 40,000 | | $1,096,912 |
| | | | | |
| JOHN CHISHOLM | 6/12/2007 | 4,000 | $26.92 | $107,680 |
| | 6/12/2007 | 1,000 | $26.92 | $26,920 |
| | 8/14/2007 | 5,000 | $31.13 | $155,650 |
| | 10/9/2007 | 5,000 | $48.90 | $244,500 |
| | 12/10/2007 | 4,900 | $39.35 | $192,815 |
| | 12/10/2007 | 100 | $39.38 | $3,938 |
| | | 20,000 | | $731,503 |
| | | | | |

- 18 -

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| JERRY DUMAS | 5/15/2007 | 13,200 | $22.50 | $297,000 |
| | 5/15/2007 | 4,000 | $22.52 | $90,080 |
| | 5/15/2007 | 1,000 | $22.55 | $22,550 |
| | 5/15/2007 | 600 | $22.50 | $13,500 |
| | 5/15/2007 | 370 | $22.57 | $8,351 |
| | 5/17/2007 | 2,000 | $22.55 | $45,100 |
| | 5/17/2007 | 1,000 | $22.50 | $22,500 |
| | 5/18/2007 | 6,200 | $22.25 | $137,950 |
| | 5/18/2007 | 2,262 | $22.28 | $50,397 |
| | 5/18/2007 | 200 | $22.30 | $4,460 |
| | 8/6/2007 | 35,000 | $31.00 | $1,085,000 |
| | 8/6/2007 | 1,000 | $31.05 | $31,050 |
| | 8/7/2007 | 81,984 | $31.42 | $2,575,937 |
| | 8/8/2007 | 30,000 | $33.00 | $990,000 |
| | 8/10/2007 | 8,000 | $32.75 | $262,000 |
| | | 186,816 | | $5,635,876 |
| | | | | |
| ROSALIE MELIA | 5/11/2007 | 530 | $23.17 | $12,280 |
| | 5/11/2007 | 200 | $23.19 | $4,638 |
| | 5/11/2007 | 200 | $23.18 | $4,636 |
| | | 930 | | $21,554 |
| | | | | |
| GARY PITTMAN | 5/21/2007 | 6,600 | $23.25 | $153,450 |
| | 5/21/2007 | 4,200 | $23.57 | $98,994 |
| | 5/21/2007 | 1,400 | $23.70 | $33,180 |
| | 5/21/2007 | 1,200 | $23.58 | $28,296 |
| | 5/21/2007 | 400 | $23.75 | $9,500 |
| | 5/21/2007 | 400 | $23.37 | $9,348 |
| | 5/21/2007 | 400 | $23.41 | $9,364 |
| | 5/21/2007 | 400 | $23.32 | $9,328 |
| | 5/21/2007 | 200 | $23.31 | $4,662 |
| | 8/8/2007 | 20,000 | $33.00 | $660,000 |
| | 8/27/2007 | 20,000 | $38.43 | $768,600 |
| | 9/13/2007 | 12,000 | $39.20 | $470,400 |
| | 9/13/2007 | 7,250 | $39.25 | $284,563 |
| | 9/13/2007 | 600 | $39.26 | $23,556 |
| | 9/13/2007 | 100 | $39.30 | $3,930 |
| | 9/13/2007 | 50 | $39.36 | $1,968 |
| | | 75,200 | | $2,569,139 |
| | | | | |

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BARRY STEWART | 5/11/2007 | 49,800 | $23.00 | $1,145,400 |
| | 5/11/2007 | 200 | $23.06 | $4,612 |
| | 5/16/2007 | 24,902 | $22.00 | $547,844 |
| | 5/16/2007 | 1,200 | $22.00 | $26,400 |
| | 5/17/2007 | 23,898 | $22.00 | $525,756 |
| | | 100,000 | | $2,250,012 |
| | | | | |
| RICHARD WILSON | 8/6/2007 | 10,000 | $30.50 | $305,000 |
| | | 10,000 | | $305,000 |
| | | | | |
| WILLIAM ZIEGLER | 5/11/2007 | 11,200 | $22.65 | $253,680 |
| | 5/11/2007 | 6,800 | $22.67 | $154,156 |
| | 5/11/2007 | 5,800 | $22.70 | $131,660 |
| | 5/11/2007 | 5,200 | $23.00 | $119,600 |
| | 5/11/2007 | 5,140 | $22.75 | $116,935 |
| | 5/11/2007 | 3,200 | $23.02 | $73,664 |
| | 5/11/2007 | 1,952 | $22.65 | $44,213 |
| | 5/11/2007 | 1,200 | $22.70 | $27,240 |
| | 5/11/2007 | 1,200 | $22.68 | $27,216 |
| | 5/11/2007 | 1,000 | $23.12 | $23,120 |
| | 5/11/2007 | 1,000 | $23.03 | $23,030 |
| | 5/11/2007 | 800 | $23.00 | $18,400 |
| | 5/11/2007 | 600 | $23.05 | $13,830 |
| | 5/11/2007 | 600 | $22.91 | $13,746 |
| | 5/11/2007 | 600 | $22.80 | $13,680 |
| | 5/11/2007 | 400 | $23.15 | $9,260 |
| | 5/11/2007 | 400 | $22.95 | $9,180 |
| | 5/11/2007 | 400 | $22.91 | $9,164 |
| | 5/11/2007 | 400 | $22.90 | $9,160 |
| | 5/11/2007 | 400 | $22.71 | $9,084 |
| | 5/11/2007 | 400 | $22.67 | $9,068 |
| | 5/11/2007 | 400 | $22.78 | $9,112 |
| | 5/11/2007 | 260 | $22.69 | $5,899 |
| | 5/11/2007 | 248 | $22.82 | $5,659 |
| | 5/11/2007 | 200 | $22.94 | $4,588 |
| | 5/11/2007 | 200 | $22.73 | $4,546 |
| | 5/11/2007 | 200 | $22.75 | $4,550 |
| | 5/11/2007 | 200 | $22.72 | $4,544 |
| | 5/11/2007 | 200 | $22.78 | $4,556 |
| | 5/11/2007 | 200 | $22.80 | $4,560 |
| | 5/14/2007 | 3,696 | $22.66 | $83,751 |
| | 5/14/2007 | 800 | $22.65 | $18,120 |
| | 5/15/2007 | 15,400 | $22.50 | $346,500 |
| | 5/17/2007 | 17,504 | $22.50 | $393,840 |
| | 5/17/2007 | 6,400 | $22.51 | $144,064 |

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
|         | 5/17/2007 | 4,000 | $22.52 | $90,080 |
|         | 5/17/2007 | 1,200 | $22.55 | $27,060 |
|         | 5/17/2007 | 200 | $22.60 | $4,520 |
|         | 8/7/2007 | 600 | $32.00 | $19,200 |
|         | 8/8/2007 | 49,400 | $32.84 | $1,622,296 |
|         | 8/29/2007 | 23,900 | $39.04 | $933,056 |
|         | 9/4/2007 | 25,400 | $39.00 | $990,600 |
|         | 9/12/2007 | 700 | $39.00 | $27,300 |
|         | 9/13/2007 | 25,000 | $39.03 | $975,750 |
|         |      | 225,000 |       | $6,833,238 |
|         |      |        |       |          |
|         |      | **657,946** |       | **$19,443,233** |

### Loss Causation/Economic Loss

46.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Flotek common stock and operated as a fraud or deceit on Class Period purchasers of Flotek common stock by failing to disclose the material adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Flotek common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Flotek common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

47.     By failing to disclose and misrepresenting the material information detailed herein, among other things, defendants presented a misleading picture of Flotek's business and prospects. Defendants' false and misleading statements had the intended effect and caused Flotek common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $53.49 per share on October 29, 2007.

48.     As a direct result of information disclosed on October 31, 2007 and January 23, 2008, the price of Flotek common stock fell precipitously, falling from $50.80 per share on October 31, 2007 to $17.86 per share on January 24, 2008 – a decline of 65%. These drops removed the inflation

from the price of Flotek common stock, causing real economic loss to investors who had purchased Flotek common stock during the Class Period.

49.    The 65% decline in the price of Flotek common stock after these disclosures came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of the price decline in Flotek common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Flotek common stock and the subsequent significant decline in the value of Flotek common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

50.    At all relevant times, the market for Flotek common stock was an efficient market for the following reasons, among others:

(a)    Flotek common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Flotek filed periodic public reports with the SEC and the NYSE;

(c)    Flotek regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Flotek was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

51.     As a result of the foregoing, the market for Flotek common stock promptly digested current information regarding Flotek from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Flotek common stock during the Class Period suffered similar injury through their purchase of Flotek common stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

52.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Flotek who knew that those statements were false when made.

- 23 -

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

53.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.    During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

56.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Flotek common stock.  Plaintiff and the Class would not have purchased Flotek common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

57.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Flotek common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of Flotek within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Flotek, and their ownership of Flotek stock, the Individual Defendants had the power and authority to cause Flotek to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 7, 2009

SCHWARTZ, JUNELL, GREENBERG &
   OATHOUT, L.L.P.


             /s/ Roger B. Greenberg
             ROGER B. GREENBERG

Roger B. Greenberg
Texas State Bar No. 08390000
Federal ID No. 3932
Thane Tyler Sponsel III
State Bar No. 24056361
Two Houston Center
909 Fannin Street, Suite 2700
Houston, Texas 77010
Telephone:  (713) 752-0017
(713) 752-0327 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone:  770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, Colorado 80203
Telephone: 303/861-1764
303/395-0393 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint and authorized its filing.

2.     Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.     Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
| --- | --- | --- | --- |
| FTK | November 1, 2007 | 400 | $16,400.00 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
| --- | --- | --- | --- |
| FTK | | | |

5.     During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Not applicable

6.     Plaintiff will not accept any payment for serving as a representative party on behalf

of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __7th__ day of __August__, 2009 in ___Lake Zurich___, ___Illinois___.

City                      State

(Signature) X _____