IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID EARL STOCKMAN AND CAROL BURKE, on behalf of themselves and others similarly situated, | § § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. H-09-02526 JUDGE SIM LAKE |
| v. | § § | |
| FLOTEK INDUSTRIES, INC., JERRY D. DUMAS, SR., AND LISA G. MEIER, | § § § | |
| Defendants. | | |

**DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT**

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

NATURE AND STAGE OF PROCEEDINGS ................................................... 3

SUMMARY OF FACTUAL ALLEGATIONS ................................................... 3

      A.    March 13, 2007 Press Release And Conference Call ................................ 4

      B.    May 8, 2007 Press Release And Conference Call ................................... 5

      C.    August 2, 2007 Press Release And Conference Call ............................... 6

      D.    October 31, 2007 Press Release And Conference Call........................... 7

      E.    Flotek's January 23, 2008 Earnings Announcement ................................ 9

      F.    Flotek's Additional Cautionary Statements ........................................... 10

      G.    Plaintiffs' Unparticularized Allegations Of GAAP Violations .............. 11

      H.    Plaintiffs' Deficient "Confidential Source" Allegations........................ 12

ISSUES TO BE RULED UPON AND STANDARD OF REVIEW ......................................... 17

ARGUMENT AND AUTHORITIES ................................................................. 17

  I.    Plaintiffs Have Failed To State A Section 10(b)/Rule 10b-5 Claim................... 17

      A.    Plaintiffs Do Not Allege Particularized Facts Showing A Material False Statement Or Actionable Omission ................................................ 17

      B.    Plaintiffs' Claims Are Barred By The Safe Harbor For Forward-Looking Statements ................................................................. 19

            1.    The PSLRA Establishes A Statutory Safe Harbor ...................... 20

            2.    Flotek's Statements Were Forward-Looking And Were Accompanied By Meaningful Cautionary Language ................. 20

      C.    The Allegations Do Not Support A Strong Inference Of Scienter ......... 21

            1.    Plaintiffs Do Not Allege Dumas Or Meier Knew Their Statements Were False Or Were Severely Reckless................... 23

            2.    The Stock Sale, Certification, And Resignation Allegations Fail ......................................................................... 25

      D.    Plaintiffs' "Confidential Witness" Allegations Are Grossly Deficient................................................................................. 27

      E.    Plaintiffs Fail To Allege Loss Causation ............................................... 29

  II.    Plaintiffs' Control Person Claims Fail Because There Is No Primary Claim...... 30

CONCLUSION.............................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABC Arbitrage v. Tchuruk*,
    291 F.3d 336 (5th Cir. 2002) ....................................................................................19, 27

*Abrams v. Baker Hughes, Inc.*,
    292 F.3d 424 (5th Cir. 2002) ...................................................18, 19, 23, 24, 26

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008)........................................................................................22

*In re Alamosa Holdings, Inc.*,
    382 F. Supp. 2d 832 (N.D. Tex. 2005) ...................................................19, 21

*In re AOL Time Warner, Inc. Secs. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)....................................................................30

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
    _ F.3d _, 2010 WL 481407 (5th Cir. Feb. 12, 2010) ......................................29

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)................................................................................................17

*In re Azurix Corp. Secs. Litig.*,
    198 F. Supp. 2d 862, *aff'd*, 332 F.3d 854 (5th Cir. 2003) (Lake, J.) ................................18

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)........................................................................................17, 22

*In re Bisys Secs. Litig.*,
    496 F. Supp. 2d 384 (S.D.N.Y. 2007)....................................................................23

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..............................................................26

*In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*,
    830 F. Supp. 361 (S.D. Tex. 1993) .........................................................................4

*In re Capstead Mortgage Corp. Sec. Litig.*,
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ...............................................................30

*Catogas v. Cyberonics, Inc.*,
    292 Fed. Appx. 311 (5th Cir. 2008)........................................................................29

*Central Laborers' Pension Fund v. Integrated Electrical Services, Inc.*,
    497 F.3d 546 (5th Cir. 2007) ......................................................................22, 25, 26

*In re Cerner Corp. Secs. Litig.,*
    425 F.3d 1079 (8th Cir. 2005) ............................................................28

*Coates v. Heartland Wireless Communs., Inc.,*
    55 F. Supp. 2d 628 (N.D. Tex. 1999) .............................................18

*Congregation of Ezra Sholom v. Blockbuster, Inc.,*
    504 F. Supp. 2d 151 (N.D. Tex. 2007) .....................................20, 21

*Cordova v. Lehman Bros.,*
    526 F. Supp. 2d 1305 (S.D. Fla. 2007) .........................................22

*Coronel v. Quanta Capital Holdings Ltd.,*
    No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .......................18, 24

*In re Cyberonics Inc. Secs. Litig.,*
    523 F. Supp. 2d 547 (S.D. Tex. 2007) ...........................................22

*In re Downey Secs. Litig.,*
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ...............................29

*In re Dell Inc.,*
    591 F. Supp. 2d 877 (W.D. Tex. 2008)......................................27, 30

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005)..........................................................................29

*In re Enron Corp. Secs., Deriv. & ERISA Litig.,*
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ...........................................26

*Financial Acquisition Partner v. Blackwell,*
    440 F.3d 278 (5th Cir. 2006) .....................................................17, 23

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,*
    565 F.3d 200 (5th Cir. 2009) ...........................................4, 17, 22

*Goldstein v. MCI WorldCom,*
    340 F.3d 238 (5th Cir. 2003) ..........................................................27

*Higginbotham v. Baxter Int'l, Inc.,*
    495 F.3d 753 (7th Cir. 2007) ..........................................................22

*Home Solutions of Am. Inv. Grp. v. Fradella,*
    2008 WL 1744588 (N.D. Tex. Mar. 24, 2008)..........................20, 21

*In re Huntington Bancshares Inc. Secs. Litig.,*
    _ F. Supp. _, 2009 WL 4666455 (S.D. Ohio Dec. 4, 2009)..........18, 24

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ....................................................12, 22, 23, 24, 25, 26, 27, 28

*Johnson v. NYFIX, Inc.*,
    399 F. Supp. 2d 105 (D. Conn. 2005) ......................................................................18, 24

*Kinder v. Acceptance Ins. Cos.*,
    423 F.3d 899 (8th Cir. 2005) ....................................................................................18, 24

*Kunzweiler v. Zero.net, Inc.*,
    No. 3:00-CV-2553-P, 2002 U.S. Dist. LEXIS 12080 (N.D. Tex. July 3, 2002) ..............17

*Lormand v. U.S. Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ..........................................................................................29

*In re Michaels Stores, Inc. Sec. Litig.*,
    No. 3:03-cv-0246, 2004 WL 2851782 (N.D. Tex. Dec. 10, 2004)............................20, 26

*Millcreek Assocs., L.P. v. Bear, Stearns & Co.*,
    205 F. Supp. 2d 664 (W.D. Tex. 2002)..............................................................................4

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2003) ............................................................................17, 18, 26

*In re Odyssey Healthcare, Inc. Secs. Litig.*,
    424 F. Supp. 2d 880 (N.D. Tex. 2005) ..............................................................20, 21, 23

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*,
    No. Civ. A. H-06-3022, 2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ..........................18

*In re Patterson Companies, Inc. Secs., Deriv. & ERISA Litig.*,
    479 F. Supp. 2d 1014 (D. Minn. 2007)............................................................................18

*Pollio v. MF Global, Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009)..............................................................................22

*R2 Invs., LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ....................................................................................17, 21

*In re Rackable Sys., Inc. Secs. Litig.*,
    No. C 09-0222 CW, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010)..............................19, 24

*In re Rhodia S.A. Secs. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007)..............................................................................30

*Rodriguez-Ortiz v. Margo Caribe, Inc.*,
    490 F.3d 92 (1st Cir. 2007)..............................................................................................22

iii

*Schiller v. Physicians Res. Group, Inc.*,
    No. 3:97-CV-3158-L, 2002 U.S. Dist. LEXIS 3240 (N.D. Tex. Feb. 26, 2002),
    *aff'd*, 2003 U.S. App. LEXIS 18021 (5th Cir. Aug. 29, 2003) ..........................................17

*In re Sec. Litig. BMC Software*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) .......................................................................19, 24

*Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..................................................................18, 20, 21, 23, 26

*Stark Trading v. Falconbridge Ltd.*,
    No. 05-C-1167, 2008 U.S. Dist. LEXIS 2677 (E.D. Wisc. Jan. 14, 2008)........................22

*Taubenfeld v. Hotels.com*,
    385 F. Supp. 2d 587 (N.D. Tex. 2004) ....................................................................20, 21

*Weiss v. Amkor Technology, Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) ...........................................................................22

*Winters v. Stemberg*,
    529 F. Supp. 2d 237 (D. Mass. 2008) .........................................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
    445 F. Supp. 2d 1201 (D. Or. 2006), *aff'd*, 552 F.3d 981 (9th Cir. 2009).......18, 24, 26, 28

## RULES AND STATUTES

15 U.S.C. § 78u-4(b)(1) .........................................................................................27

15 U.S.C. § 78u-4(b)(1)(B) .....................................................................................17

15 U.S.C. §  78u-4(b)(2) .........................................................................................17

15 U.S.C. § 78u-4(b)(3) ..........................................................................................17

15 U.S.C. § 78u-5(c)(1)(A) ......................................................................................20

15 U.S.C. § 78u5-(c)(1)(B) ......................................................................................21

Fed. R. Civ. P. 8(b), 9(b) and 12(b)(6) ....................................................................1, 17

SEC Rule 10b-5 ................................................................................................1, 18, 22

## <u>DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT</u>

Defendants Flotek Industries, Inc. ("Flotek"), Jerry D. Dumas, Sr. ("Dumas"), and Lisa G. Meier ("Meier") (collectively, "Defendants") move to dismiss the First Amended Class Action Complaint for Violations of Federal Securities Laws (the "Amended Complaint") under Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

This is a groundless securities fraud case based on a 1.25% shortfall in actual versus expected year-end revenue for 2007 that fails to satisfy the rigorous pleading requirements of the PSLRA.[1]  Flotek is a Houston-based company that supplies drilling and production-related products and services to the energy and mining industries.  *See* Amended Complaint ¶ 26.  On October 31, 2007, and January 23, 2008, Flotek announced earnings that, while reflecting a robust 44.5% increase from 2006, fell short of expectations and were followed by declines in Flotek's stock price.  More than eighteen months later, Plaintiff David Earl Stockman filed suit, seeking to alchemize Flotek's lower-than-expected earnings into a Rule 10b-5 fraud claim.[2]

Plaintiffs' Amended Complaint consists entirely of unparticularized "missed guidance" and "fraud by hindsight" claims that violate the PSLRA in virtually every respect.  Plaintiffs do not and cannot allege that Flotek – which went through a full outside Sarbanes-Oxley audit in 2007 that did not reveal any material internal control deficiencies during the time period at issue in this case –had to restate ***any*** historical financial results from the alleged class period.  Because of the PSLRA's safe harbor for forward-looking statements, missed guidance is one of the most difficult theories on which to predicate a securities fraud claim.  To survive dismissal under the

---

[1] Flotek predicted total revenue of $160 million for fiscal year 2007 and realized actual revenue of $158 million.

[2] The Lead Plaintiffs are two individuals: Mr. Stockman and Carol Burke ("Plaintiffs").

PSLRA, Plaintiffs must show that the cautionary language was insufficient – which they cannot – and that Defendants' guidance statements were knowingly false when made.

Plaintiffs cannot meet these strict requirements. Given that Flotek only missed its year-end revenue target by 1.25%, it can hardly be said that Flotek knew there was no factual basis for its earnings guidance. In fact, Flotek had its ***best month ever*** in October 2007, the first month of the fourth quarter. The October performance immediately preceded Flotek's guidance announcement on October 31, 2007, and Flotek only needed to earn $0.03 per share higher in the fourth quarter than during the third quarter ($0.29 versus $0.26) to meet its $1.00 per share target for the year. Flotek had experienced similar third-to-fourth quarter earnings increases during 2005 and 2006. There is simply no basis for Plaintiffs' contention that Flotek knew it could not achieve guidance. Plaintiffs further ignore Flotek's numerous cautionary statements that its results could be affected, and in fact were continuously being affected, by weather, gas prices, and other variables. Flotek also repeatedly disclosed to investors that it faced significant challenges integrating companies it had recently acquired and was incurring significant audit-related expenses. Plaintiffs fail to identify a single actionable misstatement or omission.

Plaintiffs likewise cannot satisfy the PSLRA's stringent scienter requirement. The Amended Complaint supplies nothing to substantiate Plaintiffs' claims aside from the alleged testimony of four "confidential witnesses." The witness relied on most extensively is a former "human resources" director who ***was not even at the Company at the time of the alleged March-August 2007 misstatements***, admittedly has no personal knowledge or involvement regarding Flotek's earnings guidance, and simply recites vague hearsay statements from other individuals. Plaintiffs' "stock sale" allegations are likewise insufficient to demonstrate scienter, particularly given that the individual defendants ***retained*** the vast majority of their Flotek stock.

Plaintiffs' claims also fail for lack of loss causation. The only "corrective disclosures" alleged here are the press releases and conference call transcripts on October 31, 2007 and January 23, 2008. None of those disclosures, however, reveals that Plaintiffs' prior statements were false. There is also no loss causation, falsity, or scienter for Plaintiffs' allegations regarding the "integration" of acquired companies and Flotek's alleged inaccurate accounting for inventory. Indeed, most of those allegations involve events occurring long after the alleged class period and which had nothing to do with the stock declines at issue.

Accordingly, Plaintiffs' Amended Complaint should be dismissed in its entirety.

## NATURE AND STAGE OF PROCEEDINGS

After the Court selected Plaintiffs as Lead Plaintiffs on December 21, 2009, Plaintiffs filed their Amended Complaint on February 4, 2010, to which this Motion is directed.

## SUMMARY OF FACTUAL ALLEGATIONS

Plaintiffs assert that Flotek made false statements and omissions in four sets of press releases and analyst calls between March 13 and October 31, 2007. *See* Amended Complaint ¶¶ 41-60. The two individual Defendants are Jerry D. Dumas, Sr., who served as Chief Executive Officer of Flotek from September 1998 until his retirement in 2009 and as Chairman from 1998 until Flotek's 2010 annual stockholders meeting; and Lisa G. Meier, who served as Chief Financial Officer of Flotek from April 2004 until August 2008 and Vice President from January 2005 until August 2008. *See id.* ¶¶ 27-28. The alleged misstatements and omissions fall into three broad categories: (i) earnings guidance; (ii) alleged false statements and omissions regarding the integration of acquired companies; and (iii) alleged false inventory accounting.

3

## A.   March 13, 2007 Press Release And Conference Call[3]

Plaintiffs first cite a March 13, 2007 press release and analyst call regarding Flotek's year-end 2006 financial results.  *See* Amended Complaint ¶¶ 41-42; Ex. A & B.  Far from containing any fraudulent statement or omission, the March 13 disclosures cautioned investors that Flotek: (i) would need to spend significant efforts integrating companies it had acquired in recent years; (ii) underwent an "exorbitant" audit process in 2006 due to the first year of Sarbanes-Oxley compliance; (iii) would not raise per share earnings guidance above $1 per share for fiscal year 2007 despite being asked by one analyst whether the Company should raise its guidance[4]; and (iv) could not "give guidance" regarding its "margins" because Flotek had "a lot of acquisitions that we're integrating."  Ex. B at 1, 3, 8,

These measured, conservative statements are not remotely fraudulent.  There is nothing resembling a particularized allegation that Flotek could not reasonably estimate annual per-share earnings guidance of $1 per share at that point.  With respect to administrative costs, Defendant Lisa Meier responded only that "[w]e ***hope*** that we will be able to leverage off of our year one compliance work and reduce the amount of work that needs to be done next year."  *Id.* ¶ 42.

---

[3] A district court may consider documents referenced in the complaint and SEC filings in considering a motion to dismiss.  *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 209 (5th Cir. 2009) (court may consider "documents incorporated in the complaint by reference, and matters subject to judicial notice"); *Millcreek Assocs., L.P. v. Bear, Stearns & Co.*, 205 F. Supp. 2d 664, 680 (W.D. Tex. 2002) (court may consider "complete copies" of documents referenced in complaint); *In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*, 830 F. Supp. 361, 367 n. 2 (S.D. Tex. 1993) (court may take judicial notice of SEC filings).  Because there are no official transcripts of the March, May, and August conference calls, Flotek is providing the Court with the audio transcripts as well as written transcripts prepared by a paralegal.  There appear to be several transcription errors in the excerpts cited in Plaintiffs' motion.  In addition, Flotek did not undertake "72 acquisitions" as repeatedly alleged by Plaintiffs.  Plaintiffs appear to be relying on an inadvertent reading error during the March 2007 conference call.  The first page of Flotek's March 16, 2007 Form 10-K expressly sets forth the ten acquisitions Flotek undertook between 2002 and 2007.  Plaintiffs do not allege this list is fraudulent in any respect, nor could they.  Finally, unless otherwise specified, page cites for exhibits are to the page number in the pdf file, not the number in the filing itself.

[4] Flotek gave guidance of $2 per share, which translates to $1 per share after the company's 2-for-1 stock split on June 19, 2007.  *See* Amended Complaint ¶ 50.

**B.     May 8, 2007 Press Release And May 9, 2007 Conference Call**

Plaintiffs next assert that Defendants made false statements in Flotek's May 8, 2007 press release and May 9, 2007 conference call announcing financial results for the first quarter of 2007.  *See* Amended Complaint ¶¶ 45-46 and Ex. C-D.  Plaintiffs claim the May 8 disclosures falsely stated that: (i) Flotek was "actively integrating Triumph Drilling Tools (which Flotek acquired in January 2007) into our existing drilling tool segment and have begun the process of rolling out Rental Tool Management Software (RTMS)[5] to better utilize our extensive inventory of rental tools"; (ii) "Our business operations and prospects for future revenue remain strong and we have not seen a slow down in any of our three operating segments exclusive of the weather that just delayed some of our activities; (iii) "[W]e project the company will generate revenues of $160 million and diluted earnings per share of [$1.00]"; and (iv) "We only have two months of experience and we're making a lot of adjustments right now so we anticipate a significant increase in [the run rate for CAVO, a company Flotek recently acquired]."  *Id.*

The Amended Complaint again fails to plead facts showing falsity or fraud.  The press release and conference call expressly disclosed that "[s]evere weather in the Mid-Continent and Rocky Mountains adversely affected activity levels and resulted in the delay of approximately $2.0 million of specialty chemical and artificial lift revenues," and that Flotek experienced a significant increase in administrative costs.  Ex. C at 1-3.  Plaintiffs also fail to identify any corrective disclosure regarding the alleged non-integration of Triumph or the CAVO run rate, which Flotek made clear was based on only "two months of experience."  Ex. D at 6.

---

[5] As its name implies, RTMS is a system for managing rental tools.  It is ***not*** a sales forecasting system, nor does it have any application to Flotek's chemical business.

5

### C.   August 2, 2007 Press Release And August 3, 2007 Conference Call

Plaintiffs next assert that Flotek made false statements when it disclosed second quarter results in a press release and conference call on August 2 and 3, 2007.  *See* Amended Complaint ¶¶ 51-52.   Plaintiffs claim the August 2-3 disclosures falsely stated that: (i) "our business operation prospects for future revenue remain strong and we have not seen a reduction in demand for our products"; (ii) "we hold our earnings guidance of $1 [per] diluted share"; (iii) "[t]he integration of Triumph into Flotek has been very successful.  We have leveraged off their expertise to help to roll out our RTMS to our drilling locations this year which we will further increase the utilization of our expansive tool industry"; and (iv) "I think we'll maintain SG&A costs at the level they're running.  We've got the internal controls audit work running smoothly, we've got the annual audit work running smoothly.  Last year, professional fees were probably the most significant variable so I think we've got a good handle on those."  *Id.*

Once again, Plaintiffs plead no particularized facts showing that any of these statements were false, let alone intentionally or recklessly so.  The company's historical financial results for the second quarter, which Plaintiffs do not contend are false, confirm that demand for Flotek's products did indeed remain strong and support the inference that Flotek's $1/share guidance was attainable.  Plaintiffs again plead no facts showing falsity or loss causation regarding Triumph.

Flotek also expressly disclosed that its major customers "definitely had a slowdown," that the weekly run rate in July "was not good," and that revenue from these postponed jobs was "*hopefully delayed rather than lost*."  *Id.* ¶ 52; Ex. F at 13.  Meier's statements regarding future earnings were similarly qualified, stating that "[s]hould a few of those factors *turn to our favor*, I think we will be pleasantly surprised.  Should the year *maintain where it is*, we are confident that we will meet our original expectations . . . ."  Amended Complaint ¶ 52.  Meier's statement

6

regarding professional fees was borne out by the fact that professional fees *declined* in the third quarter. Ex. G at 2 (noting "slight decrease in professional fees" during third quarter).

### D.      October 31, 2007 Press Release And November 1, 2007 Conference Call

Plaintiffs next assert Flotek made false statements and omissions in its October 31, 2007 press release and November 1, 2007 conference call announcing third quarter results.  *See* Amended Complaint ¶¶ 56-60.  While describing Flotek's performance as "disappointing,"[6] Plaintiffs nonetheless assert that the October 31 disclosures fraudulently overstated Flotek's financial outlook by: (i) reiterating "guidance of $1.00 per share," which would require Flotek to earn $0.29 per share during the fourth quarter (it had already earned $0.71/share through three quarters); (ii) stating that "[o]ur business operations and prospects for future revenue remain strong"; (iii) stating that "there seems to be a movement back to doing more fracing[7] plus we are being able to get more people to utilize the product than the ones we have before"; and (iv) in response to a question about the integration of companies that Flotek had acquired, stating that "we are going to continue to work on it.  I hope that we will see and I think we will see an improvement in the fourth quarter over the third quarter."  *Id.*

Plaintiffs once again fail to identify a single false statement or material omission.  Given that Flotek earned $0.26 per share during the third quarter in spite of the challenges and delays it faced during that quarter, it can hardly be said Flotek had no reasonable basis for anticipating earnings of $0.29 per share during the fourth quarter.  *Id.* ¶ 56.  During the fourth quarters of 2005, and 2006, for example, Flotek experienced similar earnings-per-share increases from the

---

[6] Notably, while the stock price declined following this announcement, Flotek did not "miss" guidance during the third quarter.  Flotek did not give quarterly guidance or guidance regarding its expected profit margins.

[7] "Fracing," or "fracturing," refers to the use of pressurized fluids to stimulate production from oil and gas wells by creating fractures that allow oil and gas to travel more easily from the rock pores to the production well.

third quarters of those years. *See* Ex. A at 1, Ex. P at 5 of pdf (showing increases of $0.37 to $0.41 per share from third to fourth quarter 2006 and $0.21 to $0.27 per share in 2005). Flotek also experienced a 30% full-year increase in diluted earnings per share from 2005 to 2006, again making it hardly unreasonable to anticipate a similar increase in 2007. Ex. A at 1.

Moreover, Plaintiffs do not and cannot dispute that Flotek had "a record month in October," the month immediately preceding the October 31, 2007 guidance. *Id.* ¶ 58. With one-third of the fourth quarter completed, Flotek was well on its way to achieving its guidance.

Flotek's October 31 disclosures also included numerous cautionary statements and qualifiers. When asked whether the positive October trend would continue, Dumas stated that "I am certainly ***hopeful*** and right now it appears that we are still moving forward, so we could have about a $2 million increase in sales in the chemical or more in the fourth quarter." *Id.* ¶ 58 (emphasis added). Likewise, when asked about the integration of Flotek's previously acquired companies, Dumas stated only that "we are going to continue to work on it. I hope that we will see and I think we will see an improvement in the fourth quarter over the third quarter." *Id.* Dumas also cautioned that "[o]ur G&A is quite expensive," that Flotek would be "spending everything we can get our hands on to make certain that we fulfill our obligations under the Sarbanes-Oxley requirement. And that I don't want to talk about any further because, it's a very expensive issue, but it is a law and we are going to fulfill our responsibilities in that regard," and that he and Meier could only make a "guesstimate" regarding Sarbanes-Oxley expenses. Ex. H at 6. Dumas also candidly opined that there had been "some irrational exuberance" in the marketplace about the price of Flotek stock, and that the $50-$55 peak price during the third quarter was "pretty rich." *Id.* ¶ 60; Ex. H at 10-11. This is ***precisely the opposite*** of what one would expect an executive to say if he were trying to inflate the stock price.

8

Finally, Plaintiffs appear to allege that Dumas's November 1, 2007 statement that Flotek's customers began experiencing a temporary "pause" in activities was somehow inconsistent with his statements during the August 2 call. *Id.* ¶ 58. This allegation has no merit whatsoever. Dumas expressly and repeatedly stated during the August 3 call that inclement weather had "shut down driving activity and it certainly delayed dramatically the amount of truck activity that was going on" in Texas and Oklahoma," that "[w]e definitely had a slowdown," that "[w]e actually had about a six-week period of time when two-thirds of the activity was closed down," that Flotek had "determined by talking to those customers [in the mid-continent region] that they have a ten week backlog of frac jobs," and that the weekly run rate in July "was not good." *Id.* ¶ 52; Ex. F at 4. Dumas further disclosed on August 3 that these delays had reduced Flotek's second quarter earnings by $3-4 million, and that the delayed revenue from these delayed jobs was "***hopefully delayed rather than lost***." Ex. F at 13. Dumas's statements on August 2-3 are entirely consistent with his statements on November 1.

### E.    Flotek's January 23, 2008 Earnings Announcement

On January 23, 2008, Flotek preliminarily reported revenue for 2007 of approximately $158 million (compared to an estimated $160 million) and earnings of $0.88 to $0.92 per diluted share (compared to an estimated $1.00 per diluted share). Amended Complaint ¶¶ 63-66. The shortfall was attributed to "a general slowdown in North American fracturing activity and drilling activity, accompanied by weather disruptions in the mid-continent region." *Id.* ¶ 63. Flotek also reported that "general and administrative expenses are expected to be approximately 30% higher in the fourth quarter of 2007 than in the third quarter of 2007, related to increases for completing Sarbanes-Oxley initiatives, computing systems upgrades/conversions, and final implementation of the RTMS (rental tool management system)." *Id.*

While Flotek fell short of guidance, the January 23, 2008 earnings release and conference call fail to show that any of Flotek's prior statements were false.  Plaintiffs plead no facts showing that Dumas or Meier knew on October 31, 2007, that Flotek could not meet its guidance (nor could it given that October was a record month), nor do they plead any facts showing that Dumas or Meier knew on October 31 that G&A expenses would be 30% higher during the fourth quarter.  Dumas specifically warned on October 31 that G&A would be "quite expensive," that Flotek would be "spending everything we can get our hands on" to comply with Sarbanes-Oxley, and that Flotek could only offer a "guesstimate" of such costs.  Notably, Flotek subsequently reported in its 2007 Form 10-K on March 19, 2008, that its outside auditors found **no internal control weaknesses** at year-end 2007.  *See* Ex. K, p. 38 of pdf (concluding Flotek "maintained, in all material respects, effective internal control over financial reporting. . . .").

### F.      Flotek's Additional Cautionary Statements

In addition to the numerous specific qualifying and cautionary statements described above, each of Flotek's press releases and conference call transcripts also incorporated by reference the risk disclosures in Flotek's SEC filings.  One of these filings, Flotek's March 16, 2007 Form 10-K, contained more than six pages of detailed risk disclosures and specifically warned investors that Flotek "might not be successful in integrating our acquisitions into our existing operations," that "integrating acquired business into our business" could be "expensive and time-consuming," that "[t]he markets for oil and natural gas have historically been extremely volatile," that demand from Flotek's customers could be adversely affected by oil and gas prices and "[t]he volatility of the oil and gas industry," that Flotek faced significant competitive pressure, that "[s]evere weather could have a material adverse impact on our business," and that Flotek had identified material weaknesses in its internal controls during fiscal year 2006.  Ex. L at 8-14 and 35 of pdf.  Flotek also stated that Flotek's historical financial information "is not

necessarily indicative of the results that we would have achieved had we operated the companies we recently acquired under a fully integrated corporate structure," thus making clear to investors that Flotek had *not* fully integrated the companies it had acquired.  *Id.* at 9 of pdf.

In addition, each of Flotek's press releases cautioned that "actual results and outcomes may differ materially from the results and outcomes discussed in the forward-looking statements," and that actual results could be affected by factors including "demand for oil and natural gas drilling services . . ., competition, obsolescence of products and services," and other factors disclosed in Flotek's SEC filings.  Flotek also warned at the beginning of each analyst call that "[o]ur actual results may differ materially" from Flotek's forward-looking projections "as a result of factors that are outlined in our filings with the SEC."

### G.    Plaintiffs' Unparticularized Allegations Of GAAP Violations

Plaintiffs also include an unparticularized allegation that Flotek "improperly accounted for its inventory valuation" during the first three quarters of 2007 and overstated its "net inventory" by "hundreds of thousands of dollars" during that time.  *See* Amended Complaint ¶¶ 80-82.  This claim is predicated entirely on the allegations of three so-called "confidential witnesses" who uniformly fail to identify any specific instance during the alleged class period where Flotek incorrectly valued inventory on its financial statements, let alone any particularized allegation of which or how much inventory was fraudulently overvalued or any communication where Dumas or Meier were informed that Flotek's reported inventory numbers were false.  *See id.* ¶¶ 49, 55.  Notably, despite undergoing a full-bore outside audit during 2007, Flotek was not required to restate any of its financial results or report any material weaknesses for that year.

Plaintiffs also note that Flotek's "slow-moving and obsolescence reserve increased during the fourth quarter of 2007 from approximately 8% to 10% of gross inventories.  Amended Complaint ¶¶ 81-82.  The mere fact Flotek increased its reserve does not demonstrate fraud,

11

particularly given the absence of any allegation that Flotek was required to restate its net inventory and the absence of any particularized confidential witness allegation showing that this increase resulted from fraud.[8]  Indeed, Flotek made clear in its March 16, 2007 Form 10-K that the reserve "would be reviewed for adequacy on a periodic basis."  Ex. L at 21 of pdf.

### H.    Plaintiffs' Deficient "Confidential Source" Allegations

Despite the Fifth Circuit's recent holding that "courts must discount allegations from confidential sources" and that "[s]uch sources afford no basis for drawing the plausible competing inferences [of scienter] required by *Tellabs*,"[9] Plaintiffs nonetheless rest virtually their entire case on the allegations of four anonymous "confidential witnesses."

The first confidential witness ("**CW1**") is described as a "former Corporate Human Resources Director who worked for Flotek between August 20, 2007 through May of 2009." Amended Complaint ¶ 49(a).  CW1 is not alleged to have any involvement in or knowledge of the preparation or estimation of Flotek's earnings guidance and did not even arrive at the company until nearly three weeks after Flotek's August 2, 2007 earnings call.  *Id.*  Instead, the guidance-related allegations attributed to CW1 consist entirely of alleged vague hearsay remarks by other members of Flotek management that Dumas "had a habit" of overstating financial projections, that senior management sometimes disagreed with Dumas regarding performance estimates, and that Defendant Meier made a vague remark to him in September 2007 that "we really have to do something about Jerry" (which supposedly related to Dumas's conversations

---

[8] Flotek continuously reviewed and adjusted its reserve throughout the alleged class period, from 4.5% as of December 31, 2006, to 6.8% as of March 31, 2007, to 7.8% as of June 30, 2007, to 8% on September 30, 2007, and expressly disclosed these increases to investors.  *See* Ex. M, p. 9 of pdf; Ex. N, p. 9 of pdf  Ex. O, p. 9 of pdf.  There are many innocent reasons a company may decide to increase reserves.  Inventory can be usable one year and become obsolete the next.  Plaintiffs also ignore that while the inventory reserve increased during the fourth quarter, gross inventories also increased and cancelled out most of the reserve increase.  *Compare* Ex. K, p. 52 of pdf *with* Ex. N, p. 9 of pdf.

[9] *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535-36 (5th Cir. 2008).

with analysts).  *Id.* ¶¶ 49(a)(i)-(iv) and 55(a)(i)).  Plaintiffs offers no insight as to which specific projections were incorrect, let alone what was specifically wrong with them.

CW1 also allegedly stated that Dumas committed fraud because he "projected revenues and profit margin that were better than the acquired companies had ever achieved."  *Id.* ¶ 49(b)(1).  Leaving aside the complete lack of particularity as to the specific acquisitions and projections being described and CW1's admitted lack of personal knowledge regarding these issues, it is hardly remarkable Dumas would expect improved results from acquired companies. Most companies make acquisitions with the expectations that they can achieve better performance.  Moreover, Flotek's actual financial results through the first three quarters of 2007 reflected a pattern of increased quarterly earnings growth that bore out Dumas's expectations.

CW1 also allegedly opined that Flotek did not have a "uniform accounting or forecasting system for the newly acquired companies." *Id.* ¶ 49(b)(ii).  Not only is this allegation completely devoid of any specificity regarding which acquired companies are being described, but Flotek *did not represent* during the alleged class period that all of its newly acquired companies had a "uniform accounting or forecasting" system.[10]

Plaintiffs' next alleged source, **CW2**, is described as a "Fixed Asset Accountant who worked for the Company from July 2008 through February 2009."  Amended Complaint ¶ 49(b)(iv).  CW2 thus did not join Flotek until long after any of the alleged false statements were made and has no personal knowledge regarding those statements.  The sum total of the "integration" allegations attributed to CW2 are that he "saw no indication of an integrated,

---

[10] *See, e.g.,* Ex. L, p. 9 of pdf (stating that Flotek's historical financial information "is not necessarily indicative of the results that we would have achieved had we operated the companies we recently acquired under a fully integrated corporate structure," thus making clear that Flotek had *not* fully integrated the companies it had acquired); Amended Complaint ¶¶ 41-42 and Ex. B, pp. 7-8 (refusing to provide guidance regarding margins because Flotek had not fully integrated acquired companies).

uniform accounting or other management/computer system" at Flotek.  *Id.*  Again, however, Flotek never represented it had such a system during the alleged class period.  CW2 also makes a curious allegation that Flotek somehow committed fraud because the people he worked with "used whatever they sold the last year and maybe adjusted that as things changed" to generate sales forecasts, which sounds like a perfectly reasonable way to make projections.  *Id.* ¶ 49(b)(v).

CW2 also allegedly stated that during 2008, he observed "large volumes of old, rusting and otherwise unusable tools which were scheduled to sit on Flotek's books for as many as seven years as usable assets being depreciated."  *Id.* ¶ 49(c)(i)-(viii).  Yet there are no particularized allegations regarding what percentage of tools were "unusable," when they became unusable, or the level of knowledge Dumas and Meier had about these alleged problems in 2007.  Just because a tool appears to be "old," "rusting," or presently unusable to CW2 in 2008 does not mean the tool is in fact unusable or that it must be immediately written off in 2008, let alone in 2007.  It is also meaningless to allege that a witness observed "large volumes of junk inventory" without particularized allegations of what percentage of Flotek's total recorded inventory was junk, given that Flotek maintained a significant reserve for obsolete inventory, and given that drilling and production services companies frequently maintain "junk piles" at toolyards (as it is often more economical to store "junk" onsite than to transport it elsewhere for disposal).

CW2 also admitted that he "left the Company before [he] completed the [inventory] counts and therefore never had the opportunity to reconcile findings from the counts to determine the amounts of assets being carried on Flotek's books for the last several years, which should have been written off."  *Id.* ¶ 49(b)(vii).  CW2 thus professes to have no knowledge whether the increases in Flotek's obsolete inventory reserves ***during 2007*** resulted from fraud and does not tie his allegations regarding "fixed assets" in 2008 (which is a ***different accounting category***

*than inventory and has nothing to do with the obsolete inventory reserve*)[11] to the alleged false disclosures regarding inventory reserves and guidance in 2007 that preceded the alleged October 31, 2007, and January 23, 2008 corrective disclosures and stock price declines.

The third alleged source, **CW3**, is described as "Flotek's IT Director and Senior Architect from April 2008 to June 2009."  *Id.* ¶ 49(b)(iv)-(viii).  All of the allegations attributed to CW3 relate to alleged integration, IT, and inventory issues during 2008.  *See id.*  Like CW2, however, CW3 was not even at Flotek during the time of the alleged misstatements, has no knowledge regarding whether the increase in Flotek's inventory reserve during 2007 resulted from fraud, and offers nothing resembling a particularized allegation that Dumas or Meier knew in 2007 that Flotek's reserve was inadequate or that Dumas and Meier made any false statements.  Many of the CW3 allegations relate to companies that Flotek did not even acquire until late 2007 or 2008, including CAVO and Teledrift.[12]  *See id.* ¶¶ 49(b)(x)-(xiv).  While CW3 claims that Flotek's new RTMS system was "inadequate," Flotek never represented that RTMS was fully operational in May, August, or October 2007, stating only that Flotek "ha[s] begun the process of rolling out" RTMS during the May 8 call and that "we are going to continue to work on it" in response to a question about RTMS during the October 31 call.  *See id.* ¶ 59.

Moreover, CW3 admits numerous facts that undercut Plaintiffs' allegations.  For example, CW3 asserts that Flotek paid "hundreds of thousands of dollars to consultants" prior to

---

[11] *See* Ex. K, pp. 23, 52-53 of pdf (explaining difference between "inventories" and "property, plant, and equipment").  Machinery, equipment, and rental tools are not "inventory" and have no bearing on the "obsolete inventory" reserve.  *See id.* p.4 53 (counting "machinery, equipment, and rental tools" under property, plant, and equipment.  Most, if not all, of the allegations by CW2, CW3, and CW4 describe machinery, equipment, and rental tools, not inventory (which is generally limited to drill bits).

[12] Flotek did not acquire Teledrift until February 2008, did not complete the acquisition of CAVO until November 2007, and did not include CAVO's assets on its balance sheet until after November 1, 2007.  The allegation that the prior owner of CAVO misrepresented the value of its assets to Flotek does not show that Flotek itself made misrepresentations and, in any event, is wholly devoid of particularity.  *See* Amended Complaint ¶ 49(c)(ix)-(x).

her arrival in an effort to improve integration.  *Id.* ¶ 49(b)(v).  CW3 also describes an "inventory accounting performed in early 2007," a "2007 count" performed "at all of Flotek's divisions in all yards in an attempt to reconcile Flotek's overall actual inventory with the RTMS," and various on-site visits by Dumas and Meier (who wanted to "get it cleaned up").  *Id.* ¶ 49(b)(viii), (xiv) (stating that Meier and Dumas wanted to "get integrated" during 2007).  These allegations confirm Flotek made significant attempts to improve integration and count its inventory.

Plaintiffs' last alleged source, **CW4**, is described as a "Regional Manager" of Triumph from April 1, 2004 until some undisclosed time after Flotek acquired it.  *Id.* ¶ 49(b)(xx).  While Plaintiffs baldly allege "there was no integration in 2007," CW4 acknowledged that "an inventory accounting was conducted at Triumph in October 2006 for the acquisition," that "there was inventory counting in 2007 and 2008," and that "[i]n mid 2007, the Triumph Oklahoma City yard was consolidated into the yard in Chickasha, Oklahoma."  *Id.* ¶ 49(c)(xiii).  Plaintiffs thus admit that Flotek did take steps to integrate Triumph in 2007 and assess its inventory.  CW4 also alleges that management at two Flotek businesses had disagreements with the president of Flotek's downhole tools division over financial projections and thought fourth quarter expectations were too high, but offers no particularity regarding when management had these concerns, what specific communications occurred, whether any concerns were voiced to Dumas or Meier, or what impact (if any) these alleged concerns had on Flotek's company-wide guidance, of which downhole tools is only one segment.[13]  *Id.* ¶ 55(d).

---

[13] The allegation by CW4 that the fourth quarter was "'notorious' for being slower due to weather" is also contradicted by Flotek's pattern of improved earnings during the fourth quarters of 2005 and 2006, thus further undermining any inference of CW4's reliability.  *See* Ex. A at 1, Ex. P at 5 of pdf.

## ISSUES TO BE RULED UPON AND STANDARD OF REVIEW

The issue is whether Plaintiffs have shown with particularity: (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused the plaintiff's injury. *Flaherty & Crumrine Preferred Inv. Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009); *R2 Invs., LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005). Plaintiffs must also "plead specific facts establishing a *strong* inference of scienter." *Financial Acquisition Partner v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (emphasis added); 15 U.S.C. § 78u-4(b)(2). "[P]ursuant to the PSLRA, failure to adequately plead scienter requires dismissal of the complaint." 440 F.3d at 287; 15 U.S.C. § 78u-4(b)(3).

## ARGUMENT AND AUTHORITIES

### I. Plaintiffs Have Failed To State A Section 10(b)/Rule 10b-5 Claim

#### A. Plaintiffs Do Not Allege Particularized Facts Showing A Material False Statement Or Actionable Omission

Plaintiffs first must allege specific facts showing a material false statement or omission.[14] Even under Rule 8(b), a complaint must contain sufficient factual detail supporting each element of the claim and demonstrating a plausible right to relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950–52 (2009). Plaintiffs must plead facts that actually "show" Defendants made material misstatements and omissions. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965–66 & n.3 (2007) (complaint must "show" that pleader is entitled to relief). Because this is a fraud case, such facts must be particularized under Rule 9(b) and the PSLRA.

---

[14] *See* 15 U.S.C. § 78u-4(b)(1)(B) (plaintiffs must specify "the reason or reasons why [a] statement is misleading"); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412-13 (5th Cir. 2003) (plaintiffs must "explain why the statements were fraudulent"); *Kunzweiler v. Zero.net, Inc.*, No. 3:00-CV-2553-P, 2002 U.S. Dist. LEXIS 12080, at *15 (N.D. Tex. July 3, 2002) ("Plaintiff has failed to specify *how* the stated investment values are untrue; in other words, he has failed to provide specific facts explaining why the values, as represented, were false"); *Schiller v. Physicians Res. Group, Inc.*, No. 3:97-CV-3158-L, 2002 U.S. Dist. LEXIS 3240, at *17 n.3 (N.D. Tex. Feb. 26, 2002), *aff'd*, 2003 U.S. App. LEXIS 18021 (5th Cir. Aug. 29, 2003) (complaint did not "identify a false statement or omission and match it with specific facts explaining how the statement is misleading").

Plaintiffs have failed to plead facts showing that *any* of Flotek's press releases or public statements contained material misstatements or actionable omissions.  As set forth above, all of Flotek's public statements were accurate, and there are no particularized allegations to the contrary.  Flotek was candid regarding the challenges and risks it faced and did not "promise" it would be able to achieve guidance.  Many of the alleged false statements are merely "soft opinions" and statements of "hope" and optimism that fail to state a claim.[15]  Simply alleging that Flotek fell short of guidance likewise does not "show" a false statement or omission.[16]

The fact that Flotek "increased its allowance of excess and obsolete inventory" during the fourth quarter of 2007 likewise fails to show a material false statement or omission[17] in prior quarters.[18]  Vague allegations from confidential sources that a company appeared to have excess

---

[15] *See, e.g., Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, No. Civ. A. H-06-3022, 2007 WL 2720074, at *3 (S.D. Tex. Sept. 18, 2007) (statements regarding company's "hopes and expectations" do not support Rule 10b-5 liability); *In re Azurix Corp. Secs. Litig.*, 198 F. Supp. 2d 862, 882, *aff'd*, 332 F.3d 854 (5th Cir. 2003) ("A company's expressions of confidence in its management or business are not actionable, especially where, as here, all historical information appears to be factually correct") (Lake, J.).  *See also Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("soft opinions" that "contain no concrete factual or material misrepresentation" are not actionable); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2003) ("generalized positive statements about a company's progress are not a basis for liability").

[16] *See, e.g., Azurix*, 198 F. Supp. 2d 882 ("The mere fact that a business did not live up to expectations is insufficient to create an inference of fraud") (Lake, J.); *see also In re Patterson Companies, Inc. Secs., Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1031-32 (D. Minn. 2007) ("[P]laintiffs' attempt to contort missed earnings into actionable securities fraud with the benefit of hindsight based on motivational sales talks and the company's maintenance of previously issued growth and earnings projections fails to state with particularity an actionable claim for securities fraud under the Exchange Act"); *Coates v. Heartland Wireless Communs., Inc.*, 55 F. Supp. 2d 628, 635-36 (N.D. Tex. 1999) ("It is also impermissible to allege fraud by hindsight, that is, to seize upon disclosures in later reports and allege that they should have been made in earlier ones"); *see also Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) ("mismanagement" does not amount to securities fraud).

[17] Plaintiffs also cannot demonstrate a material omission unless "what [the Defendants said]" – *i.e.*, their affirmative statements – are rendered misleading by the omission.  *See Shaw Group*, 537 F.3d at 541.  Plaintiffs have failed to demonstrate any affirmative statement rendered materially misleading by any alleged omission.

[18] *See, e.g., Kinder v. Acceptance Ins. Cos.*, 423 F.3d 899, 903 (8th Cir. 2005) (fact that company later increased reserves does not demonstrate earlier reserves were false); *In re Huntington Bancshares Inc. Secs. Litig.*, _ F. Supp. _, 2009 WL 4666455, at *6-14 (S.D. Ohio Dec. 4, 2009) (same; collecting cases); *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *14-5 (S.D.N.Y. Jan. 26, 2009) (allegation that company increased reserves did not support fraud claim; collecting cases); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1207 (D. Or. 2006), *aff'd*, 552 F.3d 981, 997-98 (9th Cir. 2009) (rejecting claim regarding alleged false inventory reserves); *Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 116 (D. Conn. 2005) ("Mere

or unusable inventory fail to demonstrate a fraudulent statement.[19]  The Fifth Circuit has also opined that inventory-related accounting issues can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002).

The allegations likewise do not show that Flotek made false statements or omissions regarding the integration of acquired companies.  Flotek never represented that the acquired companies had been fully integrated and repeatedly cautioned that integration would pose significant challenges.  CW3 and CW4 also admitted that Flotek did take significant steps to integrate acquired companies (including the consolidation of a Triumph tool yard) and accurately count inventory during 2007.  Plaintiffs have thus failed to plead falsity with particularity.

### B.    Plaintiffs' Claims Are Barred By The Safe Harbor For Forward-Looking Statements

Plaintiffs' claims are also barred under the common law and statutory prohibitions on liability for forward-looking statements.  "'[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.'"  *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 358 (5th Cir. 2002).[20]  Flotek did not "guarantee" anything and consistently warned that actual results could differ from guidance.

---

allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud").

[19] *See, e.g., In re Rackable Sys., Inc. Secs. Litig.*, No. C 09-0222 CW, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) (vague allegations from confidential witnesses that company "appeared to have a lot of excess inventory" failed to demonstrate that company should have written off inventory sooner).

[20] *See, e.g., ABC Arbitrage*, 291 F.3d at 360 (company's projections of "continued double-digit growth both in sales and orders for the full year" and "the potential for sales growth of 10 to 20 percent per year" were inactionable projections); *In re Alamosa*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) ("The setting of aggressive targets by management does not constitute securities fraud"); *see also In re Sec. Litig. BMC Software*, 183 F. Supp. 2d 860, 887 n.36 (S.D. Tex. 2001) ("'Projections of future performance not worded as guarantees' are not actionable").

### 1.      The PSLRA Establishes A Statutory Safe Harbor

In addition to the longstanding common law prohibition on liability for forward-looking projections, the PSLRA contains a safe harbor.  The safe harbor "has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind."  *Southland*, 365 F.3d at 371.  If either prong is satisfied, the claim fails.  *See Home Solutions of Am. Inv. Grp. v. Fradella*, 2008 WL 1744588, at *6 (N.D. Tex. Mar. 24, 2008); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 161 (N.D. Tex. 2007).

The first prong creates a safe harbor for forward-looking statements that are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  *See* 15 U.S.C. § 78u-5(c)(1)(A).  The second prong is discussed in the scienter section below.

### 2.      Flotek's Statements Were Forward-Looking And Were Accompanied By Meaningful Cautionary Language

Plaintiffs' allegations regarding earnings guidance, expected future performance, and expected future progress in integrating acquired companies are clearly forward-looking.  Each of the press releases and conference call transcripts contains a cautionary disclosure stating that the company was making forward-looking statements and containing express cautionary language, including references to the detailed cautionary disclosures in Flotek's 10-K filings with the SEC.  Risk disclosures in prior SEC filings may be "incorporated by reference into a forward-looking statement," as Flotek did here.[21]  In addition, Flotek made specific cautionary disclosures during the analyst calls themselves regarding weather delays, the challenges of integration, the high cost

---

[21] *See Home Solutions*, 2008 WL 1744588, at *6 (N.D. Tex. Mar. 24, 2008); *In re Odyssey Healthcare, Inc. Secs. Litig.*, 424 F. Supp. 2d 880, 886-87 (N.D. Tex. 2005) (dismissing guidance-related claims); *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591-592 (N.D. Tex. 2004) (same); *In re Michaels Stores, Inc. Sec. Litig.*, No. 3:03-cv-0246, 2004 WL 2851782, at *15 (N.D. Tex. Dec. 10, 2004) (dismissing claims where SEC filing referenced in press release contained five pages of cautionary statements).

of Sarbanes compliance, and numerous other specific issues.  Texas federal courts have routinely held that these types of disclosures are sufficient to bar liability.[22]

### C.    The Allegations Do Not Support A Strong Inference Of Scienter

Plaintiffs have also failed to plead specific facts supporting a strong inference of scienter. The complaint must "'with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" which requires intentionally fraudulent or severely reckless conduct.  *R2 Invs.*, 401 F.3d at 641. "Severe recklessness is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care.'"  *Id.* at 643 (citation omitted).

Further, for forward-looking statements, Plaintiffs must allege that the defendant who made the statement had actual knowledge that it was false ***even if the cautionary language is deemed inadequate***.  "[T]here is no liability if the plaintiff fails to prove that the statement (i) if made by a natural person, was made with ***actual knowledge*** that the statement was false or misleading, or (ii) if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading."  *Southland*, 365 F.3d at 371-72; 15 U.S.C. § 78u5-(c)(1)(B) (emphasis added). Plaintiffs cannot rely on severe recklessness to support a claim based on Flotek's failure to perform as expected.  *Southland*, 365 F.3d at 371-72; 15 U.S.C. § 78u5-(c)(1)(B).

Under the Supreme Court's recent decision in *Tellabs*, an inference of scienter not only must be "powerful" or "cogent," but it must also be at least as compelling as any non-fraudulent

---

[22] *See, e.g., Home Solutions*, 2008 WL 1744588, at *6; *Blockbuster*, 504 F. Supp. 2d at 161; *In re Odyssey*, 424 F. Supp. 2d at 887; *In re Alamosa*, 382 F. Supp. 2d at 844-45 (dismissing claims under "cautionary language" safe harbor); *Taubenfeld*, 385 F. Supp. 2d at 591-592 (same); *In re Michaels Stores,* 2004 WL 2851782, at *15 (same).

inference that could be drawn. *Flaherty & Crumrine*, 565 F.3d at 207-08 (citing *Tellabs*, 127 S. Ct. at 2509-10). "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id. Tellabs* has left securities fraud plaintiffs facing a difficult legal landscape. The Fifth Circuit has rejected securities fraud claims due to noncompliance with *Tellabs* involving more serious allegations than those here.[23] Courts routinely affirm dismissals despite stronger allegations of wrongdoing such as options backdating, accounting violations, restatements, internal investigations, false certifications, insider trading, and even in situations where the allegations involved "suspect" timing, "raise[d] the Court's eyebrows," or demonstrated "inexcusable negligence."[24]

---

[23] In *Central Laborers' Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d 546 (5th Cir. 2007), the Fifth Circuit affirmed dismissal of a Rule 10b-5 suit despite allegations of GAAP violations that led to the restatement of more than two years of financial reports, false Sarbanes-Oxley certificates, insider trades, and allegations from a confidential witness that one of the individual defendants "did not want to know the details of a revenue issue so that he would not be liable"—a far cry from the allegations here. *Id.* at 549-556. In *Shaw Group*, 537 F.3d at 539, the Fifth Circuit reversed a district court's denial of a motion to dismiss and held that the complaint did not adequately allege scienter under *Tellabs* despite allegations from a confidential witness that the company's executives knew of deficiencies in the company's project tracking software. *See also Flaherty & Crumrine*, 565 F.3d 200, 210 (5th Cir. 2009) (affirming dismissal with prejudice despite "suspect" timing of dividend announcement).

[24] *See, e.g., ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 63–68 (1st Cir. 2008) (affirming dismissal with prejudice despite plaintiffs' argument that defendants possessed internal budget that contradicted their public statements); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756–57 (7th Cir. 2007) (affirming dismissal with prejudice and discounting allegations from anonymous confidential sources); *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 97–98 (1st Cir. 2007) (affirming dismissal with prejudice under *Tellabs*); *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, (S.D.N.Y. 2009) (dismissing complaint with prejudice despite 28-day period between last alleged false statement and adverse news); *Stark Trading v. Falconbridge Ltd.*, No. 05-C-1167, 2008 U.S. Dist. LEXIS 2677, at *20–32 (E.D. Wisc. Jan. 14, 2008) (granting dismissal in tender offer case where defendants allegedly provided inaccurate information to investors); *Winters v. Stemberg*, 529 F. Supp. 2d 237, 250–52 (D. Mass. 2008) (granting dismissal despite allegations of possible options backdating that "raise the Court's eyebrows"); *Cordova v. Lehman Bros.*, 526 F. Supp. 2d 1305, 1319 (S.D. Fla. 2007) (granting dismissal even though evidence supported "a showing of negligence or even inexcusable negligence on the part of Defendants"); *In re Cyberonics Inc. Secs. Litig.*, 523 F. Supp. 2d 547, 553–55 (S.D. Tex. 2007) (granting dismissal despite allegations of options backdating, accounting violations, false certifications, and insider trades); *Weiss v. Amkor Technology, Inc.*, 527 F. Supp. 2d 938, 948–56 (D. Ariz. 2007) (granting dismissal in backdating case even though company's own internal review identified wrongdoing and accounting violations); *In re Bisys Secs. Litig.*, 496 F. Supp. 2d 384, 386 & n.1 (S.D.N.Y. 2007) (denying motion to reinstate claims and holding that "[i]f anything, *the law [since Tellabs] is now more favorable to [the defendant]* than it was [when the claims were initially dismissed]").

1.     **Plaintiffs Do Not Allege Dumas Or Meier Knew Their Statements Were False Or Were Severely Reckless**

To allege a claim against Flotek, Plaintiffs must individually satisfy the scienter requirement as to the person who actually made the alleged misrepresentation (*i.e.*, there is no "collectivized" corporate scienter or "group pleading").  *Southland*, 365 F.3d at 366.  Plaintiffs must therefore establish scienter as to Dumas and Meier individually and may not impute scienter to them based on their positions with the company.  *Blackwell*, 440 F.3d at 287.

The Amended Complaint wholly fails to establish a "cogent and compelling" inference of scienter that is at least as compelling as the inference that Dumas and Meier's conduct was not fraudulent and that the guidance was not knowingly false.  Plaintiffs fail to identify any specific communications or reports to Dumas or Meier that directly contradicted their public statements or identify who provided the information, what information was furnished and when.[25]  Bald hearsay-based allegations from an anonymous "human resource director" that Dumas "had a habit" of overstating projections cannot substitute for particularized allegations that Dumas and Meier actually received specific information directly contradicting their public statements.[26]

Plaintiffs' unparticularized allegations regarding the inventory accounting and integration issues likewise fail to support a strong inference of scienter.  There is no particularized allegation of any communication to Dumas or Meier demonstrating that they knew or recklessly

---

[25] *See Abrams*, 292 F.3d at 432 (dismissing complaint where plaintiffs "point[ed] to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them"); *Rosenzweig*, 332 F.3d at 868 (5th Cir. 2003) (dismissing complaint where report "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information"); *In re Odyssey*, 424 F. Supp. 2d at 890 ("The Complaint does not allege the existence of any specific reports that would have disclosed such irregularities that were provided to the Individual Defendants").

[26] *See, e.g., Shaw Group*, 537 F.3d at 539 (allegation that executive was "informed, in great detail, by a former Baton Rouge project controls manager of all the problems associated with the use of Shaw-Trac" insufficient); *Southland*, 365 F.3d at 375-76 (allegation that individual defendants were told by programmers of alleged problems insufficient).

disregarded *in 2007* that Flotek's statements regarding net inventory and obsolescence reserves were supposedly false.  As the Fifth Circuit has recognized, alleged inventory-related accounting issues (assuming *arguendo* there even are any such issues here) can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action."  *Abrams*, 292 F.3d at 433.  Merely alleging that Flotek failed to follow GAAP or incorrectly valued its inventory does not demonstrate scienter.  *E.g., Shaw Group*, 537 F.3d at 534-36 (noting that "[v]aluations of assets" leave "broad scope for judgment and informed estimation," and "determinations on such matters can differ reasonably and sizably").  Courts also routinely hold that a subsequent increase in reserves does not show that earlier reserves were fraudulent, as the concept of a "reserve" is a matter of judgment.[27] Similarly, mere allegations that Flotek management underestimated challenges, made mistakes, or could have done a better job integrating acquired companies does not demonstrate scienter.[28]

The allegations also support an overwhelming competing inference under *Tellabs* that Dumas and Meier did *not* act fraudulently, including the fact that:

- Flotek's earnings had been consistently improving until the end of the fourth quarter of 2007 and had improved significantly during the fourth quarter of the previous two calendar years.

- Flotek earned $0.26 per share during the third quarter and only needed to earn $0.29 per share during the fourth quarter to meet guidance.

- Flotek was coming off a record October immediately before the October 31, 2007 guidance reiteration.

---

[27] *See, e.g., Kinder*, 423 F.3d at 903; *In re Huntington Bancshares*, _ F. Supp. _, 2009 WL 4666455, at *6-14; *Coronel*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *14-5; *Zucco Partners*, 445 F. Supp. 2d at 1207; *Johnson*, 399 F. Supp. 2d at 116; *see also In re Rackable*, No. C 09-0222 CW, 2010 WL 199703, at *6 (vague allegations from confidential witnesses that company "appeared to have a lot of excess inventory" failed to demonstrate that company should have written off inventory sooner).

[28] *E.g., Abrams*, 292 F.3d at 433 ("mismanagement" does not demonstrate fraud); *In re Secs. Litig. BMC Software*, 183 F. Supp. 2d 860, 907, 916-17 (S.D. Tex. 2001) (rejecting fraud allegations based on alleged failure to integrate acquired companies).

- Flotek only missed its year-end revenue target by 1.25%.

- Flotek's auditors found no material weaknesses during 2007 and have never required Flotek to restate its financials.  The fact there was no restatement cuts heavily against any inference of scienter.  *E.g., Shaw Group*, 537 F.3d at 534-36; *see also Central Laborers*, 497 F.3d at 552 (no strong inference of scienter even where company *did* restate earnings and declare internal control weaknesses).

- Dumas and Meier heavily qualified their predictions throughout the class period, made numerous specific cautionary statements, and refused to provide guidance regarding profit margins or raise earnings guidance above $1 per share.  They candidly disclosed that Flotek's customers had experienced a "slowdown" and taken a "pause" from activities during mid-2007, that the anticipated revenue from these delayed jobs was "hopefully delayed rather than lost," that Flotek's stock price reflected "irrational exuberance," that Flotek faced significant risks from weather and gas prices, that integration would be a challenge, and that Sarbanes compliance would be costly and unpredictable.  These measured statements are wholly inconsistent with an intent to inflate the stock price.

- Flotek never represented that it had fully integrated the companies it acquired and cautioned that integration would pose significant challenges.

- Even Plaintiffs' alleged confidential sources admitted that Flotek did take significant steps during 2007 to improve inventory controls and integrate acquired companies, including several inventory counts, the hiring of consultants, and the consolidation of toolyards.  *See supra* at 15-16.

2.      **The Stock Sale, Certification, And Resignation Allegations Fail**

Plaintiffs' other scienter allegations are likewise insufficient.  For example, Plaintiffs assert that Dumas and Meier sold a minority of their stock holdings in Flotek during the alleged class period.  *See* Amended Complaint ¶ 90.  Stock sales, however, cannot *create* an inference of scienter; they can only *enhance* an inference that already exists from Plaintiffs' other well-pled factual allegations (of which there are none).[29]  Even then, such trades only enhance an inference

---

[29] "[A]llegations of insider trading are essentially a form of motive and opportunity allegations," and the Fifth Circuit "requires more than allegations of motive and opportunity to withstand dismissal." *Southland, Inc.*, 365 F.3d at 368; *see also Nathenson*, 267 F. 3d at 412 (stock sales can only enhance existing inference of scienter).

of scienter when they occur "at times calculated to maximize the personal benefit from undisclosed inside information." *Southland*, 365 F.3d at 368.

Plaintiffs' stock sale allegations fail to support an inference that Dumas and Meier knew their statements were false.[30]  Plaintiffs allege that Meier sold 29.81% of her total Flotek holdings during the alleged class period, and that Dumas sold just 18.83% of his total Flotek holdings, with no allegations regarding their prior trading patterns.  Amended Complaint ¶ 90. The stock sales all occurred at prices between $22.31 and $36.10 per share, far below the $53.49 peak on October 29, 2007, and were thus not timed to maximize profits.  *Id.* ¶¶ 90, 101.  Courts have consistently held similar allegations insufficient.[31]

Plaintiffs also allege that the individual Defendants signed false Sarbanes-Oxley certifications.  Amended Complaint ¶¶ 85-88.  The Fifth Circuit has rejected "false certification" allegations as insufficient to demonstrate scienter.[32]  Meier's resignation in 2008 and the resignations of certain non-defendant directors in 2009 likewise do not support a strong inference of scienter.  *See Abrams*, 292 F.3d  at 434 (resignations do not demonstrate scienter).

---

[30] Plaintiffs apparently want to draw an inference, based on their stock sales, that Dumas and Meier must have known by August that Flotek would fall short of guidance by the end of December.  The Fifth Circuit recently rejected a far more compelling "timing" inference in *Flaherty & Crumrine*, 565 F.3d at 210 (no strong inference of fraud where company substantially raised dividend just eight days after completing tender offer).

[31] *E.g., Shaw Group*, 537 F.3d at 544 (sale of 57% of executive's stock immediately after positive earnings announcement did not support strong inference of scienter); *Central Laborers*, 553-54 (executive's stock sale profit of $1.44 million did not support strong inference of fraud); *Dell*, 591 F. Supp. 2d at 897 (allegations that defendants sold 29.61% and 49.33% insufficient); *Zucco Partners*, 552 F.3d at 1005-06 (executive sale of 48% insufficient); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1118-19 (N.D. Cal. 2009) (executive sales of 35%-68% of total holdings insufficient); *In re Michaels Stores, Inc. Secs. Litig.*, 2004 WL 2851782, at *13 (N.D. Tex. Dec. 10, 2004) (sale of 18.93% of holdings insufficient); *In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 634-39 (S.D. Tex. 2003) (rejecting insider trading allegations against outside directors who sold "between 20-100% of their Enron holdings during the Class Period for a total of over $1 billion").

[32] *E.g., Shaw Group*, 537 F.3d at 545 ("[A] Sarbanes-Oxley certification, standing alone, is not indicative of scienter"); *Central Laborers*, 497 F.3d at 555.

### D.    Plaintiffs' "Confidential Witness" Allegations Are Grossly Deficient

Plaintiffs' confidential witness allegations likewise violate the PSLRA and fail to support any inference of falsity or fraud.  The PSLRA requires securities fraud plaintiffs to provide specific details regarding the sources of so-called "information and belief" allegations.[33] Following *Tellabs*, the Fifth Circuit has held that confidential sources "afford **no basis** for drawing the plausible competing inferences [of scienter] required by *Tellabs*."  *Shaw Group*, 537 F.3d at 535-36 (emphasis added).  To the extent these types of allegations are allowable at all after *Tellabs*, the sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded."  *ABC Arbitrage*, 291 F.3d 336, 353 (5th Cir. 2002).  "[P]laintiffs must allege with particularity **when** a comment was made to a confidential source, or, if the source alleges a conversation took place, when and where the conversation occurred."  *In re Dell Inc.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008) (citing *Indiana Elec.*, 537 F.3d at 538).  A statement that is "susceptible to many interpretations, including innocent ones," cannot "contribute to a strong inference of scienter."  *Shaw Group*, 537 F.3d at 538 (internal quotation marks omitted). Statements by sources who did not work at Flotek during the alleged class period likewise "could hardly be probative of the Individual Defendants' scienter concerning matters that happened when they were not employed at" Flotek.  *Dell*, 591 F. Supp. 2d at 895.  Scienter also cannot be inferred just because those with alleged knowledge of alleged improper practices reported to the individual Defendants.  *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 251 (5th Cir. 2003). Plaintiffs also cannot demonstrate scienter through "vague hearsay" allegedly overheard by

---

[33] "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts on which that belief is formed*."  15 U.S.C. § 78u-4(b)(1).  While courts have previously allowed confidential source allegations under limited circumstances, Defendants note that allowing anonymous allegations appears to contradict the plain meaning of the phrase "all facts on which that belief is formed."

confidential sources and must plead particularized facts showing that the sources are "reliable." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996-97 (9th Cir. 2009).

Plaintiffs' confidential source allegations are similar to the allegations held insufficient in *Shaw Group*, *Central Laborers*, and other Fifth Circuit cases.  None of the alleged sources claims any personal knowledge regarding the specific information relied upon by Dumas and Meier in providing guidance or making other statements to the market in 2007.  CW 1 did not join Flotek until late August 2007, is a "human resources director" with no involvement in guidance, and fails to identify any specific false statements or any specific information provided to Dumas and Meier contradicting their public statements.  An opinion by other employees that a company's guidance is unattainable – which CW1 does not even allege – "sheds no light on the relevant issue of whether the Individual Defendants shared this view, or indeed of whether the forecasts were necessarily unattainable."[34]

CW2 and CW3 did not join Flotek until long after the alleged misstatements, claim no knowledge regarding the specific actions undertaken by Dumas or Meier in 2007 or any involvement in the determination of Flotek's earnings guidance, and fail to identify any specific information provided to Dumas and Meier that rendered their 2007 statements fraudulent.  CW4 is a lower level "regional manager" who likewise offers no particularized information regarding the individual Defendants' state of mind.  Courts routinely reject similar allegations about differences of opinion among lower-level management regarding obsolete inventory reserves, write-offs, and financial projections.[35]  The allegations also do not describe the alleged

---

[34] *In re Cerner Corp. Secs. Litig.*, 425 F.3d 1079, 1086 (8th Cir. 2005); *Zucco Partners*, 552 F.3d at 996-97 (allegations by "human-resources employee" not probative regarding financial reporting).

[35] *E.g., Zucco Partners*, 552 F.3d at 999 ("CW1's statements about specific obsolete inventory held within the corporation do not present a cogent and compelling inference of scienter.  Obsolete inventory may be retained for a variety of reasons, including to satisfy the repair demands of prior customers"); *In re Cerner Corp.*, 425 F.3d at

integration and inventory problems with particularity and lack sufficient indicia of "reliability" to support a strong inference of scienter.[36]   Moreover, many of the allegations involved alleged issues at companies acquired after the October 31, 2007 statements (*i.e.*, CAVO and Teledrift).

### E.    Plaintiffs Fail To Allege Loss Causation

Plaintiffs have also not pled loss causation – *i.e.*, "that the market reacted negatively to a corrective disclosure, which revealed the falsity of [Flotek's] previous representations. . . ."[37] The "truth" revealed in a corrective disclosure must "'make the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true).'"[38]

Plaintiffs identify only two sets of alleged "corrective disclosures": the press releases and conference calls of October 31/November 1, 2007, and January 23, 2008.   *See* Amended

---

1086 (confidential testimony regarding disagreements by other employees over projections "sheds no light on the relevant issue of whether the Individual Defendants shared this view, or indeed of whether the forecasts were necessarily unattainable").

[36] For example, CW3 claims he was told Flotek would include the writedown of "millions of dollars" in unusable tools in a goodwill impairment charge, which apparently refers to the $67.7 million goodwill impairment announced on March 16, 2009.   Amended Complaint ¶¶ 55(b)(xvii), (c)(vi) and 66.   Not only does this allegation lack particularity, but Flotek's "goodwill" impairment only included "goodwill and other intangible assets."   *See* Ex. R, pp. 47 and 53 of pdf.   It did not include inventories, and there was no significant increase in the inventory reserves in the March 16, 2009 Form 10-K versus 2008 – again, a figure that was audited.   Ex. R, p. 78 of pdf.   It is also noteworthy that CW3 (the "IT architect," with no alleged knowledge of accounting issues) was allegedly told about the purported inclusion of this writedown in the March 2009 goodwill writedown, yet CW2 (the alleged "fixed asset accountant") appears to make no allegation regarding the purported inclusion of inventory writedowns in the March 2009 goodwill impairment charge.   Plaintiffs plead no facts showing that CW3 has knowledge of accounting issues, and in any event, the 2009 goodwill writedown has no bearing on whether the 2007 numbers were false or whether there is loss causation.   In addition, the numerous admissions made regarding the integration steps taken by Flotek in 2007 (including the alleged hiring of consultants, inventory counts, and consolidation of toolyards) detract from the witnesses' reliability by contradicting their conclusory allegations that Flotek did "no integration" in 2007 and no due diligence regarding the Triumph acquisition.   *See In re Downey Secs. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (contradictions between statements "severely undermine the reliability of the confidential witnesses and, as a result, are insufficient to support a finding of scienter").   Plaintiffs also ignore that Flotek obtained audited financials from Triumph at the time of the acquisition, and that Triumph's revenue was only a small part of Flotek's overall business.   *See* Ex. U.   Flotek also received audited financials for Spidle when it made that acquisition in 2005.   *See* Ex. V.

[37] *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311, 314-15 (5th Cir. 2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

[38] *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, _ F.3d _, 2010 WL 481407, at *3 (5th Cir. Feb. 12, 2010) (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 256 n.20 (5th Cir. 2009)).

Complaint ¶ 102.  These disclosures fail to reveal the falsity of any prior alleged misstatements. They contain no information regarding Flotek's alleged lack of integration or inaccurate inventories, let alone do they reveal any "relevant truth" that makes "the existence of the fraud" regarding these issues "more probable than it would be without that alleged fact (taken as true)." There also obviously can be no loss causation for actions occurring after January 23, 2008, which eliminates the vast bulk of the "confidential witness" allegations regarding Flotek's alleged inventory and integration issues in 2008.

In addition, the "'[m]ere failure to meet earnings guidance is insufficient to establish loss causation.'"  *Dell*, 591 F. Supp. 2d at 909 (quoting *In re AOL Time Warner, Inc. Secs. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007).  "[D]isclosure of financial losses generally – even if those financial losses are a result of the specific concealed fact – is not sufficient' to establish – or allege – loss causation.'"  *Dell*, 591 F. Supp. 2d at 901 (quoting *In re Rhodia S.A. Secs. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007)).  The October 31, 2007 and January 23, 2008 disclosures merely reveal disappointing financial results and do not contain any facts making it more probable than not that Flotek's prior statements were false.

## II.      Plaintiffs' Control Person Claims Fail Because There Is No Primary Claim

"Where a primary violation by the 'controlled person' has not been adequately pleaded, the court should also dismiss a section 20(a) claim."  *In re Capstead Mortgage Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 548 (N.D. Tex. 2003).  Because Plaintiffs have not adequately pled a primary violation, the control person claims also fail.

## <u>CONCLUSION</u>

Defendants pray that the Court dismiss this action with prejudice and award all further relief to which they are justly entitled.

Respectfully submitted,


FULBRIGHT & JAWORSKI L.L.P.


s/ Gerard G. Pecht
Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:  (713) 651-5151
Telecopier:  (713) 651-5246

Peter A. Stokes
State Bar No. 24028017
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Ave., Suite 2400
Austin, Texas 78701-2978
Telephone:  (512) 536-5287
Telecopier:  (512) 536-4598

ATTORNEYS FOR DEFENDANTS

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of March 2010, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of Texas, using the electronic case filing system of the Court.  The electronic case filing system sent a "Notice of Electronic Filing" to all other counsel who have appeared in this action.

s/ Gerard G. Pecht
Gerard G. Pecht