UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID EARL STOCKMAN, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 4:09-cv-02526 |
| | § | <u>CLASS ACTION</u> |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| FLOTEK INDUSTRIES, INC., et al., | § § | |
| | § | |
| Defendants. | § | |
| | § | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND TO DEFENDANTS' FRAUD ................................................................1

II.     SUMMARY OF THE ARGUMENT ................................................................3

III.     LEGAL STANDARD ON A MOTION TO DISMISS ....................................................6

IV.     ARGUMENT AND AUTHORITIES ................................................................6

    A.     Plaintiffs Allege Materially False and Misleading Statements with Particularity ................................................................6

    B.     Defendants' Misrepresentations and Omissions Were Material ............................10

    C.     Defendants' Misrepresentations Are Not Protected Forward-Looking Statements ................................................................11

    D.     Each Defendant Knew or Was Severely Reckless in Not Knowing About the Fraud ................................................................15

        1.     Defendants' Public Admissions Constitute Firm Evidence of Scienter ................................................................15

        2.     Defendants' Knowledge Concerning Financial Projections Raises a Strong Inference of Scienter ................................................................17

        3.     Defendants' GAAP Violations Raise a Strong Inference of Scienter.......21

        4.     The Individual Defendants' Stock Sales and Board Member Resignations Also Support an Inference of Scienter .................................23

        5.     Defendants Fail to Provide Plausible Competing Inferences ...................26

    E.     The Complaint Meets the Pleading Requirements for Loss Causation ................28

    F.     Plaintiffs Have Stated a §20(a) Claim for Control Person Liability.....................30

V.     CONCLUSION................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*ABC Arbitrage v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002) ...................................................................................19

*Barrie v. Intervoice-Brite, Inc.*,
409 F.3d 653 (5th Cir. 2005) ....................................................................................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955 (2007)........................................................................6

*Berger v. Compaq Computer Corp.*,
No. Civ. A. H-98-1148, 1999 WL 33620108
(S.D. Tex. Dec. 22, 1999) .......................................................................................24

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..................................................................24

*Brody v. Zix Corp.*,
No. 3:04-CV-1931-K, 2006 U.S. Dist. LEXIS 69302
(N.D. Tex. Sept. 26, 2006)...................................................................4, 5, 19, 30

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*,
497 F.3d 546 (5th Cir. 2007) ...................................................19, 20, 21, 24

*Coates v. Heartland Wireless Commc'ns, Inc.*,
100 F. Supp. 2d 417 (N.D. Tex. 2000) ...........................................................21, 22

*Dura Pharms, Inc. v. Broudo*,
544 U.S. 336, 125 S. Ct. 1627 (2005)......................................................................28

*Fine v. American Solar King Corp.*,
919 F.2d 290 (5th Cir. 1990) ..................................................................................18

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) .............................................................................3, 7, 10

*Griffin v. GK Intelligent Sys., Inc.*,
87 F. Supp. 2d 684 (S.D. Tex. 1999) ......................................................................11

*In re Blockbuster Inc. Sec. Litig.*,
No. 3:03-CV-0398-M, 2004 U.S. Dist. LEXIS 7173
(N.D. Tex. Apr. 26, 2004)..............................................................................4, 11, 17

**Page**

*In re Dell Inc., Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)....................................................................24

*In re Dynegy, Inc.*,
  339 F. Supp. 2d 804 (S.D. Tex. 2004) (Lake, J.)....................................................7

*In re Enron Corp. Securities, Derivative & ERISA Litigation*,
  258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................9, 23, 25

*In re Fleming Cos. Sec. & Deriv. Litig.*,
  No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488
  (E.D. Tex. June 10, 2004) ......................................................................................19

*In re Michaels Stores, Inc. Sec. Litig.*,
  No. Civ. A. 3:03-CV-0246, 2004 WL 2851782
  (N.D. Tex. Dec. 10, 2004) ......................................................................................24

*In re Nash Finch Co. Sec. Litig.*,
  502 F. Supp. 2d 861 (D. Minn. 2007)....................................................................25

*In re OCA, Inc.*,
  No. 05-2165, 2006 U.S. Dist. LEXIS 90854
  (E.D. La. Dec. 14, 2006) ........................................................................................11

*In re Penn Treaty Am. Corp. Sec. Litig.*,
  202 F. Supp. 2d 383 (E.D. Pa. 2002) .................................................................3, 10

*In re Tetra Techs., Inc. Sec. Litig.*,
  No. 4:08-cv-0965, 2009 U.S. Dist. LEXIS 126687
  (S.D. Tex. July 9, 2009)..............................................................12, 13, 21, 23

*Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008) ............................................................................21, 24

*Kaltman v. Key Energy Servs.*,
  447 F. Supp. 2d 648 (W.D. Tex. 2006)..................................................................10

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ........................................................................ *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) .............................................................................3, 10

- iii -

**Page**

*Middlesex Retirement Sys. v. Quest Software, Inc.*,
   No. CV 06-6863 DOC (RNBx), 2008 WL 7084629
   (C.D. Cal. Jul. 10, 2008) ................................................................................25

*Moskowitz v. Mitcham Indus.*,
   No. H-98-1244, 2000 U.S. Dist. LEXIS 22424
   (S.D. Tex. Sept. 27, 2000) ...........................................................................24

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) ......................................................................27

*Pfeiffer v. Toll*,
   989 A.2d 683 (Del. Ch. 2010) ....................................................................11

*Plotkin v. IP Axess Inc., Etc.*,
   407 F.3d 690 (5th Cir. Tex. 2005) ...................................................... *passim*

*Rubinstein v. Collins*,
   20 F.3d 160 (5th Cir. 1994) ...........................................................12, 13, 14, 15

*Southland SEC Corp. v. INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) ..................................................................24, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499 (2007) .......................................................6, 15

*United States v. Henke*,
   222 F.3d 633 (9th Cir. 2000) ......................................................................24

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009)..........................................................25

*Zucco Partners, LLC v. Digimarc Corp.*,
   445 F. Supp. 2d 1201 (D. Or. 2006) ............................................................24

*Zucco Partners LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ......................................................................25

523404_1

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)........................................................................................ 15, 24, 30
    §78t(a)..................................................................................................30
    §78u-4(b)(1)(B)......................................................................................6
    §78u-4(b)........................................................................................ *passim*
    §78u-4(b)(2)..........................................................................................15
    §78u-4(b)(3)(B)....................................................................................19
    §78u-5(c)(1)(B).............................................................................14, 15
    §78u-5(c)(1)(B)(i)................................................................................14

Federal Rules of Civil Procedure
    Rule 8(a)(2)..........................................................................................28
    Rule 9(b)...........................................................................................7, 10

17 C.F.R.
    §240.10b-5......................................................................................24, 30

523404_1

## I.      BACKGROUND TO DEFENDANTS' FRAUD

Plaintiffs' First Amended Class Action Complaint For Violations of Federal Securities Laws (the "Complaint") tells the simple tale of Flotek Industries, Inc. ("Flotek") or (the "Company"),[1] a small but growing company rendered dysfunctional after a spate of hasty acquisitions.[2]  Between 2005 and 2007, Flotek claimed to have achieved milestone after milestone, reporting 100% growth in sales and 75-80% growth in profits as a result of its aggressive acquisition strategy.  ¶¶6, 60.[3] Flotek's stock price only went up and up.  ¶5.  However, in early 2007, Flotek's CEO and CFO, Individual Defendants Jerry Dumas ("Dumas") and Lisa Meier ("Meier"), realized that while in eager pursuit of their growth-by-acquisition strategy, their failure to conduct adequate due diligence left the Company with worthless assets and created an unwieldy environment that rendered financial reporting and forecasting a horrendous task.  ¶49(b)(viii), (ix), (xiv), (xix).  Compounding matters, a slowdown in the fracing and drilling industry and the inevitable price cutting threatened to diminish Flotek's sales and eat into margins.  ¶¶55(d), 58-59.

The Complaint alleges that between May 8, 2007 and January 23, 2008 (the "Class Period"), defendants violated the Federal Securities Laws when they issued false statements to the public that materially misrepresented Flotek's business and financial condition.  Defendants touted the

---

[1]      Flotek supplies drilling and production related products and services to the energy and mining industry.  ¶26.

[2]      Flotek consummated nine acquisitions between 2005 and early 2007.  Defendants' Motion to Dismiss and Brief in Support (Doc. No. 36) ("Defs' Mem.") Ex. K at 5 of 75.  Defendants have provided the Court with transcriptions of Flotek's March, May and August 2007 conference calls which reference "72 acquisitions" undertaken by Flotek and cited throughout the Complaint.  *See* Defs' Mem. Ex. B at 1.  Plaintiffs do not dispute defendants' explanation that Flotek did not undertake "72 acquisitions," which appears to be a reading error during the March 2007 earnings call.  Defs' Mem. at 4 n.3.

[3]      Unless otherwise noted, citations to "¶" or "¶¶" refer to the Complaint.

Company's active and successful integration of acquired companies and highlighted the rollout of Rental Tool Management Software ("RTMS") to manage inventory across the acquisitions. *E.g.*, ¶52. At the same time, defendants concealed from investors the massive accounting and inventory issues stemming from the acquisitions that rendered Flotek's financial statements and projections baseless, were sure to result in exorbitant Selling, General & Administrative Expenses ("SG&A") and would erode rather than improve margins as ordinarily expected when acquisitions are integrated. *E.g.*, ¶49(b)(i)-(xix). Defendants repeatedly and falsely assured the market that demand for Flotek's business was stable, weather had simply "deferred" missed sales and the Company would achieve an unprecedented $1.00 Earnings Per Share ("EPS") in 2007. ¶¶46, 52, 56. In fact, defendants knew that Flotek could not achieve the stated guidance and industry conditions would diminish sales and margins. ¶¶49(a)(i), (iv), 49(b)(i), 49(b)(ii), 49(b)(viii), 55(a)(i), 55(c)-(d)(iv), 58-59, 60(a)-(d). Defendants' statements concerning demand for Flotek's products, integration of acquired companies, inventory management and financial projections were critically important as demonstrated by analysts' repeated questions on such topics during Flotek's quarterly earnings calls. ¶¶52, 58-59.

As a result of defendants' misrepresentations, Flotek's stock price skyrocketed from $20 at the beginning of the Class Period to over $50 per share in October 2007. ¶¶5, 47. As Dumas and Meier were promising investors that Flotek would achieve unprecedented results, they were simultaneously jumping ship, selling huge quantities of stock and reaping nearly $7 million in proceeds from insider trades executed immediately following their public misrepresentations. ¶¶90-92. Flotek shareholders were not as lucky. Between October 2007 and January 2008 defendants disclosed more of the truth about the Company's business and financial position, causing plaintiffs and the Class to lose millions of dollars in the wake of Flotek's precipitous and unrelenting stock decline. ¶¶100, 102.

523404_1

## II.   SUMMARY OF THE ARGUMENT

The Complaint adequately alleges that defendants issued materially false statements and omissions with scienter and that plaintiffs' reliance on defendants' misstatements caused plaintiffs injury.  Accordingly, plaintiffs have met the pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA").  15 U.S.C. §78u-4(b).

As required, the Complaint's allegations of material false statements and omissions are pled with particularity.  The Complaint sets forth the ***who, what, when, where and how*** regarding each of defendants' false statements and omissions.  The Complaint also explains in detail why each statement regarding Flotek's product demand, acquisitions, inventory software rollout and financial projections was false at the time it was made.  Nothing more is required and defendants' arguments concerning falsity should be rejected.  *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003).

Defendants do not seriously contend that their Class Period misrepresentations and omissions were immaterial, nor can they.  Such an assertion ignores the crucial fact that analysts repeatedly questioned Flotek executives about financial guidance, including EPS expectations, anticipated SG&A costs and whether better margins could be expected as a result of efforts to consolidate the Company's acquisitions.  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) (statements made in direct response to analyst questions not mere puffery); *In re Penn Treaty Am. Corp. Sec. Litig.*, 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002) (same).  Here, the Complaint alleges that defendants made specific assurances to investors which were material and caused Flotek's stock price to be artificially inflated throughout the Class Period.  ¶¶46, 51-52, 56-60 (false statements) 47, 53 (stock price reaction).  Between October 2007 and January 2008, when the market learned that these statements were false, Flotek stock plummeted nearly 65%, from a high of over $50 per share in October to just $17.86 per share after the close of the Class Period, and never recovered.  ¶¶69,

- 3 -

101-102.  This massive correction in Flotek's stock price demonstrates that defendants' Class Period misrepresentations were material.  *See In re Blockbuster Inc. Sec. Litig.*, No. 3:03-CV-0398-M, 2004 U.S. Dist. LEXIS 7173, at *24-*25 (N.D. Tex. Apr. 26, 2004) (analyzing hypothetical scenario in which large stock decline supports finding of materiality).

The Complaint also sets forth detailed allegations of scienter, indicating that defendants ***knew*** their statements were false when made.  Defendants Dumas and Meier iterated firm guidance of $1.00 EPS to the market, knowing full well that discussions with and reports received from Flotek's Division presidents did not support those estimates.  ¶¶49(a)(i)-(iv), 49(b)(i)-(iii), 55(a), 62(a)(i)-(v). Moreover, defendants assured the market that poor weather had merely "delayed" or "deferred" sales despite knowledge of fracing and drilling slowdowns and consequential price cutting that were sure to, and did, negatively impact the Company's sales and margins.  ¶¶55(d)(i)-(iv), 58-59, 62(d).  With respect to statements concerning acquisitions and inventory management, including statements related to financial metrics such as margins and SG&A, the Individual Defendants knowingly concealed extensive accounting and inventory management problems that rendered integration a formidable task and would result in additional costs rather than achievement of synergies through consolidation.  ¶¶49(b)(vi)-(xii), 49(b)(xiv)-(xii), 49(b)(xix), 55(b), 62(b).

Defendants do not dispute these allegations, but rather assert that plaintiffs have not sufficiently identified their sources.  But defendants' characterization of plaintiffs' confidential witnesses as "anonymous" ignores the detailed allegations concerning the witnesses' job titles, job descriptions, time-frame of employment and the circumstances under which the witnesses were in a position to learn the information they acquired.  *See Brody v. Zix Corp.*, No. 3:04-CV-1931-K, 2006

- 4 -

U.S. Dist. LEXIS 69302, at *13-*14 (N.D. Tex. Sept. 26, 2006) (finding such information sufficient) (quoting *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005)).[4]

The Complaint's allegations of scienter are bolstered by additional evidence that: Flotek violated Generally Accepted Accounting Principles ("GAAP") (¶¶73-84); the Individual Defendants certified the Company's financial statements despite their direct knowledge that the Company's assets and inventory were overstated (¶¶49(b)(ix), (xiv), 85-88); and disclosure of Flotek's myriad acquisition-related problems would wreak havoc on the Company's liquidity (¶66).  Furthermore, the Individual Defendants engaged in suspicious insider trading activity immediately following dissemination of their false and misleading statements and omissions, reaping more in illicit proceeds during the Class Period than from all pre-Class Period sales combined.  ¶¶90-98. Ultimately, Flotek's two longest-standing members of the Board of Directors resigned, but not quietly.  ¶67.  Both individuals cited disputes with CEO Dumas and one Board member, Gary Pittman, pointed to disagreements concerning monthly financial reporting and governance.  *Id.*

Finally, the Complaint sets forth sufficient allegations of loss causation, by explaining how defendants' false statements and omissions affected Flotek's stock price during the Class Period and how the Company's stock price declined when the market became aware of the true facts concerning Flotek's business and financial condition that were directly related to defendants' Class Period misrepresentations and omissions.  Flotek suffered an enormous stock decline between October 2007 and January 2008 as the truth became known and Flotek was forced to revise downward its guidance for 2007.  ¶¶61, 64, 102.

The Complaint meets the pleading requirements under the PSLRA.  Accordingly, plaintiffs respectfully request that this Court deny defendants' motion to dismiss in its entirety.

---

[4]      Here, as elsewhere, emphasis has been added or citations omitted unless otherwise noted.

## III.    LEGAL STANDARD ON A MOTION TO DISMISS

When ruling on a motion to dismiss, courts must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007). *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955 (2007) ("'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'").    The United States Supreme Court has cautioned, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Id.* at 563 n.8.

## IV.    ARGUMENT AND AUTHORITIES

### A.    Plaintiffs Allege Materially False and Misleading Statements with Particularity

The PSLRA requires a complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).  Plaintiffs more than adequately satisfied this standard by alleging in detail: the materially false and misleading statements and omissions (*see, e.g.*, ¶¶45-46, 51-52, 56-60, 73-74, 82, 85-88); where and when each statement was made (*id.*); who made each statement or signed the statement (*id.*);[5] and the reasons why each statement was false and misleading (*see, e.g.*, ¶¶49, 55, 62).  Plaintiffs also allege Flotek's improper accounting treatments and the reasons why the accounting treatments were improper.

---

[5]    Regardless of who made the alleged false statements, the Individual Defendants were both responsible for correcting any such statements. *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) ("Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant made the statement and which defendant did not correct it, the fraud is sufficiently pleaded as to each defendant.").

¶¶49(b)(ix)-(x), (xii)-(xvii), 49(c)(i), 75-82.  Nothing more is required.  *See Goldstein*, 340 F.3d at

245; *In re Dynegy, Inc.*, 339 F. Supp. 2d 804, 894-95 (S.D. Tex. 2004) (Lake, J.).

Contrary to defendants' arguments, the true facts alleged in the Complaint directly contradict

defendants' Class Period statements concerning Flotek's guidance, business prospects and

integration of acquired companies.  Throughout the Class Period, defendants repeatedly told

investors that Flotek was on track to achieve guidance of $1.00 EPS in 2007:

> "[W]e hold our earnings guidance of $1" (¶¶46, 52); "[w]e are holding to our original
> guidance. . . .  Should a few of those factors turn to our favor, I think we will be
> pleasantly surprised.  Should the year maintain where it is, we are confident that we
> will meet our original expectations . . . ." (¶52); "we reiterate our guidance of $1.00
> per share (¶56); "we are right on our plan . . . and we have consistently indicated to
> our shareholders that we would have a guidance of $1 per share diluted earnings . . .
> [and] I want to point out that we continue to stand firm on [$1.00 EPS] guidance"
> (¶57); "we feel very bullish that we will continue to meet our plan . . . [w]e
> consistently believe that we will make $1 per share fully diluted . . . there is nothing
> in our planning that doesn't indicate that we are going to continue to grow at the
> same approximate level that we have been growing for the last 3-4 years, and that is
> a 75-80% growth in profits . . . [i]f I look at the plan that we have and we are right
> on, or a little bit above our plan for the year."  ¶60.

Plaintiffs identify when those statements were made, who made them and how they were false.

Plaintiffs do not, as defendants suggest, simply allege that Flotek "fell short of guidance."  *See* Defs'

Mem. at 18 (arguing fraud by hindsight).  Rather, plaintiffs detail how defendants' statements

concerning guidance were false ***at the time they were made***.  *See, e.g.*, ¶¶49(a)(i), (a)(iv), (b)(i)-

(b)(ii), (b)(viii), (b)(ix), (b)(xiv), 55(a)(i), 55(c), 55(d)(i)-(d)(iv), 60(a)-(d).  These allegations are

sufficiently particular and satisfy Rule 9(b) and the PSLRA.

The Complaint also details defendants' false statements and omissions concerning integration

of the acquired companies, including the rollout of RTMS, to improve margins and better manage

inventory across the companies.  ¶¶45-46, 52, 59.  During the August 2007 earnings call, Defendant

Dumas advised investors that "[t]he integration of Triumph into Flotek has been very successful.

We have leveraged off their expertise to help to roll out our RTMS to . . . further increase the

- 7 -

523404_1

utilization of our expansive tool inventory." ¶52.  This statement was false because the Triumph integration was not successful and RTMS would not "roll out" any time soon due to severe inadequacies.  ¶¶49(b)(ix), (xx).  Plaintiffs further allege that Flotek experienced tremendous accounting, inventory, forecasting and other problems that impeded integration of the acquired companies, rendered defendants' statement materially false and misleading and should have been disclosed.  ¶¶49(b)-(c).  Defendants should have but did not disclose the acquisition-related problems after choosing to speak about Flotek's integration and inventory management.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) ("a duty to speak the full truth arises when a defendant undertakes a duty to say anything").

Defendants also made numerous false statements concerning financial metrics that bore on integration.  For instance, defendants falsely asserted, "we anticipate a significant increase in the [equity earnings contribution] run rate [from CAVO Drilling Motors Ltd. Co. ("CAVO")]."  ¶46.  This statement was misleading in light of the severe accounting and inventory problems at CAVO that made forecasting impossible.  ¶¶49(b)(x), (xvi)-(xvii), 73.  Defendants also dodged an analyst's question concerning margin improvement estimates by saying it was "very difficult to answer," because Flotek was "bringing together facilities . . . [yet] expanding at the same time."  ¶52.  This statement misled investors because, in addition to purported "expansion" efforts, massive integration problems were also undermining margin improvement that would ordinarily be anticipated with integration.  ¶49(b).  In October 2007, defendants again failed to inform the market of the same integration problems when Dumas definitively and falsely advised investors, "I think we will see an improvement [in margins due to final integration of Triumph and RTMS] in the fourth quarter." ¶59.  The same integration-related problems ensured the Company would incur significant expense with respect to Sarbanes-Oxley ("SOX") and other integration-related computing initiatives, including the RTMS rollout.  ¶¶49(b)-(c), 55(b), 62(b).  That did not prevent Meier from advising investors that

- 8 -

Flotek would "maintain SG&A costs at the level they're running. We've got the internal controls audit work running smoothly, we've got the annual audit work running smoothly." ¶52. Additionally, having chosen to speak on these topics, defendants were obligated to inform investors of the massive acquisition-related problems – including accounting, forecasting and inventory management problems – that bore directly on these financial metrics. *Lormand*, 565 F.3d at 249.

Plaintiffs also detail defendants' materially false statements regarding continuing demand for Flotek's products and "deferred" or "delayed" sales. Such statements include:

> "[W]e have not seen a slow down in any of our three operating segments exclusive of weather that just delayed some of our activities." (¶46); "[w]e estimate . . . weather deferred approximately $2 million in sales" (¶51); "we have not seen a reduction in demand for our products" (¶52); "[w]e are very confident that a vivid portion of that [$4 million] was delayed, and [that we] will pick it up" (*id.*); "that pause [in the fracing] seems to have been eliminated" (¶58); "there seems to be a movement back to doing more fracing . . . . In the month of October, it has recovered, and we have every belief that it will continue to be recovering" (*id.*); The "pause in the fracing work . . . based on what we're seeing right now, that pause seems to have been eliminated. . . . [W]e do not consider [the 3Q07 Chemicals Division decrease in gross profit margin] a trend. It was only a short-term adjustment." *Id.*

These statements were false and misleading because defendants knew by early 3Q07 that sales had not been "delayed," but that decreasing drilling and fracing activity would further erode sales throughout 2007 and impact the Company's margins by 30%. ¶¶49(d), 55(d), 58-59.[6]

Finally, the improper accounting treatment with respect to obsolete and excess "junk" assets and inventory overstated net income by hundreds of thousands of dollars during the first three quarters of 2007. ¶¶49, 62(c), 80-82, 85-88. Yet defendants repeatedly reported net income and

---

[6]   Defendants not only had a duty to speak truthfully and completely to investors, but they were also required to disclose the material adverse facts alleged in the Complaint before engaging in insider trading activity which followed on the heels of their public misrepresentations. *See In re Enron Corp. Securities, Derivative & ERISA Litigation*, 258 F. Supp. 2d 576, 590 (S.D. Tex. 2003) ("a corporate insider must either disclose all material inside information known to him . . . or abstain from trading").

other financial metrics during the Class Period without notifying investors that acquisition of obsolete inventory rendered those numbers inaccurate.

In sum, the Complaint contains over sixty pages of detailed allegations demonstrating the who, what, where, when and how related to defendants' materially false statements and omissions. Coupled with plaintiffs' allegations of scienter (discussed in §IV.C.), the Complaint is sufficiently particularized to satisfy Rule 9(b) and the PSLRA. *See Goldstein*, 340 F.3d at 245.

### B.   Defendants' Misrepresentations and Omissions Were Material

Defendants make no serious contention that the alleged false statements and omissions are immaterial, nor can they. There can be little doubt that disclosure of Flotek's pervasive integration problems and expected slowdowns in the industry would have altered the total mix of information available to investors. *See Lormand*, 565 F.3d at 248. Indeed, defendants' misstatements were often made in direct response to analysts' questions that bore directly on these matters, further evidencing materiality. ¶¶46, 59. *Tellabs, Inc.*, 437 F.3d at 597 (statements made in direct response to analyst's inquiry not mere puffery); *Penn Treaty*, 202 F. Supp. 2d at 392-93 (same).[7] Failure to disclose the severity of integration and inventory problems also concealed the impact those problems had on the Company's margins and SG&A costs and the ability to prepare adequate business and financial

---

[7]    To the extent defendants appear to argue that certain statements and financial projections constitute "soft opinions" of "hope," courts have held otherwise. *See, e.g.*, *Lormand*, 565 F.3d at 249 n.13 ("'[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact'"); *Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 661-62 (W.D. Tex. 2006) (EPS projections sufficiently concrete and do not constitute vague, inactionable puffery). Moreover, defendants' statements must be analyzed in context. *Lormand*, 565 F.3d at 247. Dumas reiterated $1.00 EPS guidance specifically to mollify investors' concerns about diminished sales in 3Q07 and the resulting stock decline, and all but directed investors to buy Flotek stock. ¶60 (In the wake of Flotek's stock price decline following the Company's 3Q07 earnings announcement, Dumas repeatedly assures investors that Flotek will achieve $1.00 EPS and says "I guess it's unwise of me, and probably not to say it's a good time to buy; so I didn't say that. But it's a fantastic company with a lot of people . . . [with] the profitability . . . in the front of their minds").

forecasts.  *See In re OCA, Inc.*, No. 05-2165, 2006 U.S. Dist. LEXIS 90854, at *54 (E.D. La. Dec.

14, 2006) (denying motion to dismiss where the defendants' statements could be "characterized as

misleading investors into believing that . . . problems were less severe than they actually were");

*Lormand*, 565 F.3d at 248 (statements are not evaluated by their "literal truth, but by the ability . . .

to accurately inform rather than mislead prospective buyers" and even "emphasis and gloss can, in

the right circumstances create liability").

      Materiality is also demonstrated by the fact that Flotek's stock grossly outperformed the

Philadelphia Oil Service Sector Index (OSX) during the Class Period.  ¶103.  This eight-month

outperformance can only reasonably be attributed to defendants' misstatements about the success of

Flotek's acquisition campaign and the Company's business and financial outlook.  When combined

with the tremendous decline in Flotek's stock price that followed disclosure of the truth concerning

these matters, it can hardly be disputed that defendants' Class Period misrepresentations and

omissions were material.  ¶¶53, 64.  *See Pfeiffer v. Toll*, 989 A.2d 683, 694 (Del. Ch. 2010)

(consistent reiteration of projections coupled with outperformance of industry index found material

when downward revised projections resulted in significant market reaction); *see also Blockbuster*,

2004 U.S. Dist. LEXIS 7173, at *24-*25 (large stock decline supports materiality).

    **C.**    **Defendants' Misrepresentations Are Not Protected Forward-Looking Statements**

      Defendants seek to characterize all of their false and misleading statements and omissions as

"forward-looking," accompanied by "cautionary language," and thus protected by the PSLRA's safe

harbor provision.  *See* Defs' Mem. at 10, 19-21.  Defendants' contentions are baseless.  The alleged

misrepresentations and omissions concerned present facts and the "cautionary language" was

insufficient to afford protection to defendants' statements.

      Most of defendants' false and misleading Class Period statements concern existing facts and

do not qualify as forward-looking under the safe harbor.  *See, e.g.*, *Griffin v. GK Intelligent Sys.*,

- 11 -

*Inc.*, 87 F. Supp. 2d 684, 689 (S.D. Tex. 1999) (no amount of cautionary language will protect "false statements of present fact"); *In re Tetra Techs., Inc. Sec. Litig.*, No. 4:08-cv-0965, 2009 U.S. Dist. LEXIS 126687, at *89-*90 (S.D. Tex. July 9, 2009) (statement about existing inventories not forward-looking).  For example, the Complaint alleges the following false statements which concern existing or historical facts:

> "We are actively integrating [Triumph] into our existing drilling tool segment" (¶45); "We estimate . . . weather deferred approximately $2 million in sales" (¶51); "[W]e have not seen a reduction in demand for our products" (¶52); "The integration of Triumph into Flotek has been very successful.  We have leveraged off their expertise to help to roll out our RTMS" (*id.*); "We've got the internal controls audit work running smoothly, we've got the annual audit work running smoothly" (*id.*); "[W]e are on track and performing at or above plan . . . .  Based on our performance we reiterate our guidance" (¶56); Flotek has "not seen a reduction in demand for our products and services" (¶57); "[T]hat pause [in the fracing] seems to have been eliminated" (¶58); and "***there is nothing in our planning*** that doesn't indicate that we are going to continue . . . 75-80% growth in profits" (¶60).

These and similar misrepresentations are based on existing or historical facts and plainly fall outside the safe harbor.

Even if some of defendants' statements contain predictions or projections that are considered forward-looking, the statements still fail to qualify for protection because defendants' purported "cautionary language" was insufficient.  *See Lormand*, 565 F.3d at 244.  With regard to predictions or projections, defendants have a duty to disclose "material, firm-specific adverse facts that affect the validity or plausibility of [the] prediction."  *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994).  *See also Lormand*, 565 F.3d at 244-45 (calling for "'"substantive" company-specific warnings based on a realistic description of the risks applicable to the particular circumstances'").  The fact that defendants' "risk disclosures" contained generalized warnings about industry conditions that ***may*** affect the Company's business and financial results is insufficient.  *See* Defs' Mem. at 10, 20; *Rubinstein*, 20 F.3d at 168 n.30 (risk disclosures concerning "general economic 'facts' and conditions [are] already known to investors and analysts").  Defendants should have

- 12 -

warned investors of the specific risks relevant to their predictions that "*had already begun to materialize.*" *Tetra Techs.*, 2009 U.S. Dist. LEXIS 126687, at *82. *See also Rubinstein*, 20 F.3d at 171 ("'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'").[8]

Here, defendants issued earnings guidance of $1.00 EPS with full knowledge of the following, existing facts: (1) internal reports were forecasting less than $1.00 EPS (¶¶49(a)(iv), 55(d)(ii)-(iii)); (2) division executives were adamant that the Company could not achieve the stated guidance (¶¶49(b)(ii), 55(d)(ii)-(iii), 62(a)(i), (v), 62(d)); (3) customers had specifically warned defendants that a slowdown in drilling and fracing would occur (¶¶55(d)(i), 58-59); and (4) price cutting in the industry would hurt sales and margins (*id.*). Defendants also touted their successful and continued efforts to integrate acquired companies and rollout RTMS to better manage inventory – efforts directed at improving costs and margins – without disclosing, *inter alia*, then known facts indicating that: (1) little to no integration had taken place and acquired companies continued to operate independently on disparate legacy systems (¶¶49(b)(i), (v), (vii), (xiv), (xx), 62(b)); (2) accounting and inventory management at individual facilities, let alone across acquired companies, was a disaster (¶¶49(b)(viii)-(x), (xiv)); (3) RTMS was severely inadequate (¶¶49(b)(ix), (xix)); and

---

[8]     The "bespeaks caution" doctrine is equally inapplicable.  Under this doctrine, "a predictive statement is one that contains at least three factual assertions that may be actionable: 1) The speaker genuinely believes the statement is accurate; 2) there is a reasonable basis for that belief; and 3) *the speaker is unaware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement*." *Rubinstein,* 20 F.3d at 166.  The doctrine "reflects the unremarkable proposition that statements must be analyzed in context" and is applied in circumstances where projections are coupled with cautionary language.  *Id.* at 167.  "[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts." *Id.* at 171.

- 13 -

(4) many acquired tools worth millions of dollars were either obsolete or had been stolen (¶49(c)).[9] These same undisclosed factors also render unprotected defendants' statements that SG&A costs would "maintain . . at the level they're running" (¶52), because defendants knew that the existing acquisition, integration and inventory-related issues would seriously impact SG&A costs, including internal control and annual audit costs as well as computing system costs aimed at integration, such as RTMS. *See, e.g.*, ¶¶49(b)(vii)-(x), (xiv), 49(c)(xi). Because defendants concealed material adverse facts that existed at the time they made their predictive statements, their "cautionary language" is insufficient, and their statements are not protected. *See Lormand*, 565 F.3d at 244; *Rubinstein*, 20 F.3d at 170-71.

Defendants' misrepresentations further evade protection because plaintiffs sufficiently allege that defendants ***knew*** their statements were false when made. *See* 15 U.S.C. §78u-5(c)(1)(B); *Lormand*, 565 F.3d at 244; *Rubinstein*, 20 F.3d at 170 (defendants' "optimistic projections" not protected when plaintiffs adequately alleged they knowingly concealed adverse, material information). Defendants appear to iterate a rule that the PSLRA's safe harbor provision authorizes defendants to lie to investors as long as cautionary language is present. Defs' Mem. at 20. This pronouncement is meritless. The PSLRA unequivocally states that a person may be held liable if a "forward-looking statement" is made with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1)(B)(i); *Lormand*, 565 F.3d at 244. As set forth below, plaintiffs adequately allege that defendants knew their predictive statements were false at the time they were made and failed to disclose "facts that would tend seriously to undermine the accuracy of the statement." *See Rubinstein*, 20 F.3d at 166. Accordingly, defendants' misrepresentations do not

---

[9]     These factors also render defendants' misrepresentations concerning margins unprotected.

qualify for protection.  15 U.S.C. §78u-5(c)(1)(B); *Lormand*, 565 F.3d at 244; *Rubinstein*, 20 F.3d at 170.

**D.     Each Defendant Knew or Was Severely Reckless in Not Knowing About the Fraud**

A complaint alleging securities fraud under §10(b) must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  The inquiry for the Court is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 127 S. Ct. at 2503, 2509 (emphasis in original).  When evaluating a defendant's scienter, courts must consider whether an inference of scienter is "cogent" and "'***at least as likely as***'" – but not more likely than – "'any plausible opposing inference.'"  *Lormand*, 565 F.3d at 254-55 (ties favor the plaintiff) (citing *Tellabs*, 127 S. Ct. at 2503, 2510, 2513) (emphasis in original).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 127 S. Ct. at 2510.  Pursuant to these standards, the Complaint sufficiently alleges scienter and demonstrates that defendants' conduct constituted an "extreme departure" from the standard of ordinary care they owed to investors.

**1.     Defendants' Public Admissions Constitute Firm Evidence of Scienter**

The Fifth Circuit recently held that admissions, including post-class period admissions, "directly and cogently tend to prove [defendants'] state-of-mind at the time of their misleading statements and omissions, *i.e.*, they are evidence that the defendants actually knew earlier that the course of action would turn out badly."  *Lormand*, 565 F.3d at 254.  Here, Defendant Dumas' admissions reveal that in August 2007 he was aware of facts that directly contradicted statements he made to the public at that time.  During the August 2007 earnings call, Dumas reassured investors

- 15 -

that Flotek "had not seen a reduction in demand for [its] products" and that despite "$4 million in total revenue" that was not booked due to inclement weather, "[w]e are very confident that a vivid portion of that was delayed, and [that we] will pick it up." ¶52; Defs' Mem. Ex. F at 13.  Although Dumas did not admit it until October 2007, he knew at the time he made those statements that customers were advising Flotek that "some of the operators are taking a pause, a time out, on some of [the] fracing" and that Flotek was expecting a further sales decline – not a "pick up" – of deferred sales.  ¶58 ("sure enough," as anticipated, Flotek had a "$1.5 million drop in sales").[10]  Indeed, as customers were advising defendants of a slowdown in drilling, defendants were bracing for the imminent price cutting, as evidenced by Dumas' admission that "we made a decision; we were not going to cut prices.  No question about it, we knew what we did.  And we knew that we were absolutely going to lose some market share, because we've actually seen price discounts up to 28% and we made a decision to ignore that and it has cost us some revenue."  ¶59.[11]

Dumas and Meier concealed this information from investors during the 2Q07 earnings call in August, then promptly sold over 160,000 shares for illicit proceeds of more than $5 million (¶¶5, 90).  *After* unloading his stock and reaping the proceeds, Dumas admitted that "there has been . . . irrational exuberance about our stock and our expectations," effectively acknowledging that the

---

[10]     *See Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 700 (5th Cir. Tex. 2005) (inconsistent statements "strengthen[ed] the permissible inference that [the defendant] intended to deceive or mislead its investors").

[11]     Defendants do not refute plaintiffs' allegations that customers were notifying Flotek of an expected slowdown in fracing and drilling. *See* Defs' Mem. at 9.  Rather, they spuriously argue that statements made during the August 2007 earnings call that related to previously experienced slowdowns sufficiently warned investors about future slowdowns. *Id.*  These purported "warnings" were insufficient because Dumas did not once mention that drilling and fracing delays would continue into the third quarter, but rather told investors that Flotek was "seeing a return" in the third quarter.  Defs' Mem. Ex. F at 4.  Furthermore, defendants specifically advised the public that the second quarter slip merely "deferred" sales that Flotek would "pick up" in 3Q07 and the "outlook for the remainder of 2007 [was] positive."  ¶¶51-52.

- 16 -

information digested by the market, and provided by defendants, did not reflect the true conditions at Flotek at the time and caused Flotek's stock to artificially inflate by nearly 50%.  ¶¶5, 60, 90.  *See Blockbuster*, 2004 U.S. Dist. LEXIS 7173, at *59-*64 (finding allegations created an inference of scienter where, *inter alia*, there was a "dramatic difference" between the price at which shares were sold and the alleged artificially inflated price).[12]  Dumas' admissions plainly demonstrate his knowledge that Flotek expected diminished sales in 3Q07 and his intent to deceive investors in order to capitalize on Flotek's artificially inflated stock price.

### 2.    Defendants' Knowledge Concerning Financial Projections Raises a Strong Inference of Scienter

The Complaint alleges ample facts detailing the Individual Defendants' knowledge that their Class Period statements concerning Flotek's business and financial prospects were false when made. As senior executive officers, Dumas and Meier received financial results and projections from the Division presidents through conversations and through monthly profit and loss reports, and participated in meetings to discuss financial results and prospects prior to quarterly closing. ¶¶49(a)(ii), 62(a)(v); *see also* ¶55(d)(ii)-(iii) (the Divisions prepared monthly "sales/loss reports" that detailed sales results as a function of pricing and contained monthly and quarterly projections). Defendant Dumas' own public statements confirm that he and Meier receive "weekly sales report[s]" (¶58) and that Dumas monitored sales through discussions with Flotek employees and customers.[13]

The Complaint alleges that Defendant Dumas spoke directly with executives in the Divisions to discuss the aforementioned reports and financial projections (¶49(b)(ii)), but intentionally ignored

---

[12]    At the same time that Dumas was blaming Flotek's increased share price on "irrational exuberance," he was engaging in a hard sell of Flotek stock.  ¶60.

[13]    For example, in October 2007 Dumas commented that he monitored the status of the Rockies Express Pipeline for the purpose of analyzing its impact on drilling activity and Flotek's sales and obtained information from customers concerning Flotek's sales prospects.  ¶58.

the projections that were stated to him, and touted false projections to the market in May, August and October of 2007, because Dumas "never wanted to hear any bad news" and would tell the divisions to "just go out and find it" if they were not projecting the numbers Dumas wanted.  ¶¶49(a)(i), 49(a)(iv), 55(d)(ii-iii), 62(a)(i)-(v), 62(d).  Defendant Meier – the CFO – was acutely aware of Dumas' inaccurate forecasting to the market and his recitation of lofty numbers that did not correspond to those prepared by the operating divisions.  ¶62(a)(i)-(v).  Despite her duty to shareholders and her opportunity to correct Dumas during quarterly earnings calls, Meier not only failed to correct the CEO, but she also knowingly reiterated the same false guidance projections touted by Dumas.  ¶¶55(a)(i), 62(a)(i)-(ii).[14]  Accordingly, plaintiffs have adequately alleged that defendants knew their public statements concerning guidance were false and issued with utter disregard for internal reports and management consensus demonstrating $1.00 EPS was unachievable.

At a minimum, Dumas' "egregious refusal to see the obvious, or to investigate the doubtful" demonstrates his severe recklessness with respect to giving guidance to investors.  *See Plotkin*, 407 F.3d at 700.  *See also Fine v. American Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990) ("'a conscious purpose to avoid learning the truthfulness of a statement is an extreme departure from the standards of ordinary care'") (citing *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 962 (5th Cir. 1981)).  Indeed, Defendant Dumas' severe recklessness is demonstrated by the Division presidents' consensus that he should be "[kept] away from the analysts" because he "had a habit" of overstating financial projections to Wall Street (¶49(a)(i)) and touting guidance that the Division presidents told

---

[14]      Additionally, Meier knew that even if she and Dumas adhered to the forecasts prepared by the Divisions, Corporate level forecasts were unlikely to be accurate because the myriad platforms utilized across the acquired companies caused Flotek serious forecasting and accounting problems. ¶49(b)(vii)-(viii).  As a result, Meier specifically sought to utilize a business-wide enterprise resource planning ("ERP") system in order to begin generating accurate forecasts. ¶49(b)(vii)-(viii).

him was "impossible" to achieve and "not fair" to investors (¶62(a)(i)-(ii)).  *See also* ¶49(a)(iii)-(iv)

(management "cringed" at projections Dumas stated to the market that were contrary to actual

performance because he would just "make it up as he went").

Defendants do not dispute the veracity of these allegations, nor can they.  Instead, defendants

contend that these facts should be disregarded because information from confidential witnesses

should be ignored when evaluating scienter.  Defs' Mem. at 27.  Defendants' position is contrary to

the law of this Circuit which permits courts to rely on allegations arising from confidential witnesses

when the witness is identified with "sufficient particularity to support the probability that a person in

the position occupied by the source would possess the information alleged."  *ABC Arbitrage v.*

*Tchuruk*, 291 F.3d 336, 352 (5th Cir. 2002).[15]  *See also Cent. Laborers' Pension Fund v. Integrated*

*Elec. Servs.*, 497 F.3d 546, 552 (5th Cir. 2007) ("[c]onfidential source statements are a permissible

basis on which to make an inference of scienter").[16]  Here, plaintiffs' confidential witness allegations

are sufficient because, for each of the four witnesses, plaintiffs describe when and in what capacity

the witness was employed by Flotek and how the witness gained access to the information pleaded in

the Complaint:

---

[15]     As the court in *ABC Arbitrage* notes, "section 78u-4(b)(1) avoids a general requirement of
naming confidential sources which may . . . make impossible the adequate pleading of meritorious
securities fraud cases in circumstances in which informants do not wish to be exposed too early but
in which the PSLRA's stay of discovery under 15 U.S.C. §78u-4(b)(3)(B) prevents the acquisition of
other sources for allegations which the plaintiffs have no choice but to make on information and
belief."  *Id.* at 354.

[16]     *See also Brody*, 2006 U.S. Dist. LEXIS 69302, at *13-*14 (relying on confidential witnesses
where each confidential witness's job, job description, time-frame of employment, and knowledge
about the company's performance and the defendants was pleaded) (quoting *Barrie*, 397 F.3d at
259); *In re Fleming Cos. Sec. & Deriv. Litig.*, No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS
26488, at *69 (E.D. Tex. June 10, 2004) (where plaintiff pleaded specific information about the
positions held by its sources, the time period in which they worked, their job responsibilities and the
specifics regarding how they acquired their information and knowledge, the court found the
allegations specific) (citing *ABC Arbitrage*, 291 F.3d at 356).

- 19 -

- CW1, Flotek's Human Resources Director between August 2007 and May 2009, worked at Corporate Headquarters in Flotek's executive suite and reported directly to Defendant Dumas.  Because the executive worked in "close quarters," CW1 personally overheard several admissions made by Dumas and Meier, including their conversations and arguments.  ¶¶49(a)(i), 49(b)(iii).  CW1 also had a direct line of communication with the operating division executives who advised CW1 of business matters and repeatedly expressed their discomfort with Dumas' representations to the public.  *See, e.g.*, ¶¶49(a)(i), (iv), 49(b)(i), 55(a)(i), 62(a)(i)-(v), 66(d).[17]

- CW2 worked for Flotek as a Fixed Asset Accountant from July 2008 through February 2009.  ¶49(b)(iv).  CW2 performed inventory counts at most of Flotek's tool yards, including those of its acquisitions, and engaged in correspondence and discussions with Flotek's Corporate Controller, Julie Schwendimann ("Schwendimann"), and other Flotek executives concerning the Company's assets and inventory.  ¶49(c)(ii)-(xii).[18]

- CW3, Flotek's IT Director and Senior Architect from April 2008 to June 2009, reported directly to CFO Meier.  CW3 visited every facility in the divisions in order to spearhead Flotek's IT initiative and commence integration of the acquired companies.  ¶49(b)(vi)-(vii).  CW3 met with Defendant Meier to determine the Company's overall IT strategy and discussed problems with financial reporting and inventory tracking with RTMS.  ¶49(b)(vii), (xiv), (xix).  CW3 witnessed numerous inventory and controls-related problems at the facilities which CW3 discussed with Schwendimann.  ¶49(b)(x)-(xix).

- CW4 was a Regional Manager for one of Flotek's acquired companies, Triumph, acquired in January 2007.  ¶49(b)(xx).  As a manager at one of Flotek's acquired companies, CW4 knew integration of acquired companies had not occurred and was not likely to occur in 2007 or 2008.  *Id.*  As regional manager, CW4 directly witnessed asset and inventory issues in Triumph yards and discussed "overvalue in

---

[17]    Defendants seek to undermine CW1's credibility by arguing that as a human resources employee he was not involved in preparing financial estimates and only relayed "vague hearsay remarks" made by Flotek executives.  Defs' Mem. at 12.  However, CW1's testimony cannot be discounted given that a Corporate Human Resources Director is the precise individual with whom executives would discuss colleague dissatisfaction.  Moreover, CW1 stated that Flotek's executive suites were "tiny," enabling him to become embroiled in matters other than those associated with his specific job responsibilities.  *See* ¶49(b)(iii).

[18]    Although Defendants argue that CW2's experiences in 2008 have no bearing on defendants' misrepresentations in 2007 (Defs' Mem. at 14), post-class period evidence is relevant to establishing defendants' state of mind during the Class Period.  *Lormand*, 565 F.3d at 254.  Defendants simply ignore the logical inference that if the acquired companies were not integrated in 2008, they were not integrated in 2007 either.  *See* Defs' Mem. at 13, 28; *Plotkin*, 407 F.3d at 698 ("later-emerging facts can . . . provide warrant for inferences about an earlier situation").

the acquisitions" and obsolete inventory with the Division head, Steve Reeves, to whom he reported.   ¶¶49(c)(xiii)-(xiv), 55(d)(i).   Because Triumph was part of Flotek's downhole tools division, CW4 was familiar with industry activity, including pricing activity, and was intimately involved in the financial reporting and forecasting process.   ¶55(d)(i)-(iv).

Nothing else is required to establish the reliability of the confidential witnesses.[19]   Moreover, the consistency and corroboration provided by the four witnesses enhances their reliability.   *See Tetra Techs.*, 2009 U.S. Dist. LEXIS 126687, at *109-*114 (finding a CW's statements sufficient to infer scienter in part because other CWs provided corroborating statements).

### 3.   Defendants' GAAP Violations Raise a Strong Inference of Scienter

Defendants' GAAP violations also provide strong evidence of scienter because plaintiffs have adequately alleged that defendants were at least "'severely reckless in publishing such information.'"   *Coates v. Heartland Wireless Commc'ns, Inc.*, 100 F. Supp. 2d 417, 430 (N.D. Tex. 2000) (citing *Fine*, 919 F.2d at 297).   Here, plaintiffs allege that Dumas and Meier knew that the Company improperly accounted for its unusable inventory in violation of GAAP and caused misstatements of inventory, gross margin and net income.   ¶¶49(b)(vii)-(x), 49(b)(xiv), 49(b)(xvii)-(xviii), 49(b)(xix), 49(c)(iii), 49(c)(vi), 73-84.   Flotek was touting the success of and efforts to integrate its recent acquisitions without disclosing the massive volume of obsolete inventory that had not been discovered prior to purchase as a result of inadequate due diligence and would require

---

[19]      Defendants rely primarily on *Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*, 537 F.3d 527 (5th Cir. 2008) ("*Shaw Group*") and *Cent. Laborers'* to suggest that courts never uphold allegations based on statements from confidential witnesses. Defs' Mem. at 28.  These cases are inapposite because plaintiffs here have alleged each confidential source's job title and responsibilities, period of employment and circumstances under which he or she obtained the alleged information.  These allegations are in sharp contrast to those in *Shaw Group* and *Cent. Laborers'* where plaintiffs sought to rely on statements made by confidential sources without providing any specifics to suggest the sources would possess the information alleged.  *See Shaw Group*, 537 F.3d at 535; *Cent. Laborers'*, 497 F.3d at 552.

immense resources to resolve.  ¶¶49(b)(i), 49(b)(xiv), 49(c)(iii).  The Individual Defendants were intimately knowledgeable about Flotek's inventory issues, certified the Company's financial statements with full knowledge that inventory had not been "cleaned up" and, by concealing these matters from the public, avoided breaching credit arrangements with certain banks.  ¶66.

In early 2007, Dumas and Meier visited Flotek's various divisions and yards to inspect inventory across the acquired businesses, when Dumas determined that much of the inventory on Flotek's books was just "junk" that Dumas wanted "cleaned up."  ¶¶49(b)(ix), 49(b)(xiv).[20]  Dumas and Meier thus initiated a 2007 inventory accounting project which, once started, revealed the serious inadequacy of RTMS – Flotek's inventory tracking system – which was virtually useless as none of the paper records in the businesses matched up with the system records.  ¶¶49(b)(ix), 49(b)(xiv).  According to Flotek's Corporate Controller, "millions of dollars" worth of obsolete inventory was to come off the books as part of a "goodwill write-off."  ¶¶49(b)(xvii)-(xix), 49(c)(ii).  Indeed, the Company ultimately took hefty goodwill impairment charges totaling *$85 million* in 2009.  ¶66.  Had the Company taken the goodwill impairment charge in 2007, it would have breached a minimum net worth covenant that was critical to its revolving credit arrangements and would have been forced to conduct a non-public offering to repay its debt and continue Company operations.  *Id.*  Dumas and Meier's knowledge of the pervasive inventory problems across the acquired companies is not surprising because Flotek executives would be expected to familiarize themselves with the companies they acquire.  *See Plotkin*, 407 F.3d at 700 (reasonable assumption

---

[20]     Defendants concede that Dumas and Meier paid "on site visits" to the facilities and determined that the junk needed to be cleaned up. Defs' Mem. at 16.  Defendants attempt to utilize this concession as evidence that their Class Period statements concerning integration efforts were not false.  *See id.* (defendants argue that counting inventory amounts to improving integration).  This argument fails because not only were defendants unable to conduct an accurate inventory count in 2007, but they knew that an accurate count could not be conducted, impeding integration. ¶49(b)(xix).

that company executives would investigate and discover the poor financial condition of companies they deal with raises a strong inference of scienter).[21]

Despite their direct knowledge of Flotek's pervasive inventory issues which had not been remedied in 2007, defendants Dumas and Meier signed SOX certifications attesting that Flotek's quarterly reports and financial statements "fairly presented in all material respects, [Flotek's] financial condition." ¶¶85-88. Defendants also signed the respective Securities and Exchange Commission filings containing the false financial information and the certifications. ¶85. These allegations bolster plaintiffs' demonstration of scienter. *Tetra Techs.*, 2009 U.S. Dist. LEXIS 126687, at *29 (SOX certifications support a strong inference of scienter when the signing defendants "'had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions'") (citing *Cent. Laborers'*, 497 F.3d at 555). Here, Meier and Dumas certified Flotek's financial statements despite glaring problems and "red flags" related to unusable assets and inventory that remained on Flotek's books. Accordingly, the SOX certifications support a strong inference of scienter in this case.

### 4. The Individual Defendants' Stock Sales and Board Member Resignations Also Support an Inference of Scienter

The Individual Defendants' insider trading and Board member resignations further support plaintiffs' scienter allegations. Dumas and Meier's insider trading was suspicious in light of the percentage of shares sold, profit received, prior trading history, timing and coordination. *See Enron*,

---

[21]     Plaintiffs do not, as defendants suggest, offer "mere allegations" that Flotek's financial statements exhibit "mistakes" or incorrect valuations that "'arise from negligence, oversight or simple mismanagement.'" *See* Defs' Mem. at 24. On the contrary, plaintiffs allege in detail the Individual Defendants' first-hand knowledge of Flotek's pervasive inventory problems, the financial impact of the obsolete inventory and the consequences of disclosing the inventory issues to the market, including the banks with which Flotek maintained important credit arrangements.

- 23 -

258 F. Supp. 2d at 593-94 (such factors may support a strong inference of "bad faith and scienter for §10(b) and Rule 10b-5 purposes").  Dumas and Meier's coordinated Class Period sales of nearly 20% and 30% of their respective stock – for proceeds of over $6.7 million – constitute an extraordinary disposition of their holdings.  ¶90.  *See Berger v. Compaq Computer Corp.*, No. Civ. A. H-98-1148, 1999 WL 33620108, at *17 (S.D. Tex. Dec. 22, 1999) (20% of insider's shares sold is suspicious and "'sufficient to support a scienter allegation'").[22]  This is especially true because their insider sales were out of line with prior trading and "well exceeded [their] pre-Class Period sales."  ¶¶90, 91, 93, 98.  *See Cent. Laborers'*, 497 F.3d at 553 (sales suspicious when "'"out of line with prior trading practices"'").  Indeed, Dumas' Class Period sales ***generat[ed] more proceeds during the Class Period than during the five years preceding the Class Period***.  ¶93.  *See United States v. Henke*, 222 F.3d 633, 639 (9th Cir. 2000) (inferring scienter despite prior trading history which only "netted [] a relatively small return").  Excluding vested options, Meier sold more than 98% of her holdings during the Class Period.  ¶93.

---

[22]  *See also Southland SEC Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 368-69 (5th Cir. 2004) (insider sales between 14%-21% suspicious); *Moskowitz v. Mitcham Indus.*, No. H-98-1244, 2000 U.S. Dist. LEXIS 22424, at *41-*42 (S.D. Tex. Sept. 27, 2000) (23% suspicious).  Defendants cite a litany of cases in an effort to demonstrate that the percentage of shares sold by Dumas and Meier is not suspicious.  *See* Defs' Mem. at 26 & n.31.  None of the cases support defendants' position because, in each case, the court held that factors other than the percentage of sales, including prior trading history and lengthy class periods, not at issue here, weighed against an inference of scienter.  *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1118-19 (N.D. Cal. 2009) (extremely long class period weakened inference of scienter even though percentage sold was suspicious); *Shaw Group*, 537 F.3d at 545 (sales consistent with prior trading); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1210 (D. Or. 2006) (no allegation that trades were out of line with prior trading history); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 897 (W.D. Tex. 2008) (extremely long class period and consistent sales); *In re Michaels Stores, Inc. Sec. Litig.*, No. Civ. A. 3:03-CV-0246, 2004 WL 2851782, at *13 (N.D. Tex. Dec. 10, 2004) (sales consistent with prior trading); *Cent. Laborers'*, 497 F.3d at 554-55 (stock sold to fund retirement or divorce, or sold pursuant to a 10b-5 plan).

The timing of Dumas and Meier's trades is suspicious because both defendants executed sales immediately after they issued false and misleading statements to the public during Flotek's 1Q07 and 2Q07 earnings announcements.  ¶¶44-46, 48-49, 51-53, 90-91, 93.  Flotek's stock price increased significantly in the wake of defendants' misrepresentations and was at an all-time high in May and August 2007 when Dumas and Meier sold their stock.  ¶¶5, 103.  Indeed, Flotek's insiders made "'rosy characterizations of company performance'" and simultaneously sold massive quantities of stock "'for no apparent reason,'" supporting an inference that "'their rosy characterizations [were] false and that they knew it.'"[23]  *See Enron*, 258 F. Supp. 2d at 593 (quoting *Ronconi v. Larkin*, 253 F.3d 423, 434-35 (9th Cir. 2001)).  Combined with Dumas' October 2007 admission that he expected Flotek to suffer from decreased sales in 3Q07, his August 2007 sale of nearly $5 million magnifies plaintiffs' already sufficient scienter allegations.  *See* §IV.D.1.

The suspicious resignation of Flotek's two longest-standing Board members also supports a strong inference of scienter.[24]  Board members Gary M. Pittman and William R. Ziegler offered their resignation, citing numerous policy, financial reporting and governance issues and their refusal to serve on a Board where Dumas was Chairman and CEO.  ¶67.  *See* Defs' Mem. Exs. S-T.  *See Zucco Partners*, 552 F.3d at 1002 (multiple resignations may be suspicious).  Flotek's Board members did not resign simply to pursue other interests, but specifically because of their dissatisfaction with financial reporting and other matters tied to Dumas' position as Chairman and CEO.  Accordingly,

---

[23]     Contrary to defendants' assertion, stock sales need not take place at the class period high to raise an inference of scienter.  *Southland*, 365 F.3d at 369.

[24]     *See Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607-608 (S.D.N.Y. 2009); *Middlesex Retirement Sys. v. Quest Software, Inc.*, No. CV 06-6863 DOC (RNBx), 2008 WL 7084629, at *9 (C.D. Cal. Jul. 10, 2008); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 882 (D. Minn. 2007).

these resignations, and the departure of Meier in 2008 and Dumas in 2009, provide significant support for plaintiffs' allegations that defendants acted with scienter in misrepresenting Flotek's business.

### 5. Defendants Fail to Provide Plausible Competing Inferences

In an effort to undermine the strong inference of scienter alleged in the Complaint, defendants provide what they deem to be an "overwhelming competing inference" that amounts to little more than a collection of disparate facts that have little bearing on plaintiffs' allegations. First, throughout their brief, defendants repeatedly portray this case as one resulting from defendants' promise to achieve a negligible $0.03 increase in EPS during 4Q07 and, ultimately, from a mere 1.25% revenue miss. Defs' Mem. at 1, 2, 24-25. Foremost, defendants' attempt to downplay Dumas and Meier's overstatement of guidance is meritless and ignores the Company's whopping 40% guidance miss in 4Q07 (having achieved $0.71 in the first three quarters and coming in at just $0.17 in 4Q07). *See* Defs' Mem. at 2, 7, 24, Ex. K at 40 of 75. Indeed, the magnitude of the guidance miss alone suggests that defendants knew "something was amiss at the outset" of the quarter. *Plotkin*, 407 F.3d at 698.[25] Flotek's 1.25% revenue miss cannot detract from the guidance miss and the near evisceration of the Company's net income and operating margins which fell from 17.2% in 2006 to just 9.9% in 2007 in the Drilling Products Segment. *See* Defs' Mem. Ex. K at 30 of 75. Second, defendants' explanation that "Flotek's earnings had been consistently improving" and the Company had "a record October" is inconsequential and stands for nothing more than the insupportable proposition that if a Company has one good month or experiences a general upward

---

[25] Throughout the Class Period, defendants repeatedly stated that Flotek would achieve $1.00 EPS "without the addition of any acquisitions." ¶¶42, 52, 57. Accordingly, Flotek's 40% guidance miss is rendered even more profound given Flotek acquired two additional companies in the second half of 2007. Defs' Mem. Ex. K at 5-6 of 75.

trend, executives are entitled to disregard overt acquisition-related problems and ignore internal reports and executive consensus demonstrating the Company will not meet stated guidance. *See* Defs' Mem. at 24-25. Defendants' pronouncement that the lack of a restatement "cuts heavily" into plaintiffs' scienter allegations is similarly misplaced, as the majority of the alleged misrepresentations do not pertain to accounting. Regardless, plaintiffs allege that Flotek intended to dispense with its massive inventory issues by taking a goodwill impairment charge, which they did, to the tune of $85 million in 2009.[26] Finally, defendants' argument that they took steps to integrate the acquired companies carries little weight because, regardless of their efforts, little to no integration actually occurred and, as defendant Meier explained to CW3, Flotek had spent hundreds of thousands of dollars but "seemed to have gotten nowhere." ¶49(b)(viii).[27]

Some corporate events are so important that the only reasonable inference is that the company's top executives must have known – or were reckless in not knowing – of the circumstances surrounding their statements. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (finding scienter as to CEO concerning status of important patent); *Plotkin*, 407 F.3d at 700 (imputing knowledge to CEO and CFO of risky contracts maintained with large customers). Here,

---

[26]    Defendants argue that Flotek's goodwill impairment charge only included "'goodwill and other intangible assets'" and not "inventory." *See* Defs' Mem. at 29 n.36. Although defendants correctly note that goodwill and inventories are separate line items (*id.*), they ignore the consistent statements from confidential sources that the Company intended to deal with the obsolete inventory simply by writing it off as "goodwill." ¶49(b)(xvii) & (c)(vi) (Corporate Controller stated inventory and assets would be part of goodwill write-off); ¶49(c)(xiv) (President of Downhole Tool Division stated overvalue from acquisitions and obsolete inventory will be included in goodwill impairment charge). Furthermore, much of the obsolete inventory was attributable to acquired companies and factored into the calculation of goodwill at the time of acquisition. Goodwill represents the excess of cost of the acquired company over the net of the amounts assigned to assets acquired, net of liabilities. *See* FASB Statement of Financial Accounting Standards No. 141, No. 43. Thus, inventory of acquired companies was directly tied to Flotek's calculation of goodwill.

[27]    The remainder of defendants' arguments relate to the purported "cautionary-language" accompanying the misrepresentations, which plaintiffs establish as insufficient in §IV.C.

defendants' statements concern financial forecasts, acquisitions and industry conditions concerning drilling and fracing activity that form the very basis for Flotek's business.  To infer that the Individual Defendants did not know about these matters is to infer the implausible.  In light of the strong inference of scienter derived from plaintiffs' allegations, defendants simply have not provided a plausible competing inference, let alone an "overwhelming" inference, that defendants possessed the requisite state of mind.

### E.       The Complaint Meets the Pleading Requirements for Loss Causation

Pleading under Rule 8(a)(2) is not burdensome and a plaintiff need only "'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *See Lormand*, 565 F.3d at 256.  *See also Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 347, 125 S. Ct. 1627 (2005) (loss causation is adequately pleaded when a plaintiff alleges that the "share price fell significantly after the truth became known").  Here, plaintiffs have more than adequately satisfied that standard by alleging "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff[s'] economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff[s'] economic loss."  *Lormand*, 565 F.3d at 258.  *See* ¶¶45-46, 51-52, 56-60 (false statements and omissions); ¶¶56-60, 63, 65 (disclosures); ¶¶61, 64, 102 (stock decline).

Regardless of whether plaintiffs are required to demonstrate that the disclosures were "relevant" or "related" to the alleged misrepresentations, "neither are steep or difficult standards to satisfy." *Lormand*, 565 F.3d at 256 n.20.  Here, the alleged disclosures are clearly relevant, as they connect defendants' prior misrepresentations to Flotek's stock decline, thereby giving rise to "a reasonable hope or expectation that discovery will lead to evidence that the elements of loss causation existed."  *See id.* at 263.

- 28 -

On October 31, 2007, defendants partially revealed that decreased fracing and drilling activity continued to impact Flotek's sales in all three operating segments and negatively impacted the Company's operating margins. ¶¶56-57. This disclosure conflicts with defendants' fraudulent Class Period statements that demand for Flotek's products had not decreased and that poor weather merely "deferred" sales (¶¶46, 51-52). The disclosure also revealed what defendants should have disclosed during the Class Period: Flotek was experiencing *and would continue to experience* decreased fracing and drilling activity, resulting in pricing pressure that would impact the Company's margins. ¶¶55(d)-(d)(iv), 58-59.

Defendants' Class Period-ending disclosure on January 23, 2008 revealed that Flotek failed to meet its stated guidance, continued to experience a slowdown in fracing and drilling activity, and suffered significant additional General and Administrative costs as a result of SOX, the expansion of accounting support and personnel and implementation of RTMS. ¶¶63, 65. These statements directly contradict defendants' Class Period statements concerning financial guidance and fracing and drilling activity. The disclosure concerning SG&A costs revealed what defendants had omitted to disclose to investors during the Class Period – that integration and inventory issues related to the acquisitions (including problems with RTMS) had created an unwieldy environment that would not only result in increased expenditures to support accounting and inventory management across the businesses and sufficiently address internal control and annual audit work, but also rendered financial reporting and forecasting unreliable. ¶¶49(b)(vi)-(xii), 49(b)(xiv)-(xii), 55(b), 62(b).[28] In

---

[28] Defendants' post-Class Period disclosures concerning exorbitant goodwill impairment of more than $85 million, as well as the departure of Flotek's two longest-standing Board members, who resigned as a result of disagreements with defendant Dumas over financial reporting and other policy and governance issues, are also probative of loss causation. ¶¶66-67.

the wake of these disclosures, Flotek's stock price suffered a precipitous decline.  ¶¶61, 64, 102.

Accordingly, the Complaint adequately alleges loss causation.

### F.      Plaintiffs Have Stated a §20(a) Claim for Control Person Liability

Defendants Dumas and Meier are liable as controlling persons of Flotek within the meaning

of §20(a) of the Securities Exchange Act of 1934.  15 U.S.C. §78t(a).  Defendants do not seriously

contest plaintiffs' allegations in this regard, and only argue that plaintiffs fail to state a primary claim

under §10(b).  Defs' Mem. at 30.  As demonstrated herein, plaintiffs have adequately alleged the

primary violation.  Because defendants controlled Flotek and caused the Company to violate §10(b)

and Rule 10b-5, their Motion must be denied with respect to Plaintiffs' §20(a) claim.  *Lormand*, 565

F.3d at 268 n.37; *Plotkin*, 407 F.3d at 700 n.9; *Brody*, 2006 U.S. Dist. LEXIS 69302, at *25-*27

(denying motion to dismiss §20(a) claims where control person defendants allegedly knew of the

alleged misrepresentations and were in a position to prevent them).

## V.      CONCLUSION

For the reasons stated above, defendants' motion to dismiss should be denied.  In the event

that the Court grants defendants' motion in whole or in part, plaintiffs respectfully request leave to

amend.

DATED:  May 20, 2010                Respectfully submitted,

                                    ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                    JONAH H. GOLDSTEIN
                                    ANNE L. BOX
                                    JENNIFER L. GMITRO


                                            s/ JENNIFER L. GMITRO
                                    _____
                                         JENNIFER L. GMITRO

- 30 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
WILLIAM W. STONE
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone:  770/392-0090
770/392-0029 (fax)

Co-Lead Counsel for Plaintiff

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone: 303/861-1764
303/395-0393 (fax)

Additional Counsel for Plaintiff

SCHWARTZ JUNELL GREENBERG &
    OATHOUT LLP
ROGER B. GREENBERG
State Bar No. 08390000
Federal I.D. No. 3932
THANE TYLER SPONSEL III
State Bar No. 24056361
Federal I.D. No. 690068
Two Houston Center
909 Fannin, Suite 2700
Houston, TX  77010
Telephone:  713/752-0017
713/752-0327 (fax)

Liaison Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 20, 2010.

s/ JENNIFER L. GMITRO
JENNIFER L. GMITRO

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:jgmitro@rgrdlaw.com

# Mailing Information for a Case 4:09-cv-02526

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey A Berens**
  jeff@dyerberens.com

- **Anne L Box**
  anneb@rgrdlaw.com,hectorm@rgrdlaw.com

- **Robert J Dyer , III**
  bob@dyerberens.com

- **Michael I Fistel**
  mfistel@holzerlaw.com

- **Jennifer L Gmitro**
  jgmitro@rgrdlaw.com,hectorm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Roger B Greenberg**
  rgreenberg@schwartz-junell.com,sdoring@schwartz-junell.com

- **Michael A Lee**
  mlee@susmangodfrey.com

- **Gerard G Pecht**
  gpecht@fulbright.com,amorgan@fulbright.com

- **Peter Andrew Stokes**
  pstokes@fulbright.com,abevan@fulbright.com

- **William Woodhull Stone**
  wstone@holzerlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Jonah H Goldstein
Robbins Geller Rudman & Dowd, LLP
655 West Broadway
Ste 1900
San Diego, CA 92101
```