IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID EARL STOCKMAN AND CAROL BURKE, on behalf of themselves and others similarly situated, | § § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. H-09-02526 JUDGE SIM LAKE |
| v. | § § | |
| FLOTEK INDUSTRIES, INC., JERRY D. DUMAS, SR., AND LISA G. MEIER, | § § § | |
| Defendants. | | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

**Page**

I.  THE RESPONSE FAILS TO SHOW HOW PLAINTIFFS' ALLEGATIONS
    SATISFY THE PSLRA OR SUPPORT A STRONG INFERENCE OF
    SCIENTER ................................................................................................ 1

    A.  There Is No Inconsistency Between Dumas's Statements On August 3,
        2007, And November 1, 2007 ............................................................... 1

    B.  Plaintiffs' Confidential Source Allegations Violate The PSLRA And Do
        Not Support A Strong Inference Of Scienter ......................................... 5

        1.  The Guidance Allegations Are Insufficient ................................. 6

        2.  The Inventory And Integration Allegations Are Insufficient .................. 7

    C.  Plaintiffs' Conclusory Claim Of "GAAP Violations" Is Predicated
        Entirely On The Defective Confidential Source Allegations And Defies
        *Shaw Group* ........................................................................................ 11

    D.  The Stock Sale Allegations Are Insufficient ...................................... 12

    E.  The "Resignation" Allegations Are Insufficient ................................. 14

    F.  The Nonfraudulent Inferences Overwhelm Any Fraudulent Inferences ............. 15

II.  THE PSLRA SAFE HARBOR BARS PLAINTIFFS' CLAIMS ................................ 18

III.  PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION ................................ 19

CONCLUSION ........................................................................................ 21

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ...............................................................7, 9, 14, 16

*In re Administaff, Inc. Secs. Litig.*,
    No. Civ.A H-03-2082, 2006 WL 846378 (S.D. Tex. Mar. 30, 2006).............................1, 7

*In re Alamosa Holdings, Inc.*,
    382 F. Supp. 2d 832 (N.D. Tex. 2005) ...............................................................17

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
    597 F.3d 330 (5th Cir. Feb. 12, 2010) ...............................................................19, 20

*Berger v. Compaq Computer Corp.*,
    No. Civ. A. H-98-1148, 1999 WL 33620108 (S.D. Tex. Dec. 22, 1999).........................14

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...............................................................13

*California Public Employees' Retirement Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)...............................................................6

*Catogas v. Cyberonics*,
    292 Fed. Appx. 311 (5th Cir. Sept. 8, 2008).........................................................20

*In re Cerner Corp. Secs. Litig.*,
    425 F.3d 1079 (8th Cir. 2005) ...............................................................6

*In re Coca-Cola Enterprises Inc. Secs. Litig.*,
    510 F. Supp. 2d 1187 (N.D. Ga. 2007) ...............................................................9

*Commtouch Software Ltd. Secs. Litig.*,
    No. 01-719, 2002 WL 31417998 (N.D. Cal. July 24, 2002) .........................................7

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
    504 F. Supp. 2d 151 (N.D. Tex. 2007) ...............................................................18

*In re Cornerstone Propane Partners, L.P.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...............................................................14

*In re Dell Inc. Secs. Litig*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008).........................................................1, 6, 8, 13, 21

*In re Dynegy, Inc. Secs. Litig.*,
　　339 F. Supp. 2d 804 (S.D. Tex. 2004) (Lake, J.) ............................................................13

*Elam v. Neidorff*,
　　544 F.3d 921 (8th Cir. 2008) ......................................................................................17

*In re Enron Corp. Secs., Deriv. & ERISA Litig.*,
　　258 F. Supp. 2d 576 (S.D. Tex. 2003) .........................................................................13

*Flaherty & Crumrine Preferred Inv. Fund, Inc. v. TXU Corp.*,
　　565 F.3d 200 (5th Cir. 2009) .............................................................................7, 13, 17

*In re Harley-Davidson, Inc. Secs. Litig.*,
　　660 F. Supp. 2d 969 (W.D. Wisc. 2009)........................................................................8

*Home Solutions of Am. Inv. Grp. v. Fradella*,
　　2008 WL 1744588 (N.D. Tex. Mar. 24, 2008) ............................................................18

*In re Huntington Bancshares*,
　　_ F. Supp. _, 2009 WL 4666455 .................................................................................11

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
　　537 F.3d 527 (5th Cir. 2008) ................................................................................. *passim*

*In re Integrated Elec. Servs., Inc. Secs. Litig.*,
　　No. Civ.A 4:04-CV-3342, 2006 WL 54021 (S.D. Tex. Jan. 10, 2006) .................1, 12, 15

*In re Intelligroup Secs. Litig.*,
　　527 F. Supp. 2d 262 (D.N.J. 2007) ...............................................................................6

*Konkol v. Diebold, Inc.*,
　　590 F.3d 390 (6th Cir. 2009) .........................................................................................6

*Kurtzman v. Compaq Computer Corp.*,
　　No. Civ. A. H-99-779, 2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)...........................13

*Limantour v. Cray Inc.*,
　　432 F. Supp. 2d 1129 (W.D. Wash. 2006).......................................................................6

*Lormand v. US Unwired, Inc.*,
　　565 F.3d 228 (5th Cir. 2009) .....................................................................................5, 20

*In re Medicis Pharm. Corp. Secs. Litig.*,
　　689 F. Supp. 2d 1192 (D. Ariz. 2009) ............................................................................8

*In re Metawave Comms. Corp. Secs. Litig.*,
　　298 F. Supp. 2d 1056 (W.D. Wash. 2003)...................................................................6, 9

*In re Michaels Stores, Inc. Secs. Litig.*,
    2004 WL 2851782 (N.D. Tex. Dec. 10, 2004) ................................................................13

*Morgan v. AXT, Inc.*,
    No. C 04-4362 MJJ, 2005 WL 2347125 (N.D. Cal. Sept. 23, 2005)...........................8, 14

*Moskowitz v. Mitcham Indus.*,
    No. H-98-1244, 1999 WL 33606197 (S.D. Tex. 1999)......................................................14

*Moskowitz v. Mitcham Indus.*,
    No. H-98-1244, 2000 WL 33993307 (S.D. Tex. Sept. 27, 2000).......................................14

*Nathenson v. Zonagen*,
    267 F.3d 400 (5th Cir. 2001) ...........................................................................................12

*In re Odyssey Healthcare, Inc. Secs. Litig.*,
    424 F. Supp. 2d 880 (N.D. Tex. 2005) ............................................................................16

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*,
    No. Civ. A.H-06-3022, 2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ..............................1

*Patel v. Parnes*,
    253 F.R.D. 531 (C.D. Cal. 2008) .......................................................................................6

*In re PetSmart, Inc. Secs. Litig.*,
    61 F. Supp. 2d 982 (D. Ariz. 1999) ...................................................................................9

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ........................................................................................7, 15

*In re Rackable Sys., Inc. Secs. Litig.*,
    No. C 09-0222 CW, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010).........................8, 11, 17

*In re Remec Inc. Secs. Litig.*,
    388 F. Supp. 2d 1170 (S.D. Cal. 2005)..............................................................................8

*In re Rhodia S.A. Secs. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007)..............................................................................21

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ...............................................................................7, 14, 16

*In re Secs. Litig. BMC Software*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) ...............................................................................9

*In re Seracare Life Sciences, Inc.*,
    No. 05-CV-2335-H, 2007 WL 935583 (S.D. Cal. Mar. 19, 2007) .....................................8

*Slayton v. Am. Ex. Co.*,
    604 F.3d 758 (2d Cir. 2010)....................................................................................17, 18

*Sorkin, LLC v. Fischer Imaging Corp.*,
    2005 WL 1459735 (D. Colo. June 21, 2005).......................................................................9

*Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................... *passim*

*In re St. Jude Medical, Inc. Secs. Litig.*,
    629 F. Supp. 2d 915 (D. Minn. 2009).............................................................................17

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
    551 U.S. 308 (2007)......................................................................................1, 5, 14

*In re TETRA Technologies, Inc. Secs. Litig.*,
    Civ. Action No. 4:08-cv-0965, 2009 WL 6325540 (S.D. Tex. July 9, 2009) ...............5, 7

*U.S. v. Henke*,
    222 F.3d 633 (9th Cir. 2000) ...........................................................................14

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .......................................................................6, 8, 11, 13

*In re Zumiez Inc. Secs. Litig.*,
    No. C07-1980-JCC, 2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ...............................6

## RULES AND STATUTES

15 U.S.C. § 78u-4(b)(1) ...........................................................................................5

15 U.S.C. § 78u-5(c)(1)(A)...................................................................................18

Fed. R. Civ. P. 12(b)(6).........................................................................................20

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

Plaintiffs' Response fails to identify any particularized facts showing a false or misleading statement or supporting a strong inference of scienter.[1]  Federal courts in Texas routinely grant dismissals with prejudice when, as here, the consolidated complaint filed after selection of lead counsel does not satisfy the PSLRA.[2]

## I.   THE RESPONSE FAILS TO SHOW HOW PLAINTIFFS' ALLEGATIONS SATISFY THE PSLRA OR SUPPORT A STRONG INFERENCE OF SCIENTER

As set forth in the Response, Plaintiffs rest their scienter argument on the following sources:  (i) the alleged inconsistency between Dumas's statements on August 3 and November 1, 2007; (ii) the "confidential witness" allegations; (iii) the alleged GAAP violations; (iv) the Defendants' stock sales; and (v) the resignations of Flotek officers and directors after the alleged class period.  These allegations are insufficient to support a strong inference of scienter.

### A.   There Is No Inconsistency Between Dumas's Statements On August 3, 2007, And November 1, 2007

The Response first attempts to fabricate an inconsistency between Jerry Dumas's statements on November 1, 2007, regarding the "pause" in fracing activity taken by some operators during the prior quarter, and his earlier statements on August 3, 2007.  *See* Response at 15-16.  There is no inconsistency.  Dumas made no secret during the August 3 conference call

---

[1] *See Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 319 (2007).  While the allegations fail even to show that Defendants' statements were false (let alone fraudulently so), the Reply will primarily address scienter given the threshold nature of this issue.  Notably, while Plaintiffs initially alleged that Flotek acquired 72 companies, Plaintiffs now concede Flotek made far fewer acquisitions.  *See* Response at 1.

[2] *See, e.g., In re Dell Inc. Secs. Litig*, 591 F. Supp. 2d 877, 913 (W.D. Tex. 2008) (denying leave to amend initial consolidated amended complaint filed after selection of lead counsel); *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, No. Civ. A.H-06-3022, 2007 WL 2720074, at *6 (S.D. Tex. Sept. 18, 2007) (dismissing with prejudice initial consolidated complaint filed after selection of lead counsel; "The Court will not further delay the final resolution of this dispute by allowing yet another amendment"); *In re Administaff, Inc. Secs. Litig.*, No. Civ.A H-03-2082, 2006 WL 846378 (S.D. Tex. Mar. 30, 2006) (dismissing initial consolidated complaint with prejudice); *In re Integrated Elec. Servs., Inc. Secs. Litig.*, No. Civ.A 4:04-CV-3342, 2006 WL 54021 (S.D. Tex. Jan. 10, 2006), *aff'd*, 497 F.3d 546, 556 (5th Cir. 2007) (dismissing initial consolidated complaint with prejudice, which Fifth Circuit affirmed).

that some of Flotek's customers had experienced a slowdown.  He expressly stated during that call that inclement weather had "shut down driving activity and it certainly delayed dramatically the amount of truck activity that was going on in Texas and Oklahoma," that "[w]e definitely had a slowdown," that "[w]e actually had about a six-week period of time when two-thirds of the activity was closed down," that Flotek had "determined by talking to those customers [in the mid-continent region] that they have a ten week backlog of frac jobs," and that the weekly run rate in July "was not good."  Amended Complaint ¶ 52; Ex. F to MTD at 4.  Dumas further stated on August 3 that the revenue from these jobs was "***hopefully delayed rather than lost***" – hardly a guarantee the jobs would resume, let alone at any specific time.  Ex. F to MTD at 13.

The Response also selectively omits other portions of the November transcript that further dispel Plaintiffs' "inconsistency" argument.  Plaintiffs omit Dumas's November 1 statements that Flotek rebounded from September with a record October performance.[3]  Indeed, Plaintiffs plead no facts disputing that Flotek had the highest revenue month in the history of the company in October 2007.  There is also no allegation of a sales decline in August.  Dumas's "hopefully delayed rather than lost" statement on August 3 (and related statements) clearly had a reasonable factual basis:  *i.e.*, sales met expectations in August (which was barely underway on August 3), did not decline until September, and picked up again in October.

Plaintiffs also omit the statement at the beginning of the November 1, 2007 transcript that "[s]ales of our green chemicals as a percentage of total sales decreased from 72% in the second quarter to 69% in the third quarter due to decreased frac activity ***as a result of lower gas prices, particularly in the Rocky Mountains***."  Ex. H at 1 (emphasis added).  There is no plausible or

---

[3] *See* Amended Complaint ¶ 58 and Ex. H to MTD at 4 (observing that the pause "seems to have been eliminated. People seem to be going about their business again"); Ex. H at 7 ("we clearly will have a record month in October" and that run rate had picked up after declining in September).

particularized allegation Dumas had advance knowledge on August 3 of what would happen to gas prices later in the third quarter, nor is such a "crystal ball" inference cogent.[4]  To the extent Plaintiffs are implying that Dumas concealed on August 3 that he already knew there would be an additional third-quarter slowdown beyond the weather-related slowdowns during the second quarter, or that there would be price cutting during the third quarter, such an inference is not supported by any particularized factual allegations, is not cogent, and is not as compelling as the inference that these conditions developed as a result of the gas price declines that occurred later in the third quarter (*after* the August 3 call), and which were not known to Dumas on August 3.

Moreover, while the Response inaccurately asserts that Flotek suffered a "sales decline" and "diminished sales" during the third quarter (*see, e.g.,* Response at 10 n.7), Flotek's overall sales and chemical sales *increased* during the third quarter – a fact Plaintiffs have not disputed.[5] The third quarter results thus bear out Dumas's August 3, 2007 statement that "we have not seen a reduction in demand for our products. . . ."  *See* Ex. F at 3.

Finally, Plaintiffs take statements from the November 1 transcript out of context in an effort to create the inaccurate impression they refer to actions that had already occurred at the time of Dumas's August 3 statements.  For example, Dumas stated on November 1 as follows:

> Analyst:  Are we in a position that we should look for Q4, see a little better margins than we saw in Q3 and kind of ultimately given the final combination of this business together; or still a little bit more time on that?
>
> Dumas:  Bo, *we are going to continue to work on it*.  I *hope* that we will see and I think we will see an improvement in the fourth quarter over the third quarter. There are two things happening in the downhole motor business *right now*.  I beg your pardon.  And the downhole too, not only the motors.  There clearly has been

---

[4]  Moreover, given that gas prices are public information, Plaintiffs cannot plausibly assert that Dumas and Meier defrauded the public regarding gas prices.

[5]  *See* Ex. H at 1 (stating that total revenues increased by $4 million, total Chemical and Logistics sales increased by 10%, and "green chemicals" sales grew by 5%).

a little bit of a slow down in drilling. And if you look at the State of Wyoming, they are down about 40 sum odd rigs. So the amount of rigs that we *are able to service* or have the opportunity to do business with *is down* significantly. Number two, we *are running* into some price cuttings in the Rocky Mountains. And at this point, we made a decision; we were not going to cut prices. No question about it, we knew what we did. And we knew that we were absolutely going to lose some market share, because we've actually seen price discounts up to 28% and we made a decision to ignore that and it has cost us some revenue. However, we *are now firing* a short across the bow of some of these people and we're beginning to see our business pick up again. So based on that, we are going to point out to some people that we are not going to sit here and take this and without having to show them that our strength. Because we're arguably as strong as anybody in that business. So we'll be firing a shot across the bow of some of these price cutters.

Ex. H at 4 (emphasis added). Plaintiffs plead no facts showing that these events occurred before the August 3 call or otherwise contradict Dumas's August 3 statements, and Dumas's use of the present tense weighs against such an inference. Dumas's statements on page 7 of the November transcript likewise do not indicate that Dumas fraudulently misrepresented anything on August 3 regarding customers taking a "time out" from fracing. Again, at the time of the August 3 statements, the month of August was barely underway, and there is no allegation sales declined in August. The inference that Dumas already knew at the beginning of August that there would be an additional slowdown and price cutting one month later in September (beyond the pauses Dumas already disclosed on August 3) is not as compelling as the inference that Dumas did not fraudulently misrepresent or conceal anything on August 3.[6] Moreover, as stated above, Dumas specifically warned on August 3 that the July run rate "was not good" and that customers were taking pauses in fracing. Ex. F at 4. Plaintiffs' "inconsistency" argument thus fails.

---

[6] Dumas did not provide a September forecast during the August 3 call, nor was he asked for one. Dumas also did not promise that the revenue that was "hopefully delayed rather than lost" would reappear in any specific month and was merely asked whether "we should be seeing that [revenue] within, either in Third or Fourth Quarter?" *See* Ex. F at 13. The fact that revenues rose in October instead of September does not demonstrate fraud.

4

### B.   Plaintiffs' Confidential Source Allegations Violate The PSLRA And Do Not Support A Strong Inference Of Scienter

Plaintiffs also spend much of their Response rehashing their "confidential source" allegations, claiming they show Defendants' knowledge regarding the alleged falsity of Flotek's projections.  *See* Response at 17-21.  The Fifth Circuit, however, has squarely held that "courts *must* discount allegations from confidential sources," and that "[s]uch sources afford *no basis* for drawing the plausible competing inferences [of scienter] required by *Tellabs*."[7]  Plaintiffs' efforts to distinguish *Shaw Group* are unavailing.[8]

To the extent such allegations are entitled to any weight after *Shaw Group*, the Southern District of Texas recently rejected more specific confidential witness allegations in another case involving alleged forecasting inaccuracies.  *See In re TETRA Technologies, Inc. Secs. Litig.*, Civ. Action No. 4:08-cv-0965, 2009 WL 6325540, at *32-33 (S.D. Tex. July 9, 2009).[9]  Courts have consistently emphasized that mere disagreements by confidential witnesses or lower-level

---

[7] *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535-36 (5th Cir. 2008) (emphasis added).  Discounting allegations from confidential sources not only is required by *Shaw Group*, it is also more faithful to the PSLRA's plain language, which requires that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts on which that belief is formed*."  15 U.S.C. § 78u-4(b)(1) (emphasis added).

[8] Contrary to the impression left by the Response, the confidential sources in *Shaw Group* described specific conversations where witnesses allegedly overheard a defendant making specific statements, yet the Fifth Circuit still found the allegations insufficient.  *See Shaw Group*, 537 F.3d at 537-38.  *Shaw Group* also rejected allegations by sources identified by title and location.  *See id.* at 539-40; *see also Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 375-76 (5th Cir. 2004) (rejecting allegation that "programmers" told individual defendants that company's product would not work absent details regarding "when and how" such information was provided).  Moreover, contrary to Plaintiffs' assertion, Defendants are not merely contending that the confidential sources were not "sufficiently identified" (*see* Response at 4), but that the confidential source allegations should be discounted and, when considered collectively with the rest of the allegations, that the confidential witness allegations more broadly fail to show that Defendants' statements were false or support a strong inference of scienter.  Finally, while plaintiffs rely heavily on *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), the *Lormand* plaintiffs did not merely predicate their claims on confidential witness allegations, but attached specific internal emails and memos contradicting the defendants' public statements.  *See* 565 F.3d at 254.

[9] Plaintiffs repeatedly cite *TETRA* (*see* Response at 12, 13, 21), but ignore that Judge Ellison dismissed all of the claims relating to projections.  *See* 2009 WL 6325540, at *31-33.  The only claim not dismissed was a claim that TETRA represented it was owed significant insurance receivables while knowing that such claims had already been denied.  *See* 2009 WL 6325540, at *34-36.  No similar claim is made here.  Plaintiffs cannot reasonably argue that their claims in this case could withstand Judge Ellison's rigorous analysis in *TETRA*.

employees with an executive's forecast does not support a strong inference of scienter.[10]  Even under the most lenient interpretation of the PSLRA, Plaintiffs' confidential witness allegations fail to support a strong inference that Dumas and Meier made any fraudulent statements.

### 1. The Guidance Allegations Are Insufficient

Plaintiffs' allegations do not support a strong inference Dumas and Meier knowingly provided false financial guidance.  Only two of the four alleged "sources" – CW1 and CW4 – are alleged to have made any statements about Flotek's financial projections.  CW1 did not join Flotek until *after* the August guidance statements, was a "human resources" manager with no alleged involvement in determining guidance, and recited only vague hearsay statements not tied to any specific alleged misstatement.  Amended Complaint ¶ 49(a).  CW4 is alleged only to be a "Regional Manager" of Triumph, with no personal knowledge of Flotek's procedures for determining company-wide guidance.  *Id.* ¶¶ 49(b)(xx), 55(d).  Courts have routinely dismissed these types of allegations as insufficient to support a strong inference of scienter.[11]

---

[10]  *See, e.g., In re Cerner Corp. Secs. Litig.*, 425 F.3d 1079, 1086 (8th Cir. 2005) (allegation that lower-level employees disagreed with guidance "sheds no light on the relevant issue *of whether the Individual Defendants shared this view, or indeed of whether the forecasts [for company as a whole] were necessarily unattainable*") (emphasis added); *In re Zumiez Inc. Secs. Litig.*, No. C07-1980-JCC, 2009 WL 901934, at *7 (W.D. Wash. Mar. 30, 2009) ("Plaintiffs rely primarily on eleven confidential witnesses, most, if not all, of whom were in no position to have information concerning company-wide performance"); *Patel v. Parnes*, 253 F.R.D. 531, 559 (C.D. Cal. 2008) (no strong inference of scienter despite far more specific CW allegations regarding declining sales); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1148 (W.D. Wash. 2006) (no scienter despite allegation that CW told executive that company's forecasting process was "completely inadequate").

[11]  *See, e.g., Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996-98 (9th Cir. 2009) ("CW4 was a *human-resources employee* who, even while employed at Digimarc, had *no firsthand knowledge* of the workings of the finance or corporate departments"; rejecting CW hearsay allegations as "vague and unreliable") (emphasis added); *Konkol v. Diebold, Inc.*, 590 F.3d 390, 399 (6th Cir. 2009) ("When confidential sources are used to support 'vague and conclusory' allegations, the allegations are not 'accorded much weight'"); *California Public Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 149-55 (3d Cir. 2004) (rejecting confidential witness allegations by lower-level employees and unspecific confidential witness allegations based on "rumor or conjecture"); *In re Dell Inc.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008) ("[P]laintiffs must allege with particularity *when a comment was made to a confidential source, or, if the source alleges a conversation took place, when and where the conversation occurred*") (emphasis added) (citing *Indiana Elec.*, 537 F.3d at 538); *In re Intelligroup Secs. Litig.*, 527 F. Supp. 2d 262, 361 (D.N.J. 2007) (discounting information provided by confidential witnesses who were "*not providing firsthand information,*" but rather were repeating statements the witnesses heard); *Metawave Communs. Corp. Secs. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("'The Court must be able to tell

The Response also inaccurately asserts there were "internal reports [that] were forecasting less than $1.00 EPS," and that "division executives were adamant that the Company could not achieve the stated guidance." *See* Response at 13. This vastly overstates the allegations actually contained in the Amended Complaint. Plaintiffs do not identify any specific alleged internal report or communication to Dumas or Meier at any specific time contradicting any specific Flotek projection. The Fifth Circuit **requires** such details to survive dismissal.[12] The allegations simply do not support a strong inference Dumas and Meier knew in advance that Flotek could not meet its guidance, particularly given the numerous facts cited in Section F on pages 15-16 below supporting a strong opposing inference the guidance was not fraudulent.[13]

## 2.    The Inventory And Integration Allegations Are Insufficient

The Response also fails to show how the allegations relating to purported inventory and integration problems support a strong inference of scienter. CW2 and CW3 did not join Flotek

---

whether a confidential witness is speaking from personal knowledge, or merely regurgitating a gossip'") (quoting *Commtouch Software Ltd. Secs. Litig.*, No. 01-719, 2002 WL 31417998, at *4 (N.D. Cal. July 24, 2002)).

[12] *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (plaintiffs must provide "corroborating details regarding the contents of allegedly contrary reports, their authors and recipients"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (dismissing complaint where report "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information"); *TETRA*, 2009 WL 6325540, at *4 (plaintiffs must specify "'who prepared [the internal reports] and when'"); *see also In re Administaff, Inc. Secs. Litig.*, No. Civ.A H-03-2082, 2006 WL 846378, at *8 (S.D. Tex. Mar. 30, 2006) (dismissing claims despite internal documents allegedly undercutting likelihood of achieving projections; allegations failed to show projections were "impossible to achieve" or "mathematically impossible").

[13] Plaintiffs' reliance on *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697-700 (5th Cir. 2005) is misplaced. In *Plotkin*, the defendants announced substantial contracts with two companies while failing to disclose the companies' poor financial condition and lack of prior significant revenue. Nothing similar is alleged here. *Plotkin* also does not support a general rule that temporal proximity between events supports an inference of fraud – a point the Fifth Circuit later made crystal clear in *Flaherty & Crumrine Preferred Inv. Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 210 (5th Cir. 2009) (no strong inference management knew of impending dividend increase before close of tender offer even though company substantially raised dividend just eight days after offer concluded). *See also Southland*, 365 F.3d at 382-83 (announcement of disappointing quarterly results, customer lawsuits, and executive resignations insufficient because "fraud cannot be proved by hindsight"); *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) ("[T]emporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent"). Plaintiffs also cite *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005), but that case involved allegations the company's CFO received a specific report from a specific employee showing that revenue should not be recognized for certain transactions, and the company later admitted it was improper to recognize the revenue. *Id.* at 256-58, 263-64.

until after the alleged class period, which, as courts routinely hold, undercuts any alleged inference of scienter.[14]   Moreover, the statements attributed to CW3 and CW4 show that Flotek did take steps to integrate the companies it acquired and to count its inventory.[15]   There is simply no particularized allegation showing that Meier and Dumas knew *during 2007* that the "obsolete inventory" reserve or the amount of estimated future SG&A expenses were false.

Indeed, courts routinely reject allegations by confidential witnesses regarding purported "inventory" problems similar to those alleged here, particularly when there is no allegation showing that the person who made the alleged false statements had specific knowledge of a specific problem that rendered a particular statement false.[16]   There is no allegation tying any of

---

[14] *See, e.g., Zucco Partners*, 552 F.3d at 996 (discounting allegations by confidential sources not employed during class period); *In re Rackable Sys., Inc. Secs. Litig.*, No. C 09-0222 CW, 2010 WL 199703, at *8 (N.D. Cal. Jan. 13, 2010) ("Four of the confidential witnesses . . . were not employed at Rackable during the Class Period, which makes it unlikely that they had personal knowledge of Defendants' relevant state of mind"); *In re Dell*, 591 F. Supp. 2d at 895 (rejecting allegations by confidential witnesses not employed during the alleged class period).

[15] CW4 acknowledged that "an inventory accounting was conducted at Triumph in October 2006 for the acquisition," that "there was inventory counting in 2007 and 2008," and that "[i]n mid 2007, the Triumph Oklahoma City yard was consolidated into the yard in Chickasha, Oklahoma." *Id.* ¶ 49(c)(xiii). CW3 likewise acknowledged that Flotek paid "hundreds of thousands of dollars to consultants" prior to her arrival in an effort to improve integration. *Id.* ¶ 49(b)(v). CW3 also describes an "inventory accounting performed in 2007," a "2007 count" performed "at all of Flotek's divisions in all yards in an attempt to reconcile Flotek's overall actual inventory with the RTMS," and various on-site visits by Dumas and Meier (who wanted to "get it cleaned up"). *Id.* ¶ 49(b)(viii), (xiv) (stating that Meier and Dumas wanted to "get integrated" during 2007).

[16] *See, e.g., In re Rackable*, 2010 WL 199703, at *6 (allegation that Rackable had "a lot of excess inventory" did not establish "that Rackable failed to account properly for excess or obsolete inventory or that the decision to write off inventory should have been made earlier"); *In re Medicis Pharm. Corp. Secs. Litig.*, 689 F. Supp. 2d 1192, 1212 (D. Ariz. 2009) (rejecting allegations regarding inventory reserve because complaint failed to specify *which specific executives were aware of inventory problems at the time of the alleged misstatements*); *In re Harley-Davidson, Inc. Secs. Litig.*, 660 F. Supp. 2d 969, 986-87 (W.D. Wisc. 2009) (rejecting confidential witness allegations that company failed to disclose excess inventories); *In re Seracare Life Sciences, Inc.*, No. 05-CV-2335-H, 2007 WL 935583, at *8-9 (S.D. Cal. Mar. 19, 2007) (confidential witness allegation that "he performed an inventory count that failed to match the quantity of the inventory in the computer with the amount of inventory on hand *lacks specificity regarding the extent of the mismatch, and how the mismatch was reflected on the audited financial statements*," and allegation that company carried "worthless plasma on its books" *"lacks particularity regarding the key elements of why the plasma was worthless, and what was the financial impact on SeraCare's financial statements"*) (emphasis added); *In re Remec Inc. Secs. Litig.*, 388 F. Supp. 2d 1170, 1176-77 (S.D. Cal. 2005) (rejecting allegations regarding obsolete inventory and observing that complaint lacked specific allegations regarding "the approximate value of the overstated inventory," *"why the inventory was obsolete and when the inventory became obsolete"*) (emphasis added); *Morgan v. AXT, Inc.*, No. C 04-4362 MJJ, 2005 WL 2347125, at *13-15 (N.D. Cal. Sept. 23, 2005) (rejecting allegations regarding obsolete inventory reserve and holding that *"AXT's decision to write off $2.1 million for inventory obsolescence after the close of the Class Period does not*

these allegations to any specific misstatement during 2007.[17]   Merely alleging that Flotek had "junk" inventory in 2008 does not support a strong inference that Meier and Dumas knowingly or recklessly made any specific false statement relating to inventory accounting in 2007, particularly given that Flotek maintained a significant "obsolescence" reserve throughout 2007 and the common practice of keeping "junk piles" on-site.

Courts likewise routinely reject securities fraud claims based on the alleged failure to integrate acquired companies.[18]   Plaintiffs' claims relating to alleged deficiencies in RTMS are also particularly unavailing given the Fifth Circuit's rejection of similar allegations regarding defects in Shaw Group's internal project tracking program.   *See Shaw Group*, 537 F.3d at 537.

The Fifth Circuit and other courts have also repeatedly held that allegations regarding supposedly defective inventory accounting or integration at best demonstrates negligence and does not support a strong inference of scienter.   *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) (holding that alleged inventory-related accounting problems could "easily arise from negligence, oversight, or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"); *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL

---

*necessarily read back on what the Company should have done, but did not do, during the class Period, or on the falsity of the Company's financial statements during that period*") (emphasis added); *In re Metawave Comms. Corp. Secs. Litig.*, 298 F. Supp. 2d 1056, 1082-83 (W.D. Wash. 2003) (even though confidential witness was likely to have knowledge regarding alleged accounting problems relating to obsolete and unsellable inventory, *allegations failed to establish that executives had specific knowledge their own statements regarding inventory reserves were false when made*); *In re PetSmart, Inc. Secs. Litig.*, 61 F. Supp. 2d 982 (D. Ariz. 1999) (rejecting allegation that company "accumulated a significant quantity of excess, obsolete, or otherwise unsalable inventory" during the class period absent particularized allegations regarding "the defendants' knowledge").

[17] *See In re Coca-Cola Enterprises Inc. Secs. Litig.*, 510 F. Supp. 2d 1187, 1197 (N.D. Ga. 2007) (complaint must "state sufficient facts to give the Court confidence that the plaintiff can relate specific transactions to specific misstatements in sales projections or financial statements").

[18] *See In re Secs. Litig. BMC Software*, 183 F. Supp. 2d 860, 907, 916-17 (S.D. Tex. 2001) (rejecting fraud allegations based on alleged failure to integrate acquired companies); *see also In re Gildan Activewear, Inc. Secs. Litig.*, 636 F. Supp. 2d 261, 273-74 (S.D.N.Y. 2009) (dismissing claim company misrepresented integration problems); *In re Tibco Software, Inc.*, No. C 05-2146, 2006 WL 2844421, at *1-2 (N.D. Cal. Sept. 29, 2006) (same).

1459735, at *9 (D. Colo. June 21, 2005) (holding that allegations regarding deficiencies in inventory audits at best showed "carelessness" rather than "intentional or reckless misconduct").

Finally, the Response ignores Flotek's numerous qualifying statements regarding these issues. Flotek's 2007 Form 10-K contained detailed cautionary statements about integration. Ex. L at 8-9 of pdf. Dumas further cautioned on November 1 that "[o]ur G&A is quite expensive," that Flotek would be "spending everything we can get our hands on to make certain that we fulfill our obligations under the Sarbanes-Oxley requirement," that "I don't want to talk about [the audit expenses] any further because, it's a very expensive issue, but it is a law and we are going to fulfill our responsibilities in that regard, and that he and Meier could only make a "guesstimate" regarding Sarbanes-Oxley expenses for the fourth quarter. Ex. H at 6. When asked about integration, Dumas responded only that "we are going to continue to work on it. I hope that we will see and I think we will see an improvement in the fourth quarter over the third quarter." *Id.* at 4. In addition, when asked on August 3 when Flotek expected to see "economic benefits" from "consolidating" Triumph facilities, Dumas stated: "That would be very difficult to answer . . . with specificity because while we are clearly making progress of bringing together facilities in south Texas and the mid-continent . . . we're expanding at the same time . . . . So, I can only say to you that the downhole mud motor business is going to be an area of significant attention over the next – well, beginning now and continuing." Ex. F at 4-5. Dumas thus heavily qualified his statements about audit expenses and integration and made clear these were challenging issues.[19] Flotek also stated in its November 9, 2007 Form 10-Q merely that "[w]e are ***in the process*** of upgrading our information systems and are implementing [RTMS]" – not

---

[19] Moreover, contrary to Plaintiffs' depiction, professional fees declined during the third quarter. *See* Ex. O at 15 (noting $0.4 million decrease in professional fees compared to the third quarter of 2006).

that Flotek had completed these tasks.  *See* Ex. O at 21; *see also* Ex. N (Aug. 9, 2007 Form 10-Q) at 19 (same).  The allegations simply fail to support a strong inference Dumas or Meier made any fraudulent statements regarding inventory or integration issues.

### C.    Plaintiffs' Conclusory Claim Of "GAAP Violations" Is Predicated Entirely On The Defective Confidential Source Allegations And Defies *Shaw Group*

Plaintiffs next assert that Flotek's alleged "GAAP violations" support a strong inference of scienter.  *See* Response at 21-23.  This argument, however, is premised entirely on the confidential witness allegations and thus fails for the reasons set forth above.  Moreover, as in *Shaw Group*, "there was no mea culpa from the company in the form of acknowledged wrongdoing or restated financial reports, nor was there any auditor qualification to those aspects of the reports made the basis of this complaint, nor any publicly expressed reservations by the auditors to the financials."  *Shaw Group*, 537 F.3d at 535-36.  Flotek underwent a full Sarbanes audit and was not required to restate its financials or declare any internal control weaknesses for 2007.  Given the lack of a restatement, Plaintiffs' GAAP argument "disproves itself."  *Id*. at 535.

Moreover, allegations that a company failed to follow GAAP or incorrectly valued assets do not demonstrate scienter.[20]  Courts also routinely hold that a subsequent increase in reserves does not show that earlier reserves were fraudulent.[21]  The GAAP allegations are insufficient.[22]

---

[20] *E.g., Shaw Group*, 537 F.3d at 534-36 (noting that "[v]aluations of assets" leave "broad scope for judgment and informed estimation," and "determinations on such matters can differ reasonably and sizably").

[21] *See, e.g., In re Acceptance Ins. Cos. Secs. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005); *In re Huntington Bancshares*, 674 F. Supp. 2d 951, 964 (S.D. Ohio 2009); *Coronel v. Quanta Capital*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *14-5; *Zucco Partners*, 445 F. Supp. 2d at 1207; *see also In re Rackable*, No. C 09-0222 CW, 2010 WL 199703, at *6 (vague allegations from confidential witnesses that company "appeared to have a lot of excess inventory" failed to demonstrate that company should have written off inventory sooner).

[22] The allegation that Flotek took an impairment charge in 2009 does nothing to support a strong inference that this charge relates to the alleged inventory problems or should have been taken in 2007, let alone that Dumas and Meier knew in 2007 that Flotek was required to take this charge at the time.  *See* Response at 22.  As explained in Flotek's March 16, 2009 Form 10-K, the goodwill impairment related to "goodwill and intangible assets" and was taken due to the severe economic downturn in late 2008.  *See* Ex. R at 31-32.  Flotek also performed a goodwill impairment test in the fourth quarter of 2007 and was not required to take any impairment charge or restate goodwill for 2007.

### D.      The Stock Sale Allegations Are Insufficient

The Response next asserts that the stock sales by Meier and Dumas during the alleged class period support a strong inference of scienter.  *See* Response at 23-25.  Plaintiffs cite *Central Laborers* to support their "stock sale" argument (see Response at 23), but fail to mention that *Central Laborers* actually **affirmed** dismissal and rejected the plaintiffs' collective scienter allegations (including the stock sale allegations) as insufficient – even though the CFO in *Central Laborers* apparently exercised **more than 94%** of his stock options.  *See Central Laborers*, 497 F.3d at 554-55.  As *Central Laborers* makes clear, even trades far more significant than alleged here will not support a strong inference of scienter when the collective weight of the plaintiffs' other allegations fails to demonstrate a compelling inference of fraud.[23]

The complaint here is weaker in every respect than the complaint dismissed in *Central Laborers*.  Dumas sold only 18.83% of his shares, a far smaller percentage than the 94% stock option liquidation by the CFO in *Central Laborers*.[24]  This Court and the Fifth Circuit have found similar or greater percentages insufficient.  *See, e.g., Shaw Group*, 537 F.3d at 544 (sale of 57% of executive's stock immediately after positive earnings announcement did not support strong inference of scienter); *Nathenson v. Zonagen*, 267 F.3d 400, 420-21 (5th Cir. 2001)

---

*See* Ex. K at 41, 48.  Flotek also disclosed that it underwent "borrowing base audits" as part of its borrowing covenants, and there is no allegation Flotek violated any borrowing covenants.  *See id.* at 29.  This further cuts against any inference Dumas or Meier knowingly violated GAAP in 2007.

[23]  Allegations of motive and opportunity are also insufficient, standing alone, to support a strong inference of scienter.  *Southland, Inc.*, 365 F.3d at 368; *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 250-54 (5th Cir. 2003) (affirming dismissal even though "motive and opportunity" allegations were "sufficiently particularized").

[24]  The Response also makes no attempt to explain how Meier's stock sales were remotely suspicious.  Meier sold most of her shares in May 2007, more than five months before the first alleged corrective disclosure and at prices of less than $24 per share.  *See* Amended Complaint ¶ 90.  Meier sold just 6.21% of her shares in August 2007, again at a price far lower than the late October peak (and lower than even the November price after the October 31/November 1 decline).  *See id.*  Meier's December 20 and 21 sales were likewise small and occurred months after her alleged false statements on October 31 and November 1, and thus do not support an inference that Meier knew on November 1 that her statements were (supposedly) false.

(holding that district court (Lake, J.) correctly rejected insider trading allegation based on director's sale of 18.5% of his company shares during alleged class period); *In re Dynegy, Inc. Secs. Litig.*, 339 F. Supp. 2d 804, 899-900 (S.D. Tex. 2004) (Lake, J.) (executive's sale of $34 million of company stock one week before his resignation and two months before restatement insufficient where allegations failed to show executive had knowledge of these facts).[25]

Moreover, the Fifth Circuit recently refused to draw the sort of "timing" inference Plaintiffs are advocating – *i.e.*, the inference that Dumas must have known when he sold his shares on August 6-8 that Flotek's stock price would decline **more than 2 ½ months later** on November 1 – despite a timeframe far more compressed than that alleged here. *See Flaherty & Crumrine Preferred Inv. Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 210 (5th Cir. 2009) (no strong inference management knew of impending dividend increase before close of tender offer even though company substantially raised dividend just **eight days** after completing tender offer). The alleged inference of fraud is further weakened by the fact that Dumas's August sales all occurred at prices between $31 and $32.75 per share, which was nearly 40% below the $53.49 peak on October 29, 2007, and below even the $36.45 price closing price on November 1, 2007, after the first alleged "corrective disclosure." Amended Complaint ¶¶ 18, 61, 90, 101. In other words, Dumas would have made more money simply holding the stock until November 1 than by selling it in August. Dumas also did not sell any additional shares as the stock price approached $50 in September and October 2007, even though there is no allegation he was prevented from doing

---

[25] *See also Dell*, 591 F. Supp. 2d at 897 (allegations that defendants sold 29.61% and 49.33% insufficient); *Zucco Partners*, 552 F.3d at 1005-06 (executive sale of 48% insufficient); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1118-19 (N.D. Cal. 2009) (executive sales of 35%-68% of total holdings insufficient); *In re Michaels Stores, Inc. Secs. Litig.*, 2004 WL 2851782, at *13 (N.D. Tex. Dec. 10, 2004) (sale of 18.93% of holdings insufficient); *In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 634-39 (S.D. Tex. 2003) (rejecting insider trading allegations against outside directors who sold "between 20-100% of their Enron holdings during the Class Period for a total of over $1 billion"); *Kurtzman v. Compaq Computer Corp.*, No. Civ. A. H-99-779, 2002 WL 32442832, at *2 (S.D. Tex. Mar. 30, 2002) (dismissing complaint alleging that senior officers sold $48 million worth of stock immediately before company disclosed it was "below plan," which was followed by 21% stock price decline).

so, which further cuts against any inference he was attempting to maximize his profits based on inside information. *Id.* ¶ 18; *Shaw Group*, 537 F.3d at 543-44 (sales missed price "spike").

Accordingly, the stock sale allegations do not support a strong inference of scienter. Plaintiffs' case citations are likewise unavailing.[26]

### E.      The "Resignation" Allegations Are Insufficient

The Response lastly asserts that scienter can be inferred from the resignations of Flotek officers and directors after the alleged class period. *See* Response at 25-26. The Fifth Circuit, this Court, and other courts have repeatedly rejected this argument.[27]

The timing of the resignations at issue here are even less indicative of scienter than in *Rosenzweig* or *Abrams*. Meier resigned in August 2008, more than eight months after the alleged class period. *See* Amended Complaint ¶ 28. Plaintiffs do not allege any reason for Meier's resignation or provide any particularized factual allegation showing how this resignation supports an inference of fraud. Flotek directors William R. Ziegler and Gary Pittman resigned in March and May 2009, more than a year after the alleged class period. *Id.* ¶ 67. Nothing about

---

[26] In *Southland*, , the executives sold their shares within days after the alleged false statement and "only slightly more than a month before INSpire stock fell precipitously. . . ." 365 F.3d at 369. The trades were far more profitable, as they were close to the high and far above the stock price immediately after the corrective disclosure – unlike here, where Dumas sold far below the high and would have made more money even if he held the stock after the alleged October 31 corrective disclosure. Moreover, the other allegations of scienter were far more cogent and compelling in *Southland* than here. In *Berger v. Compaq Computer Corp.*, No. Civ. A. H-98-1148, 1999 WL 33620108, at *17 (S.D. Tex. Dec. 22, 1999), a case that predates *Tellabs* and the Fifth Circuit's 2000s-era PSLRA precedents regarding the insufficiency of "motive and opportunity" allegations, the individual defendants sold more than $120 million worth of company stock, with several individuals selling most or all of their shares. *Moskowitz v. Mitcham Indus.*, No. H-98-1244, 2000 WL 33993307 (S.D. Tex. Sept. 27, 2000), which followed *Moskowitz v. Mitcham Indus.*, No. H-98-1244, 1999 WL 33606197 (S.D. Tex. 1999), was a similar pre-2000s-era case and involved specific allegations that the defendants knew of undisclosed financial problems. *See* 1999 WL 33606197, at *16. *U.S. v. Henke*, 222 F.3d 633, 639 (9th Cir. 2000) was a criminal insider trading trial with direct testimony that the defendants traded after learning of inside information, and is thus completely inapposite.

[27] *E.g., Rosenzweig*, 332 F.3d at 867 ("Moreover, the successive resignations of key officials, as the district court (Lake, J.) stated, is more likely probative only of the fact that the company was failing"); *Abrams*, 292 F.3d at 434 (resignations do not demonstrate scienter); *Morgan*, 2005 WL 2347125, at *14 ("Management changes 'are not in and of themselves evidence of scienter. Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions") (quoting *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1092 (N.D. Cal. 2005)).

these resignations or Pittman's resignation letter suggests, let alone supports a strong inference, that Flotek made fraudulent statements during 2007.  In fact, the letter suggests the opposite: that Pittman resigned because of other issues, including "management compensation proposals, monthly financial reporting to the Board, and governance" over "the past year" – *i.e.*, in 2008-09, not 2007.  *See id.*  The fact that Dumas announced his resignation in August 2009, more than 20 months after the alleged class period, likewise does nothing to support an inference of scienter.

### F.    The Nonfraudulent Inferences Overwhelm Any Fraudulent Inferences

The Response next appears to concede that Flotek achieved $0.71 for the first three quarters, missed its yearly revenue guidance by only 1.25%, and had a record October (which ended one day before the November 1, 2007 conference call).[28]  These facts weigh heavily against any inference of scienter and instead support an inference that the Company's guidance estimates were reasonable.  Numerous other facts raise similar inferences, including that:

- Flotek's earnings had been consistently increasing until the end of the fourth quarter of 2007 and had increased significantly from the third quarter to the fourth quarter of the previous two calendar years.

- Flotek earned $0.26 per share during the third quarter, only needed to earn $0.29 per share during the fourth quarter to meet guidance, and had just completed a record October at the time of the November 1 conference call.

- Flotek's auditors found no material weaknesses during 2007 and have never required Flotek to restate its 2007 financials.  The fact there was no restatement cuts heavily against any inference of scienter.  *E.g., Shaw Group*, 537 F.3d at 534-36; *see also Central Laborers*, 497 F.3d at 552 (no strong inference of scienter even where company *did* restate earnings and declare control weaknesses).

- Dumas and Meier heavily qualified their predictions throughout the class period, repeatedly used the words "hope" and "hopefully," made numerous specific

---

[28] Plaintiffs again cite *Plotkin* for the proposition that the size of the fourth quarter 2007 guidance miss suggests that "something was amiss at the outset."  *See* Response at 26.  In *Plotkin*, however, there were specific allegations why the contract at issue could not support the revenues touted by the company (the counterparty was a tiny company with annual revenues 30 times lower than the revenues projected by the company).  *See Plotkin*, 407 F.3d at 698.  No similar allegations are made here.

cautionary statements, and refused to provide guidance regarding profit margins or raise earnings guidance above $1 per share. *See, e.g., Rosenzweig*, 332 F.3d at 869 (no fraud where defendants used qualifying words like "anticipate").

- Flotek never represented that it had fully integrated the companies it acquired and cautioned that integration would pose significant challenges.

- Plaintiffs' own alleged confidential sources admitted that Flotek did take significant steps during 2007 to improve inventory controls and integrate acquired companies. Flotek also obtained audited financials from Triumph at the time of the acquisition, and Triumph's revenue was only a small part of Flotek's overall business. *See* Ex. U; *see also* Ex. V (audited financials for Spidle).

Moreover, there are no particularized countervailing factual allegations showing that Dumas or Meier ***personally received any specific report or possessed any specific information at any specific point in time*** contradicting any specific public statement made by them during the alleged class period – information ***required*** to satisfy the PSLRA in this circuit.[29] While Plaintiffs baldly assert that the size of Flotek's fourth quarter earnings-per-share guidance miss supports an inference that Dumas and Meier must have known Flotek would miss its guidance, Plaintiffs plead no facts showing that Dumas or Meier knew as of November 1, 2007, that Flotek could not achieve its guidance over the remaining two months of the quarter, nor could they, given that October was indisputably a record month and that Flotek had experienced similar fourth quarter upticks the previous two years.[30]

---

[29] The Fifth Circuit requires specific allegations that the speakers (Dumas and Meier) received such information. *See Abrams*, 292 F.3d at 432 (dismissing complaint where plaintiffs "point[ed] to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them"); *Rosenzweig*, 332 F.3d at 868 (5th Cir. 2003) (dismissing complaint where report "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information"); *In re Odyssey Healthcare*, 424 F. Supp. 2d 880, 890 (N.D. Tex. 2005) (complaint must identify "specific reports that would have disclosed such irregularities that were provided to the Individual Defendants").

[30] As this Court and the Fifth Circuit have held, "a 'company's expressions of confidence in its management of business are not actionable, especially where, as here, all historical information appears to be factually correct.'" *Rosenzweig*, 332 F.3d at 869 (quoting district court opinion by Lake, J.).

16

Courts also routinely reject allegations that the mere size of an earnings shortfall or revenue overstatement supports an inference of scienter.[31]   Moreover, as stated above, courts have rejected the argument that mere temporal proximity between positive statements and contrary results demonstrates scienter.[32]

The Response also complains about the reduction in Flotek's Drilling Products Segment margins (see Response at 26).   Plaintiffs, however, fail to identify a single false statement regarding Flotek's margins.[33]   Indeed, Flotek **refused** to give guidance relating to profit margins, either on a company-wide or business segment basis (*see* Ex. B at 7-8).

Finally, Plaintiffs assert that "Flotek intended to dispense with its massive inventory issues by taking a goodwill impairment charge, which they did, to the tune of $85 million in 2009."   *See* Response at 27.   The Response fails to explain the relevance of this argument to Flotek's 2007 guidance or plead specific facts showing the $85 million included items that Dumas or Meier fraudulently kept on Flotek's books in 2007.   Once again, there is no allegation Meier or Dumas had any specific knowledge of these alleged problems at any specific point in time before any specific alleged misstatement during the alleged class period.   In fact, assuming

---

[31] *See Slayton v. Am. Ex. Co.*, 604 F.3d 758, 763 (2d Cir. 2010) (no strong inference of scienter even though company projected losses of below $183 million and ultimately took $826 million loss); *Elam v. Neidorff*, 544 F.3d 921, 926 (8th Cir. 2008) (affirming dismissal despite reduction of quarterly guidance from $0.25-$0.30 range to $0.10-$0.12 range and reduction of annual guidance from $1.53-$1.70 range to $0.95-$1.04, which resulted in 35% stock price decline); *Key Equity Investors v. Sel-Leb Marketing, Inc.*, 246 Fed. Appx. 780, 787 (3d Cir. 2007) (no strong inference of scienter despite 400% overstatement of full-year earnings); *In re Rackable*, 2010 WL 199703, at *1-2 (dismissing complaint despite earnings and margins miss and stock price decline of 38% the next day); *In re St. Jude Medical, Inc. Secs. Litig.*, 629 F. Supp. 2d 915 (D. Minn. 2009) (granting dismissal despite $38 million sales revenue shortfall and observing that accuracy of company's guidance in prior quarters undercut inference of fraud).

[32] *See Flaherty & Crumrine*, 565 F.3d at 210 (no strong inference management knew of impending dividend increase before close of tender offer even though company substantially raised dividend just eight days after completing tender offer); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 838 (N.D. Tex. 2005) (dismissing complaint where company projected 30,000-35,000 new subscribers and reduced estimate to 15,000-25,000 new subscribers six weeks later).

[33] Plaintiffs also cannot demonstrate a material omission unless "what [the Defendants] said" – *i.e.*, their affirmative statements – are rendered misleading by the omission.   *See Shaw Group*, 537 F.3d at 541.   Plaintiffs have failed to demonstrate any affirmative statement rendered materially misleading by any alleged omission.

17

*arguendo* Flotek should have taken this charge earlier (an argument unsupported by any particularized fact), this argument sheds no light on why Flotek missed guidance in 2007. If the alleged "excess inventory" was written off in 2009, then by definition, it could not have affected Flotek's earnings during 2007. Plaintiffs' "goodwill" argument thus fails to support its claims.

## II.    THE PSLRA SAFE HARBOR BARS PLAINTIFFS' CLAIMS

The Response also fails to show why Plaintiffs' claims are not barred under the "cautionary language" or "actual knowledge" prongs of the PSLRA safe harbor for forward-looking statements. *See* Response at 11-15. Plaintiffs' conclusory assertion that Flotek only made "generalized warnings" wholly ignores the numerous specific cautionary statements identified on pages 4-11 of Defendants' Motion, which are far more specific than those in Plaintiffs' cited cases. Flotek is entitled to protection under the "cautionary language" prong.[34]

Plaintiffs also assert that "Dumas's 'egregious refusal to see the obvious, or to investigate the doubtful' demonstrates his severe recklessness with respect to giving guidance to investors." *See* Response at 18. Not only is this statement factually unsupportable, it also misstates the law, given that severe recklessness is insufficient to demonstrate scienter for forward-looking guidance even where the cautionary language is found to be inadequate. *See Southland*, 365 F.3d at 371-72 (requiring "actual knowledge"). Much like the plaintiffs in *Slayton v. Am. Ex. Co.*, 604 F.3d 758 (2d Cir. 2010), Plaintiffs plead no facts supporting a strong inference that Dumas or Meier had actual knowledge their statements were false when made. *See id.* at 763 (no strong inference of scienter even though company projected losses of below $183 million and ultimately took $826 million loss).

---

[34] *See* 15 U.S.C. § 78u-5(c)(1)(A); *Home Solutions of Am. Inv. Grp. v. Fradella*, 2008 WL 1744588, at *6 (N.D. Tex. Mar. 24, 2008); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 161 (N.D. Tex. 2007).

Finally, Plaintiffs assert that certain of Flotek's alleged misstatements are not forward-looking.  *See* Response at 12, which strings together numerous statements from different time frames.  Many of the quoted statements, however, clearly are forward-looking, including the "estimate" that "weather deferred approximately $2 million in sales" into the future, and the statements that "we reiterate our guidance" and anticipated "we are going to continue . . . 75-80% growth in profits."  *Id.*  Moreover, Plaintiffs apparently concede (as they must) that the other guidance statements identified in the Amended Complaint were forward-looking.

Plaintiffs also plead no facts showing that the other alleged non-forward-looking statements identified on page 12 of the Response are false or fraudulent.  Flotek really did "roll out" RTMS as stated.[35]  There really was no "reduction in demand for [Flotek's] products" during the third quarter, given that Flotek's sales increased that quarter.  The "pause" in fracing really did appear to have subsided in October, when Flotek experienced record sales.  There is no particularized allegation showing that Flotek's statements regarding audit expenses – which were accompanied by qualifying language warning that the costs were "very expensive" and that only a "guesstimate" could be offered – were remotely fraudulent.  In short, Plaintiffs plead no facts showing any of these statements are false, let alone intentionally or recklessly so.

## III.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION

Finally, the Response makes no attempt to address or distinguish the Fifth Circuit's decision in *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,[36] which quoted

---

[35] Once again, Flotek never represented that RTMS – which was a rental tool management system that had nothing to do with Flotek's earnings guidance – was fully operational in May, August, or October 2007, stating only that Flotek "ha[s] begun the process of rolling out" RTMS at its other business units during the May 8 call (RTMS was the existing system at Triumph) and that "we are going to continue to work on it" in response to a question about RTMS during the October 31 call.  *See id.* ¶ 59.  Stating that Flotek was "rolling out" RTMS hardly amounts to a guarantee that RTMS would be problem-free.

[36] 597 F.3d 330 (5th Cir. Feb. 12, 2010).

*Lormand v. U.S. Unwired, Inc.* (a Rule 12(b)(6) pleading case) for its holding that the "true facts" revealed in a corrective disclosure must "'make the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true).'"[37]  The corrective disclosures must "reveal the ***actionable truth*** about prior misstatements."[38]

The Response fails to explain how the earnings announcements on October 31 and November 1 revealed any "true facts" making it "more probable" that any of Flotek's prior statements were false.  Flotek announced earnings of $0.26 for the third quarter and experienced an increase in revenue and sales in the third quarter versus the second quarter, which was consistent with Flotek prior statements in May and August.  *See* Amended Complaint ¶ 56; Ex. H at 1.  While Flotek's margins were down slightly versus the prior quarter, Flotek never provided guidance about margins.  The Response does not identify a "correction" on October 31 or November 1 removing any "inflation" caused by a prior alleged false statement.[39]

Plaintiffs likewise fail to explain how the January 23, 2008 announcement that Flotek missed its fourth-quarter guidance plausibly shows it is "more probable" than not that the company's prior statements were false when made.  If that were true, missed guidance would

---

[37] *Halliburton*, 597 F.3d at 338 (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 256 n.20 (5th Cir. 2009)).

[38] *Halliburton*, 597 F.3d at 338 (emphasis added); *see also Catogas v. Cyberonics*, 292 Fed. Appx. 311, 314 (5th Cir. Sept. 8, 2008) (corrective statement must have "revealed the falsity" of defendants' prior statements to survive a Rule 12(b)(6) motion to dismiss).

[39] Plaintiffs' Response cites the chart in paragraph 103 of the Amended Complaint as evidence the alleged misstatements materially affected the stock price.  The chart, however, shows that the run-up in Flotek's stock price did not correlate with Flotek's "positive" statements on May 13 and August 2-3.  Indeed, the large August-October increase did not begin until August 22.  *See* Amended Complaint ¶ 103; *see also* http://finance.yahoo.com/q/hp?s=FTK&a=03&b=2&c=2007&d=10&e=21&f=2007&g=d&z=66&y=66 (stock price chart on Yahoo! Finance).  The price of Flotek stock the day after the October 31/November 1 disclosure was also higher than the stock price the day after the alleged August 3 misstatements.  *See id.*; *compare* Amended Complaint ¶ 53 ($31.94 price after August 2 disclosure; price declined over next two weeks) *with id.* ¶ 61 ($36.45 price after October 31/November 1 alleged corrective disclosure).  There is no allegation showing that the October 31/November 1, 2007 disclosure removed any "inflation" caused by the August 3 statements or any prior statements.  *See In re Zonagen, Inc. Sec. Litig.*, 322 F. Supp. 2d 764, 776-77 (S.D. Tex. 2003) (Lake, J.) (no loss causation where "inflation" supposedly eliminated by alleged corrective disclosure was not caused by alleged false statements).

support an inference of fraud in every case.  It is well-settled, however, that a company's mere failure to perform as expected does not support an inference the prior statements were fraudulent.[40]  Likewise, the mere fact that SG&A costs were higher than estimated does not support a plausible inference that is "more probable" than not that the original estimate was false, particularly given that Dumas and Meier refused to provide anything more than a "guesstimate" of audit-related costs on November 1 and warned they would be expensive.  Ex. H at 6.

Finally, the Response fails to explain how loss causation has been pled as to the alleged inventory and integration issues that occurred during 2008, or as to the goodwill writedown in 2009, which is not alleged to have caused any of the stock price declines alleged in the Amended Complaint.[41]  Plaintiffs also fail to identify any corrective disclosure regarding the alleged non-integration of Triumph, the CAVO and Teledrift acquisitions,[42] or any of the other alleged integration or inventory problems.  The claims related to these issues must be dismissed.

## CONCLUSION

Defendants pray that the Court dismiss this action with prejudice and award all further relief to which they are justly entitled.

---

[40] *See, e.g., In re Azurix Corp. Secs. Litig.*, 198 F. Supp. 2d 862, 882, *aff'd*, 332 F.3d 854 (5th Cir. 2003) ("The mere fact that a business did not live up to expectations is insufficient to create an inference of fraud").

[41] *See In re Dell*, 591 F. Supp. 2d at 909-10 ("[D]isclosure of financial losses generally – *even if those financial losses are a result of the specific concealed fact* – is not sufficient' to establish – or allege – loss causation.'") (emphasis added) (quoting *In re Rhodia S.A. Secs. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007)).

[42] In addition to the absence of loss causation, Plaintiffs' arguments regarding CAVO and Teledrift ignore that Flotek did not acquire Teledrift until February 2008, did not complete the acquisition of CAVO until November 2007, and did not include CAVO's assets on its balance sheet until after November 1, 2007.  The allegation that the prior owner of CAVO misrepresented the value of its assets to Flotek does not show that Flotek itself made misrepresentations and is devoid of particularity.  *See* Amended Complaint ¶ 49(c)(ix)-(x).

Respectfully submitted,


FULBRIGHT & JAWORSKI L.L.P.


s/ Gerard G. Pecht
Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:  (713) 651-5151
Telecopier:  (713) 651-5246

Peter A. Stokes
State Bar No. 24028017
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Ave., Suite 2400
Austin, Texas 78701-2978
Telephone:  (512) 536-5287
Telecopier:  (512) 536-4598

ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of June 2010, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of Texas, using the electronic case filing system of the Court.  The electronic case filing system sent a "Notice of Electronic Filing" to all other counsel who have appeared in this action.

s/ Gerard G. Pecht
_____
Gerard G. Pecht