IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID EARL STOCKMAN and | § | |
| CAROL BURKE, on behalf of | § | |
| themselves and others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. H-09-2526 |
| v. | § | |
| | § | |
| FLOTEK INDUSTRIES, INC., | § | |
| JERRY D. DUMAS, SR., and | § | |
| LISA G. MEIER, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, David Earl Stockman and Carol Burke, bring this federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Flotek Industries, Inc. ("Flotek" or "the Company") between May 8, 2007, and January 23, 2008, inclusive ("the Class Period"). The defendants named in this action are Flotek, Jerry D. Dumas, Sr., who served as Chief Executive Officer of Flotek from September 1998 until his retirement in 2009 and as Chairman from 1998 until Flotek's 2010 annual stockholder's meeting, and Lisa G. Meier, who served as Chief Financial Officer of Flotek from April 2004 until August 2008 and Vice-President from January 2005 until August 2008. Plaintiffs' First Amended Class Action Complaint for Violations of Federal Securities Laws (Docket Entry No. 32) asserts

claims for violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the Securities Exchange Commission (SEC).  Pending before the court are Defendants' Motion to Dismiss and Brief in Support (Docket Entry No. 36) and plaintiffs' request for leave to amend if the court grants the defendants' motion to dismiss (Docket Entry No. 40). For the reasons explained below, the defendant's motion to dismiss will be granted, and the plaintiffs' request for leave to amend will be denied.

## I.  <u>Standard of Review</u>

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief may be granted tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim."  <u>Ramming v. United States</u>, 281 F.3d 158, 161 (5th Cir. 2001), <u>cert. denied sub nom</u> <u>Cloud v. United States</u>, 122 S. Ct. 2665 (2002).  The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor.  <u>Id.</u>

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

<u>Swierkiewicz v. Sorema N.A.</u>, 122 S. Ct. 992, 997 (2002) (quoting <u>Scheuer v. Rhodes</u>, 94 S. Ct. 1683, 1686 (1974)).   To avoid dismissal a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."   <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007).   This "plausibility standard" requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"   <u>Id.</u> (quoting <u>Twombly</u>, 127 S. Ct. at 1966).[1]

The claims for fraud asserted in plaintiff's complaint are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b), which states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be

---

[1]Before <u>Twombly</u> a dismissal under Rule 12(b)(6) would not be appropriate unless it appeared beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief.   <u>Conley v. Gibson</u>, 78 S. Ct. 99, 102 (1957). In <u>Twombly</u>, 127 S. Ct. at 1966, the Supreme Court disavowed the "no set of facts" language from <u>Conley</u>.   The Supreme Court explained that "[t]his phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."   <u>Id.</u> at 1969. Courts have applied this change generally, and not limited its application to cases like <u>Twombly</u> that involve antitrust law. Although this court's decision to grant the Defendants' Motion to Dismiss rests on the standard expressed in <u>Twombly</u> and <u>Iqbal</u>, the court would have reached the same decision had it applied the <u>Conley</u> standard.

stated with particularity." Fed. R. Civ. P. 9(b).  Pleading fraud with particularity in this circuit requires "[a]t a minimum . . . the particulars of time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." Benchmark Electronics, Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir.), modified on denial of rehearing on other grounds, 355 F.3d 356 (5th Cir. 2003) (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992)).  "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim."  Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004) (citing Shushany v. Allwaste, Inc., 992 F.2d 517, 520 (5th Cir. 1993)).

In considering a Rule 12(b)(6) motion to dismiss a court must limit itself to the contents of the pleadings, with two exceptions. In Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of certain documents the defendant attached to a motion to dismiss.  The Fifth Circuit has "restricted such consideration to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim."  Scanlan v. Tex. A & M Univ., 343 F.3d 533, 536 (5th Cir. 2003) (citing Collins, 224 F.3d at 498-99).

In securities cases courts may also take judicial notice of the contents of public disclosure documents that are required by law to be filed with the SEC and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the truth of their contents. See Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996) (citing and adopting rule of Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991), and explaining that this rule does not apply to other forms of disclosure such as press releases or announcements at shareholder meetings). See also In re Azurix Corp. Sec. Litig., 198 F.Supp.2d 862, 877 (S.D. Tex. 2002), aff'd sub nom. Rosenzweig v. Azurix Corp., 332 F.3d 854 (5th Cir. 2003), and Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 209 (5th Cir. 2009).

Although defendants bear the burden of pleading and proving affirmative defenses, where facts alleged in plaintiff's pleadings make clear that a claim is barred, dismissal under Rule 12(b)(6) may be granted. See Jones v. Alcoa, Inc., 339 F.3d 359, 366 (5th Cir. 2003), cert. denied, 124 S. Ct. 1173 (Jan. 26, 2004) (citing Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp. of Texas, 20 F.3d 1362, 1366-70 (5th Cir. 1994) (dismissing claim as time barred under Rule 12(b)(6)).

## II.  **Factual Allegations**

Flotek is an oil field industry service provider that has three primary divisions:   Chemicals and Logistics, Drilling Products, and Artificial Lift.

> Chemicals and Logistics consists of . . . specialty chemical and automated bulk material handling divisions; Drilling Products consists of downhole drilling tool sales, rentals and inspection services; and Artificial Lift consists of . . . Petrovalve and . . . downhole submersible pump divisions.[2]

In 2006, "[i]n the face of increased industry competition from other niche players in the oil field service industry, Dumas and Meier sought to convert Flotek from a niche oil field industry service provider to a specialized solutions outfit." (FACAC ¶ 4)[3] That year Flotek achieved a revenue milestone, reporting more than $100 million in sales, nearly double its Fiscal Year 2005 sales.

On March 13, 2007, Flotek issued a press release announcing its financial results for the fourth quarter of 2006, which ended on December 31, 2006.  Flotek reported revenues of $33.3 million and net income of $3.9 million, or $0.21 per diluted share—a 14% increase over the prior quarter.  (FACAC ¶ 41)[4]  The press release

---

[2]News Release, May 8, 2007, Exhibit C attached to Defendants' Motion to Dismiss and Brief in Support ("Motion to Dismiss"), Docket Entry No. 36, p. 1.

[3]First Amended Class Action Complaint for Violations of Federal Securities Laws (FACAC), Docket Entry No. 32.

[4]See March 13, 2007, News Release, Exhibit A attached to Motion to Dismiss, Docket Entry No. 36.  This press release actually reported net income of $0.42 per share, but since on June 19, 2007, Flotek announced approval of a 2-for-1 split of its common stock, plaintiffs have adjusted the per share amounts alleged in the FACAC to reflect the stock split.

explained that "[t]he revenue growth was driven primarily by organic growth in our Chemicals and Logistics and Drilling Tools segments, coupled with three acquisitions made in the Drilling Tools and Artificial Lift segments."[5]   The press release quoted Dumas as stating "[d]espite a hefty increase in professional fees and effective tax rate, we met the expectations of our shareholders.  We have brought together a first-rate collection of companies and will continue to focus on integrating them in 2007 to maximize profit."  (FACAC ¶ 41)[6]  Following the press release the defendants conducted a conference call with investors and analysts, at which Dumas explained,

> [f]or the full year the Company exceeded $100 million in revenue, nearly doubling sales levels from 2005.  The growth was driven and the sales were driven by 72 acquisitions, two artificial lift acquisitions as well as strong organic growth within both our chemicals division and our established downhole drilling and mining tool group.

(FACAC ¶ 42)[7]  Dumas stated "based on our performance projections, we're providing earnings guidance of [$1] of diluted earnings per

---

[5]Id.

[6]Id.

[7]03/13/07 Flotek Earnings Call, Exhibit B attached to Motion to Dismiss, Docket Entry No. 36, p. 1.  But see Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 1 n.2 (acknowledging that Flotek did not complete 72 acquisitions between 2005 and early 2007 but, instead, completed only nine acquisitions and citing in support of this acknowledgment Flotek's Form 10-K for the fiscal year ended December 31, 2007, Exhibit K attached to Motion to Dismiss, Docket Entry No. 36, p. 5.

share for '07 without the addition of any acquisitions."[8]  Meier similarly projected "company revenues of $160 million with diluted earnings per share of $[1.00]."[9]  Plaintiffs do not allege that these statements were false when made but, instead, that these statements "remained alive and uncorrected throughout the Class Period."  (FACAC ¶ 43)

On May 8, 2007, Flotek issued a press release announcing its financial results for the First quarter of 2007, which ended on March 31, 2007.  Flotek reported revenues of $35.1 million and net income of $3.7 million, or $0.19 per diluted share.  (FACAC ¶ 45)[10] The press release quoted Dumas as stating, "[w]e are actively integrating Triumph Drilling Tools into our existing drilling tool segment and have begun the process of rolling out Rental Tool Management Software (RTMS) to better utilize our extensive inventory of rental tools."[11]  (FACAC ¶ 45)  Following the press release the defendants conducted a conference call with investors and analysts, at which Meier stated that in January 2007 Flotek

---

[8]Id. at 3.  The earnings guidance provided in this conference call was actually $2 per diluted share, but on June 19, 2007, Flotek approved a 2-for-1 stock split.  The earlier statements of projected earnings per share alleged in the FACAC have been adjusted to reflect this stock split.

[9]Id. at 4.

[10]See May 8, 2007, News Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36.

[11]Id.

-8-

completed the acquisition of Triumph Drilling Tools, a regional provider of downhole rental equipment in the oil and gas industry, and that later in January Flotek acquired a 50% partnership interest in CAVO Drilling Motors, an entity specializing in the rental servicing and sales of high performance mud motors for drilling applications.[12]  Meier also stated that "we project the company will generate revenues of $160 million and diluted earnings per share of $[1.00].  These projections include the purchase of Triumph and CAVO."[13]  Dumas similarly stated that "[b]ased on our performance, we hold to our earnings guidance of $[1] diluted earnings per share for 2007 without the addition of any more acquisitions which obviously would have a positive [e]ffect."[14] (FACAC ¶ 46)

Plaintiffs allege that in response to statements made in the press release and conference call held on May 8, 2007, the price of Flotek stock rose $1.88 per share, or 9%, to close to $21.90 per share on May 9, 2007, and that from May 11, 2007, through May 18, 2007, Dumas and Meier sold over 55,000 shares of their Flotek stock for gross proceeds of over $1.27 million at prices exceeding $22.00 per share.  (FACAC ¶ 47-48)

---

[12]05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36, p. 3.

[13]Id. at 4.

[14]Id. at 3.

On June 19, 2007, Flotek announced approval of a 2-for-1 split of its common stock.  The additional shares were distributed on July 11, 2007, and Flotek began trading at the split-adjusted price the following day.  Accordingly, Flotek's previous guidance of $2.00 in diluted earnings per share was adjusted to $1.00 per share to reflect the stock split.  (FACAC ¶ 50)

On August 2, 2007, Flotek issued a press release announcing its financial results for the second quarter of 2007, the period ended June 30, 2007.  Flotek reported revenues of $37.8 million and net income of $4.9 million, or $0.25 per fully diluted share despite inclement weather.  (FACAC ¶ 51)[15]  The press release quoted Dumas as stating that "[n]et income more than doubled in the second quarter of 2007 compared to 2006, and increased 31% above first quarter 2007, despite severe weather in many of our operating areas.  We estimate inclement weather deferred approximately $2 million in sales."[16]  Following the press release the defendants conducted a conference call with investors and analysts at which Dumas stated that "[b]ased on our performance projections we hold our earnings guidance of $1 a diluted share, diluted earnings per share for '07 without the addition of any more acquisitions."[17]  (FACAC ¶ 52)  Plaintiffs allege that Meier similarly stated, "[w]e

_____

[15]August 2, 2007, News Release, Exhibit E attached to Motion to Dismiss, Docket Entry No. 36.

[16]Id.

[17]08/03/2007 Flotek Earnings Call, Exhibit F attached to Motion to Dismiss, Docket Entry No. 36, p. 3.

hold to our original guidance" (FACAC ¶ 52),[18] and that she allegedly touted Flotek's integration efforts, stating:

> [i]n January, we completed the acquisition of Triumph Drilling Tools.  Triumph is a leading regional provider of downhole rental equipment to the oil and gas industry. The integration of Triumph into Flotek has been very successful.  We have leveraged off their expertise to help roll out our RTMS shore-drilling location this year which we feel will further increase the utilization of our expansive tool inventory.

(FACAC ¶ 52)[19]   Plaintiffs allege that in response to these statements, "the price of Flotek stock rose $1.45 per share, or 5%, to close at $31.94 per share on August 2, 2007." (FACAC ¶ 53)

Plaintiffs allege that between August 6 and August 10, 2007, defendant Dumas sold over 155,000 shares of his Flotek stock (more than 17% of his holdings) at prices between $31.00-$33.00 per share for gross proceeds of over $4.9 million, and that on August 13, 2007, Meier sold 5,000 shares of her Flotek stock at a price of $32.30 per share for gross proceeds of $61,500. (FACAC ¶ 54)

On October 31, 2007, Flotek issued a press release announcing its financial results for the third quarter of 2007, which ended on September 30, 2007.  Flotek reported revenues of $41.7 million and net income of $5.0 million, or $0.26 per fully diluted share. (FACAC ¶ 56)[20]  The press release quoted Dumas as stating:

---

[18]_Id._ at 12 (Meier is quoted as stating:  "We hold to our original guidance.").

[19]_Id._ at 3.

[20]October 31, 2007, News Release, Exhibit G attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

> [t]he drop in Rocky Mountain wellhead gas prices and associated drop in gas drilling and production delayed sales in our chemical, drilling and artificial lift divisions.  Despite this, we are on track and performing at or above plan and making progress on several strategic initiatives.  Based on our performance we reiterate our guidance of $1.00 per share on a fully diluted basis for 2007.[21]

(FACAC ¶ 56)  Following the press release the defendants conducted a conference call with investors and analysts at which Dumas explained that

> [s]equentially, third quarter revenues were 4% higher than the second quarter revenues with low gas prices in the Rocky Mountains affecting drilling activity.  The focus in that area is continued integration, product line expansion and moving from sub-rental of products to owning tools that will increase the profitability on those rentals. . . Operating profit margins were 12.4% in the third quarter '07 verses 11.7% in the second quarter of '07.  And they were 20.1% in the third quarter of '06.
>
> Year-over-year operating profit margins are lower due to a shift in our revenue mix from sales to rentals and services, which are more people intensive, plus $700,000 more in depreciation and amortization expense.  Artificial Lift sales decreased from 5.8 million in the third quarter of '06 to 4.3 million in the third quarter of '07.  Low gas prices and pipeline capacity constraints significantly reduced coal bed methane production and drilling activity in the Powder River Basin in the third quarter of '07 versus 2006.  There were about 25% less drilling rigs operating in the third quarter compared to the quarter in '06.
>
> As a percentage of revenue, operating margins for the third quarter were 10.9% verses 14.6% for the same period in '06.  Sequentially, Artificial Lift sales increased 1.3 million in the third quarter compared to second quarter of this year.  Operating margins also increased from 5.4% in the second quarter of '07 to 10.9% in the third quarter.  In our corporate cost, we were

---

[21] Id.

$2.6 million in the third quarter of '07 versus 1.6 million in the third quarter of '06.

The primary increase in this cost relates to the expansion of our accounting and support personnel plus equity compensation expenses associated with the retention plan by the Board to put into place for me and Lisa.

. . .

Our business operations and prospects for future revenue remain strong.  We have not seen a reduction in demand for our products and services due to the quality of the service of our products but as I mentioned we have had some reduction because of the gas price that affected the drilling operation and because we had pipeline problems and we also have other issues that reduced the activity in the Powder River in our coal bed methane operations that reduced the rig count by 25%.

Based on all of this activity, based on the performance of projections and the third quarter performance, we are right on our plan as we have anticipated this year and we have consistently indicated to our share holders that we would have a guidance of $1 per share diluted earnings and without any addition of any acquisitions.

At this point, I want to point out that we continue to stand firm on that guidance.[22]

(FACAC ¶ 57)  During a question and answer period Dumas explained

that Flotek had anticipated a sales decline "[b]ecause we were

beginning to hear from our customers that . . . some of the

operators are taking a pause, a time out, on some of fracing and

sure enough, we had about a $1.5 million drop in sales in the

chemical division in September over August."[23]  (FACAC ¶ 58)  When

_____

[22]Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, pp. 1-3.

[23]Id. at 7.

-13-

asked "[w]here . . . [does Flotek] stand in terms of the final integration with Triumph, the RTMS and stuff like that to kind of get the last the consolidation benefits out?"[24] Dumas stated "we are going to continue to work on it.  I hope that we will see and I think that we will see an improvement in the fourth quarter over the third quarter."[25]  (FACAC ¶ 59)  Nevertheless, Dumas insisted

> there is nothing in our planning that doesn't indicate that we are going to continue to grow at the same approximate level that we have been growing for the last 3-4 years, and that is a 75-80% growth in profits and a, we grew 65% organic in revenues in the third quarter.  So we are doing it internally with it's kind of like Wal-Mart same-store sales were up 65%.[26]

(FACAC ¶ 60)  In response to these statements, the price of Flotek common stock fell $14.35 per share, or 28%, to close at $36.45 per share on November 29, 2007.  (FACAC ¶ 61)

On January 23, 2008, Flotek issued a press release announcing that it was lowering its previously announced guidance for the year ending December 31, 2007.  The press release stated:

> The Company expects revenues for the 2007 year to be approximately $158 million, generating earnings in the range of approximately $0.88 to $0.92 per diluted share, as compared to prior guidance of $1.00 per diluted share, and actual earnings of $0.61 per diluted share in 2006. The revised guidance is preliminary and subject to audit. Flotek expects to release final results for the fourth quarter and year ending December 31, 2007 on March 12, 2008.

---

[24]Id. at 4.

[25]Id.

[26]Id. at 11.

During the fourth quarter, which historically has been one of Flotek's strongest quarters, revenues were lower than anticipated due to a general slowdown in North American fracturing activity and drilling activity, accompanied by weather disruptions in the mid-continent region.

(FACAC ¶ 63)[27]   The press release quoted Dumas as stating:

"The growth fundamentals of our core businesses remain sound, and the pace of North American oilfield service activity seems to be strengthening in January.   We believe the business line additions of the last several years will continue contributing to growth in 2008 and beyond as these businesses are integrated and ramp-up matures.  We have made a significant investment in 2007 to strengthen our internal controls and expand our information technology processing capability.   We anticipate the costs associated with these initiatives to level off in 2008."[28]

Plaintiffs allege that in response to these announcements, the price of Flotek stock fell 30%, or $7.60 per share to close at $17.86 per share on January 24, 2008.  (FACAC ¶ 64)

On March 17, 2008, Flotek held a conference call with investors and analysts to discuss the Company's fourth-quarter and full-year results for the period ending December 31, 2007, stating:

Flotek delivered a strong performance in '07 and we earned net income of $16.7 million, or $0.88 per fully diluted share during 2007, compared to $11,400,000 or $0.61 per fully diluted share in '06.  Our net income increased 46% and fully diluted earnings per share increased 45% in '07 versus '06.  All amounts reflect the two-for-one split we completed in July of '07.  Our focus has been clearly on expanding sales and rentals of our proprietary technology-driven products.  Because of this company-wide, we increased our gross profit margins from 41% in 2006 to 43% in 2007.

---

[27]Press Release, Exhibit I attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[28]Id.

Operating income margin remained constant at 19% in 2007 and 2006. We generated total revenues of $158 million, compared to 101 million in 2006, despite adverse weather and lower gas prices due to lack of pipeline outlets in the Rocky Mountains. Our organic sales growth made approximately 64% of our year-over-year growth. The acquisition of Triumph Drilling Tools, Sooner Energy Services and CAVO Drilling Motors made up the balance. The chemicals and logistics segment increased revenue 71% year-over-year as a result of 117% growth in our biodegradable environmentally benign "green" chemicals sales.[29]

(FACAC ¶ 65)

On March 16, 2009, Flotek issued a press release announcing that the Company had recorded a goodwill impairment of $67.7 million. (FACAC ¶ 66)[30] The impairment caused Flotek to breach a minimum net worth covenant associated with its credit arrangements with various banks. As a result, the Company was forced to enter into a series of amendments to its credit arrangements that limited Flotek's revolving credit line and imposed capital expenditure limitations.[31]

Each of Flotek's press releases ended with a section titled "Forward-Looking Statements" that stated:

This Press Release contains forward-looking statements (within the meaning of Section 27A of the Securities Act of 1933 (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934) regarding Flotek Industries, Inc. business, financial condition, results of operations and prospects. Words such as expects,

---

[29]Q4 2007 Earnings Call, Exhibit J attached to Motion to Dismiss, Docket Entry No. 36.

[30]March 16, 2009, Press Release, Exhibit Q attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[31]Id. at 5.

anticipates, intends, plans, believes, seeks, estimates and similar expressions or variations of such words are intended to identify forward-looking statements, but are not the exclusive means of identifying forward-looking statements in this Press Release.

Although forward-looking statements in this Press Release reflect the good faith judgment of management, such statements can only be based on facts and factors currently known to management.  Consequently, forward-looking statements are inherently subject to risks and uncertainties, and actual results and outcomes may differ materially from the results and outcomes discussed in the forward-looking statements.  Factors that could cause or contribute to such differences in results and outcomes include, but are not limited to, demand for oil and natural gas drilling services in the areas and markets in which the Company operates, competition, obsolescence of products and services, the Company's ability to obtain financing to support its operations, environmental and other casualty risks, and the impact of government regulation.  Further information about the risks and uncertainties that may impact the Company are set forth in the Company's most recent filings on Form 10K (including without limitation in the "Risk Factors" Section) and Form 10-Q, and in the Company's other SEC filings and publicly available documents.  Readers are urged not to place undue reliance on these forward-looking statements, which speak only as of the date of this Press Release.  The Company undertakes no obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this Press Release.[32]

Plaintiffs allege that in August of 2009 Flotek reported another goodwill impairment of $18.5 million, amended its credit arrangements, and conducted a non-public offering to repay its debt

---

[32]May 8, 2007, Press Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36, p. 4.  Identical and/or virtually identical statements are included at the end of every press release at issue in this action.  See the following press releases attached to Docket Entry No. 36:  March 13, 2007, Exhibit A, p. 4; August 2, 2007, Exhibit E, p. 4; October 31, 2007, Exhibit G, p. 5; January 23, 2008, Exhibit I, p. 2; and March 16, 2009, Exhibit Q, p. 10.

and fund its working capital needs, and announced the departure of defendant Dumas.  (FACAC ¶ 68)  Plaintiffs allege that Flotek Director, John Chisholm, interim president, later remarked,

> "[A]s I indicated on the second quarter call, one of the
> most important goals I have as interim President is to
> provide no nonsense transparency to all of our
> stakeholders.  We have worked diligently to renew lines
> of communication with all of our stakeholders, and while
> we still have work to do, we are generally pleased with
> our efforts today."

(FACAC ¶ 68)

## III.   **Analysis**

Plaintiffs bring this securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly-traded securities of Flotek during the Class Period. Plaintiffs assert violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission (SEC) against Flotek and its senior officers, Jerry D. Dumas, Sr., and Lisa G. Meier.  Plaintiffs allege that the defendants made false statements and omissions in four sets of press releases and analysts calls between March 13 and October 31, 2007.  The alleged misstatements and omissions fall into four broad categories: (1) earnings guidance, (2) integration of acquired companies, (3) inventory accounting, and (4) product demand.  Defendants contend that the plaintiff's claims are subject to dismissal under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private

-18-

Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b)(1), because plaintiffs have failed to allege facts sufficient to state a claim for securities fraud in violation of § 10(b), Rule 10(b)-5, and/or § 20. For the reasons explained below, the court agrees.

**A.    Applicable Law**

1.    <u>Section 10(b) and Rule 10b-5</u>

Section 10(b) of the Exchange Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly,

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(b).

2.    <u>Rule 9(b) and Private Securities Litigation Reform Act</u>

Actions for securities fraud filed pursuant to § 10(b) and Rule 10b-5 are subject to the pleading requirements of Fed.R.Civ.P.

-19-

9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, <u>et</u> <u>seq.</u>

(a)  Rule 9(b)

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).  Plaintiffs must also plead the elements of their Rule 10b-5 claims with particularity.  <u>See</u> <u>Goldstein v. MCI WorldCom</u>, 340 F.3d 238, 245 (5th Cir. 2003) (citing <u>Williams v. WMX Technologies, Inc.</u>, 112 F.3d 175, 177 (5th Cir.), <u>cert. denied</u>, 118 S. Ct. 412 (1997)).  <u>See also</u> <u>Shushany v. Allwaste, Inc.</u>, 992 F.2d 517, 520-521 (5th Cir. 1993).  Particularity is required so that the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs.  <u>See</u> <u>Tuchman v. DSC Communications Corp.</u>, 14 F.3d 1061, 1067 (5th Cir. 1994).

Pleading fraud with particularity in this circuit requires "the particulars of 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'"  <u>Id.</u> at 1068 (quoting <u>Tel-Phonic Services</u>, 975 F.2d at 1139).  "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim."  <u>Southland Securities</u>, 365 F.3d at 361.

-20-

      (b)   PSLRA

In 1995 Congress amended the 1934 Act through the passage of the PSLRA.  In relevant part, the PSLRA, 15 U.S.C. § 78u-4(b)(1), provides that

> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact;  or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

In <u>ABC Arbitrage Plaintiffs Group v. Tchuruk</u>, 291 F.3d 336, 350 (5th Cir. 2002), the Fifth Circuit coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
>
> (1) specify the [sic] each statement alleged to have been misleading, i.e., contended to be fraudulent;
>
> (2) identify the speaker;
>
> (3) state when and where the statement was made;
>
> (4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA.

Where misrepresentations appear in certain types of documents that plaintiffs believe were written by groups, some courts have allowed plaintiffs to link certain defendants to alleged misrepresentations simply by pleading that the defendants were part of the group that likely put the challenged documents together. In re Solv-Ex Corp. Sec. Litig., 210 F.Supp.2d 276, 283 (S.D.N.Y. 2000); In re Worlds of Wonder Sec. Litig., 721 F.Supp. 1140, 1143 (N.D. Cal. 1989). Under this group-pleading-doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission where the defendants are insiders or affiliates of the company. Solv-Ex, 210 F.Supp.2d at 283. The group-pleading-doctrine allows plaintiffs to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud.

In Southland the Fifth Circuit held that group pleading

cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be pleaded with regard to "each act or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind."

365 F.3d at 364.  Given the PSLRA's directive that each defendant must be enlightened as to his or her part in the alleged fraud, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded.  However, corporate documents that have no stated author, or statements within documents not attributed to any individual, may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue.  Specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement.  <u>Id.</u> at 365.  "[T]he corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation."  <u>Id.</u>

    3.  <u>Pleading Standards</u>

Section 10(b) and Rule 10b-5 may be violated by using devices, schemes, or artifices, making misstatements or omissions of material fact, or engaging in any act, practice, or course of business that would operate as a fraud in connection with the purchase or sale of any security.  To state a claim under section

-23-

10(b) of the 1934 Act and Rule 10b-5 the plaintiffs must allege
(1) that the defendant made a material misstatement or an omission,
(2) scienter, (3) a connection with the purchase or sale of a
security, (4) reliance, (5) economic loss, and (6) loss causation.
See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton
Co., 597 F.3d 330, 335 (5th Cir. 2010), pet. for cert. filed
May 13, 2010 (No. 09-1403).

(a)  Misrepresentations and Manipulations

A misrepresentation is not actionable unless it is material.
Tuchman, 14 F.3d at 1067.  To meet the materiality requirement
"there must be a substantial likelihood that the disclosure of the
omitted fact would have been viewed by the reasonable investor as
having significantly altered the 'total mix' of information made
available."  Basic Inc. v. Levinson, 108 S. Ct. 978, 983 (1988).
"[M]ateriality is not judged in the abstract, but in light of the
surrounding circumstances."  Rubenstein v. Collins, 20 F.3d 160,
168 (5th Cir. 1994) (quoting Krim v. BancTexas Group, Inc., 989
F.2d 1435, 1448 (5th Cir. 1993)).  The appropriate inquiry is
whether, under all the circumstances, the statement or omitted fact
"is one [that] a reasonable investor would consider significant in
[making] the decision to invest, such that it alters the total mix
of information available about the proposed investment."  Id.
(quoting Krim, 989 F.2d at 1445).

-24-

(b)  Scienter

The term "scienter" as applied to conduct giving rise to an action under the Exchange Act and Rule 10b-5 is defined as "a mental state embracing intent to deceive, manipulate or defraud." Lovelace, 78 F.3d at 1018 (quoting Ernst & Ernst v. Hochfelder, 96 S. Ct. 1375, 1381 n.12 (1976)).  In order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b-5 claim must plead facts rendering a plausible inference of scienter that is cogent and at least as strong as any opposing inference one could draw from the facts alleged.  Lormand v. US Unwired, Inc., 565 F.3d 228, 250-51 (5th Cir. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510-11 (2007)).

> [S]evere recklessness can supply the scienter required to prove securities fraud.  Severe recklessness is "limited to those highly unreasonable omissions or misrepresenta-tions that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Abrams v. Baker Hughes, Inc., 292 F.3d 424, 430 (5th Cir. 2002) (quoting Nathenson v. Zonagen, Inc., 267 F.3d 400, 408-409 (5th Cir. 2001)).  "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Lormand, 565 F.3d at 251 (citing Tellabs, 127 S. Ct. at 2509).

-25-

### (1)  Circumstantial Evidence

The Fifth Circuit has "never required a plaintiff to present direct evidence of scienter in order to withstand dismissal of his securities claims." Goldstein, 340 F.3d at 246.  "[U]nder the PSLRA circumstantial evidence can support a strong inference of scienter." Nathenson, 267 F.3d at 410.  Nevertheless, conclusory allegations will not suffice to plead scienter, and the court may not conduct a piecemeal analysis of the alleged facts and circumstances but must, instead, view the totality of the alleged facts and circumstances as a whole to determine whether they raise the requisite strong inference of scienter.  See Abrams, 292 F.3d at 430-431 (citing Nathenson, 267 F.3d at 424-425).

### (2)  Motive and Opportunity

Before enactment of the PSLRA the Fifth Circuit followed the Second Circuit's approach that allowed plaintiffs to raise an inference of scienter either by pleading facts that identify circumstances indicating defendants' conscious or severely reckless behavior, or by pleading facts that demonstrate defendants' motive and opportunity to commit securities fraud.  Lovelace, 78 F.3d at 1018-1019.  See also Melder v. Morris, 27 F.3d 1097, 1102 (5th Cir. 1994), and Tuchman, 14 F.3d at 1068.  Following the PSLRA, however, the Fifth Circuit has "concluded that '[a]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter,' but that allegations of motive and

-26-

opportunity, without more, will not fulfill the pleading requirements of the PSLRA." Goldstein, 340 F.3d at 246 (quoting Nathenson, 267 F.3d at 412).

Insider trading can be alleged as a form of motive and opportunity. See Southland, 365 F.3d at 368 (citing In re Comshare Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999) (allegations "that the individual [d]efendants did profit by selling many of their shares at artificially inflated prices during the class period . . . largely tend to illustrate that [d]efendants had the motive and opportunity to commit securities fraud")). However, insider trading will raise a strong inference of scienter only when "in suspicious amounts or at suspicious times." Id. (quoting Abrams, 292 F.3d at 435). See also Central Laborers' Pension Fund, v. Integrated Electric Services, Inc., 497 F.3d 546, 552-53 (5th Cir. 2007) ("Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts."); In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 987 (9th Cir. 1999) ("insider trading is suspicious only when dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information"). Courts consider the amount and percentage of shares sold, trading history, and timing, including whether other defendants sold shares at the same time, when assessing whether a stock sale qualifies as extraordinary or unusual. See id. (citing In re Silicon Graphics, 183 F.3d at 986).

### (3)  Totality of the Circumstances

All the facts and circumstances alleged must be considered to determine whether they, in toto, raise a requisite strong inference of scienter.  <u>Abrams</u>, 292 F.3d at 430; <u>Nathenson</u>, 267 F.3d at 410. Conclusory assertions that the defendant should have known about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter. <u>Abrams</u>, 292 F.3d at 432.  The mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles ("GAAP"), without more, does not establish scienter.  <u>Melder</u>, 27 F.3d at 1103.  Allegations that the defendant was motivated to commit fraud to enhance his incentive compensation or to raise capital are also inadequate to establish scienter because "the executives of virtually every corporation in the United States would be subject to fraud allegations." <u>Abrams</u>, 292 at 434.

### (c)  Reliance

Plaintiffs must also allege reliance on defendants' material misrepresentations or omissions.  In class actions plaintiffs usually premise the reliance element of their claims on the fraud-on-the-market doctrine, which allows plaintiffs who may not have read the alleged misrepresentations to rely upon market conditions reflecting the fraud.  The theory is that an established market assimilates all of the available information regarding a particular

stock, sets the stock price accordingly, and that investors make their decisions in reliance on the integrity of an informed market. See Basic, 108 S. Ct. at 983.  Where material misrepresentations have been placed into the mix of information or where omissions render the market information misleading, the stock price is skewed and investors may be defrauded.  Id.  Under this theory plaintiffs are entitled to a rebuttable presumption of reliance when they show that materially misleading statements were, in fact, disseminated into "an impersonal, well-developed market for securities." Id. at 991.  Defendants can rebut the presumption by showing that the market price was not affected by their misrepresentations, that the plaintiffs did not trade in reliance on the integrity of the market, or that plaintiffs would have traded despite knowing the statement was false.  Id. at 992.

(d)  Loss Causation

Under the PSLRA plaintiffs "have the burden of proving that the act or omission of the defendant alleged to violate [the Exchange Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  But the PSLRA does not specifically describe what a plaintiff must allege in a complaint in order to plead the "loss causation" element of such a claim.  In Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005), the Supreme Court held that the federal securities statutes and regulations "permit private securities fraud actions for recovery

where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." <u>Id.</u> at 1633.

> In other words, the federal laws require "that a plaintiff prove that the defendant's misrepresentations (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  In order to establish this proximate causation, the plaintiff must prove that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic loss.

<u>Lormand</u>, 565 F.3d at 255 (quoting <u>Dura</u>, 125 S. Ct. at 1631, 1633).

### 4.   <u>Section 20(a)</u>

Section 20(a) of the Exchange Act defines "controlling person liability."  It provides, in pertinent part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).  To establish controlling person liability plaintiffs must show that a primary violation was committed and that the defendants directly or indirectly controlled the violator. <u>See</u> <u>ABC Arbitrage</u>, 291 F.3d at 348 n.57, 362 n.123.   <u>See</u> <u>G.A. Thompson & Co., Inc. v. Partridge</u>, 636 F.2d 945, 958 (5th Cir. 1981) (rejecting need to allege that the controlling person actually participated in the underlying primary violation). Nevertheless, the plaintiff needs to allege some facts beyond a defendant's position or title to show that the defendant had actual power or control over the controlled person. <u>See</u> <u>Dennis v. General Imaging, Inc.</u>, 918 F.2d 496, 509-510 (5th Cir. 1990).

-30-

**B.    Application of the Law to the Facts**

    1.    <u>Failure to State a Claim for Primary Liability Under</u>
<u>Section 10(b)/Rule 10b-5 Claims</u>

The defendants argue that the Exchange Act claims asserted against them should be dismissed because plaintiffs have failed to allege particularized facts showing a material false statement or actionable omission; plaintiffs' claims are barred by the safe harbor for forward-looking statements; plaintiffs' allegations do not support a plausible inference of scienter; and plaintiffs fail to allege loss causation.

    (a)  Material False Statements or Actionable Omissions

The statements and omissions about which the plaintiffs complain fall into four categories:  (1) earnings guidance, (2) integration of acquired companies, (3) inventory accounting, and (4) product demand.

**(1)  Earnings Guidance**

Plaintiffs allege that throughout the Class Period "[d]efendants repeatedly highlighted the company's 100% year-over-year growth and promised the market Flotek was poised to achieve $1.00 in diluted earnings per share in 2007."  (FACAC ¶ 9) Plaintiffs allege that during a pre-Class Period conference call with analysts held on March 13, 2007, Dumas projected that the Company would "be able to deliver $[1] per share diluted earnings," (FACAC ¶ 42), and that Meier similarly projected that "the Company

-31-

will generate revenues of $160 million with diluted earnings per share of $[1]." (FACAC ¶ 42) Plaintiffs do not allege that these projections were false when made but, instead, that they "remained alive and uncorrected throughout the Class Period." (FACAC ¶ 43) Plaintiffs allege that during conference calls with analysts held on May 9, 2007,[33] August 3, 2007,[34] and November 1, 2007,[35] Dumas and Meier both reiterated that based on the Company's performance projections they held to their original earnings guidance for 2007 of $1.00 earnings per diluted share. (FACAC ¶ 46 (Dumas and Meier on May 9th), ¶ 52 (Dumas and Meier on August 3rd), ¶ 57 (Dumas on November 1st))[36]

Plaintiffs allege that, unbeknownst to investors, defendants' statements about earnings guidance were false because undisclosed "internal projections indicated that the Company could not achieve $1.00 per share." (FACAC ¶ 9) However, plaintiffs do not support their allegations with cites to any promises as opposed to estimates of Flotek's 2007 earnings, or to any specific internal projections that contradict and/or conflict with Dumas's and

---

[33]05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

[34]08/03/2007 Flotek Earnings Call, Exhibit F attached to Motion to Dismiss, Docket Entry No. 36.

[35]Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36.

Meier's earnings guidance.   Instead, plaintiffs support their allegations that the defendants' statements about earnings guidance were materially false and misleading with statements attributed to CW1 identified as a "Flotek Human Resources Director from August of 2007 through May of 2009." (FACAC ¶¶ 9 and 49(a)(i)) Plaintiffs allege that CW1 heard from Company executives, including Steve Reeves, President of the Downhole Tool Division, Bruce McGovern, who headed up the Drilling Products segment, and Jesse "Jumpy" Neyman, Chief Accounting Officer, that Dumas "'had a habit' of overstating financial projections to the market" (FACAC ¶ 49(a)(i)), and "had no factual information or projections from anyone to support his positive statements" (FACAC ¶ 49(a)(iv)); but plaintiffs have not identified any specific financial projections that Dumas overstated.   Plaintiffs allege that CW1 witnessed a disconnect between Dumas and Meier evidenced by Dumas's habit of regularly jumping in to add a positive spin on numbers that demonstrated a shortfall against expectations or in comparison to prior periods (FACAC ¶ 49(a)(iii), ¶ 55(a)(i), ¶ 62(a)).   But plaintiffs fail to identify any specific numbers showing a shortfall or expected shortfall on which Dumas placed an unreasonably positive spin, and fail to identify any specific time, place, or context at which Dumas added a positive spin to such numbers.   Plaintiffs allege that during a meeting with Reeves, Neyman, McGovern, Meier, and possibly others that took place during

the third or fourth quarter of 2007, "in the middle of descriptions about specific issues causing the problems, Dumas got up to leave and in typical fashion said, 'just go out and find it,' referring to revenues that would meet performance expectations" (FACAC ¶ 62(a)(v)), but plaintiffs fail to identify which issues were raised, and/or why whatever was said about those issues would prove that Dumas's and/or Meier's statements about earnings guidance were materially false and/or misleading.

The statements attributed to CW1 are not sufficient to raise an inference that Dumas's and Meier's statements about earnings guidance were materially false and/or misleading because they are hearsay lacking factual particularity and specificity required by Rule 9(b) and the PSLRA.  The statements attributed to CW1 fail to specify any financial projections that Dumas and/or Meier overstated, fail to specify any dates on which Dumas and/or Meier received financial projections that they overstated, and fail to specify the amounts by which Dumas and/or Meier overstated any financial projections.  "The mere fact that a business did not live up to expectations is insufficient to create an inference of fraud." In re Azurix, 198 F.Supp.2d at 882.  The statements attributed to CW1 also lack indicia of reliability required by case law to raise an inference that the defendants' statements were materially false and misleading.  See ABC Arbitrage, 291 F.3d at 353 (alleged sources of information must be described "with sufficient particularity to support the probability that a person

in the position occupied by the source as described would possess the information pleaded"). Because plaintiffs have not alleged any particularized facts capable of establishing that Flotek could not reasonably estimate annual earnings of $1 per share, the court concludes that plaintiffs have failed to plead facts that if true would show that statements attributed to the defendants about Flotek's earnings guidance contained material misstatements or actionable omissions.

### (2)   Integration of Acquired Companies

Plaintiffs allege that commenting on a pre-Class Period press release issued on March 13, 2007, Dumas stated "[w]e have brought together a first-rate collection of [9] companies and will continue to focus on integrating them in 2007 to maximize profit" (FACAC ¶ 41), and that during a conference call with investors and analysts following the press release, Dumas stated that "[t]he drilling tool groups will focus on integration this year." (FACAC ¶ 42) Plaintiffs allege that throughout the Class Period defendants touted the integration efforts that would reduce costs and improve Flotek's margins. (FACAC ¶ 44) Plaintiffs allege that during a conference call with analysts held on May 9, 2007,[37] Dumas stated, "[w]e are actively integrating Triumph Drilling Tools into our existing drilling tool segment" (FACAC ¶ 45), and that during

---

[37]05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

a conference call with analysts held on August 3, 2007,[38]  Meier
stated that "[t]he integration of Triumph into Flotek has been very
successful.  We have leveraged off their expertise to help roll out
our RTMS to our drilling locations this year which we will further
[use to] increase the utilization of our expansive tool inventory."
(FACAC ¶ 52)  Plaintiffs allege that during a conference call with
analysts held on November 1, 2007, Bo McKenzie of Pritchard Capital
Partners asked where the Company stood "in terms of the final
integration with Triumph . . . and stuff like that to . . . get the
last of the consolidation benefits out" (FACAC ¶ 59), to which
Dumas responded, "Bo, we are going to continue to work on it.  I
hope that we will see and I think we will see an improvement in the
fourth quarter over the third quarter."  (FACAC ¶ 59)

     Plaintiffs allege that unbeknownst to investors, defendants'
statements about integration of acquired companies were materially
false and misleading because

> defendants failed to integrate any of the acquired
> companies into Flotek, exacerbating the inevitable
> complexity that ensues from so many acquisitions in such
> a short period of time.  Instead, according to former
> employees, the acquired companies continued to operate as
> independent entities within various, separate frameworks
> for sales, process, technology, finance, accounting and
> controls (to the extent any controls existed).  Flotek
> simply had no uniform accounting or forecast system in
> place to integrate and assimilate the acquisitions and
> was incapable of providing accurate financial results as
> a result of this lack of due diligence and integration.

---

[38]08/03/2007 Flotek Earnings Call, Exhibit F attached to Motion
to Dismiss, Docket Entry No. 36.

(FACAC ¶ 8)  However, plaintiffs do not support their allegations
with cites to any evidence that Flotek ever reported inaccurate
financial results or that any inaccurate financial reports were
attributable to Flotek's failure to integrate new acquisitions.
Instead, plaintiffs support their allegations that the defendants'
statements about integration of acquired companies were materially
false and misleading with statements attributed to CW1, a "Flotek
Human Resources Director from August of 2007 through May of 2009,"
(FACAC ¶¶ 9 and 49(a)(i)), CW2, "a Fixed Asset Accountant who
worked for the company from July 2008 through February 2009,
performing inventory counts at most of Flotek's tool yards," (FACAC
¶ 49(b)(iv)), CW3, "Flotek's IT Director and Senior Architect from
April 2008 to June 2009 . . . [whose] position was akin to the
position of a Chief Information Officer[, and who] visited each
facility for each division in performing . . . responsibilities to
spearhead Flotek's IT initiatives" (FACAC ¶ 49(b)(vi)) and CW4, a
person who "worked for Triumph from April 1, 2004 as a Regional
Manager responsible for North Texas and Oklahoma until Flotek
acquired Triumph in January 2007 . . . [and who i]n March 2008
. . . was transferred to manage the integration of the CAVO and
Spidle Turbeco sales forces."  (FACAC ¶ 49(b)(xx))

    Plaintiffs allege that CW1 heard from Company executives,
including Reeves, McGovern, and Neyman, that Dumas "did not
integrate anything" (FACAC ¶ 49(b)(i)), "kept everyone in place
doing business the same way with the same system they had" (FACAC

¶ 49(b)(i)), and "had no uniform accounting or forecasting system for the newly acquired companies." (FACAC ¶ 49(b)(ii)) Plaintiffs allege that CW1's statements are corroborated by CW2 who "saw no indication of an integrated, uniform accounting or other management/computer system utilized by Flotek's facilities during CW2's employment[, i.e., July 2008 through February 2009]" (FACAC ¶ 49(b)(v)), and "heard from the people CW2 worked with that when generating sales projections, 'they used whatever they sold the last year and maybe adjusted that as things changed.'" (FACAC ¶ 49(b)(v)) Plaintiffs have failed to allege any particularized facts showing that statements attributed to CW1 and CW2 contradict or otherwise prove that Dumas's statements that in 2007 Flotek was focused on actively integrating its recent acquisitions to maximize profit or Meier's statement that the integration of Triumph Tools had been very successful were materially false and/or misleading. Because plaintiffs have not alleged that the defendants ever stated that Flotek had a uniform accounting or forecast system for new acquisitions, or that absent such uniform systems Flotek could not reasonably generate sales projections, the statements attributed to CW1 and CW2 are insufficient to raise an inference that defendants' statements about Flotek's efforts to integrate new acquisitions contain material misstatements or actionable omissions. Moreover, plaintiffs' allegations lack any explanation for why CW1, a human resource manager who worked for Flotek during only part of the Class Period, and/or CW2, an accountant who did not work for Flotek

during any of the class period, are reliable sources of information about Flotek's efforts to integrate new acquisitions during the Class Period.

Plaintiffs allege that the statements regarding Flotek's integration of new acquisitions attributed to CW1 and CW2 are corroborated by CW3 who worked as Flotek's IT Director and Senior Architect from April of 2008 to June of 2009. Plaintiffs allege that "CW3 learned right away that although Flotek had acquired numerous companies over the past few years, there had been **virtually** no integration." (FACAC ¶ 49(b)(vii) (emphasis added)) According to CW3, Meier explained

> that Flotek had been experiencing "serious inventory problems," and accounting problems resulting from the various facilities all operating independently. CW3 was to visit each of the facilities for each division, to prepare a detailed integration plan and execute it so that Flotek could begin operating as one.

(FACAC ¶ 49(b)(vii)  Plaintiffs allege that

> [a]ccording to CW3, Flotek had not been able to even devise a plan to perform this system integration, that the Company had paid hundreds of thousands of dollars to consultants and "seemed to have gotten nowhere" when CW3 joined in April 2008. CW3 said they were bogged down figuring out what was needed and how to get all the reporting modules, the statistics and "underlying baseline" they needed.

(FACAC ¶ 49(b)(viii))

Far from showing that the statements attributed to Dumas and Meier about Flotek's efforts to integrate new acquisitions during the Class Period were materially false and misleading, the statements attributed to CW3 show that before CW3 was hired in

-39-

April of 2008 Flotek had "paid hundreds of thousands of dollars to consultants" in an effort to integrate its newly acquired companies. The only inference to be drawn from the statements attributed to CW3 is that Flotek made efforts to integrate its new acquisitions in 2007, but had not completed that effort by April of 2008 when CW3 was hired to continue that effort. Thus, even if true, CW3's allegations would only prove that Flotek's efforts to integrate its new acquisitions had not succeeded by April of 2008; they would not prove that Flotek was not focused on actively attempting to integrate its new acquisitions. Nor would CW3's statements prove that the statements about Flotek's integration efforts attributed to Dumas and Meier contained material misstatements and/or actionable omissions.

Plaintiffs allege that the statements attributed to CW2 and CW3 are corroborated by CW4 who worked for Triumph from April 1, 2004, as a Regional Manager responsible for North Texas and Oklahoma, and in March of 2008 was transferred to manage the integration of the CAVO and Spidle Turbeco sales forces. (FACAC ¶ 49(b)((xx))  Plaintiffs allege that

> [a]ccording to CW4, there was no integration in 2007 . . . Flotek was clearly moving too fast buying companies and expecting "too many cooks in the kitchen" to work together in a cooperative organized manner.  CW4 saw there would be no possibility of a "seamless" integration of the acquired companies in 2007 or 2008 as "nobody knew who was supposed to do what" and each was operating the way it always had.

(FACAC ¶ 49(b)(xx))  CW4's statements about Flotek's efforts to integrate its new acquisitions in 2007 are neither sufficiently

particularized nor sufficiently reliable to raise an inference that Dumas's statements that Flotek was actively integrating its recent acquisitions to maximize profit in 2007 were materially false and/or misleading because CW4's statements address only the outcome of Flotek's integration effort.  CW4 does not cite any particularized facts that, if true, would show that throughout the Class Period Flotek was not focused on actively integrating its new acquisitions, that the efforts Flotek was making to integrate its new acquisitions were unreasonable, or that those efforts could not be expected to accomplish the task of integrating the new acquisitions within a reasonable period of time.  Nor are CW4's statements sufficiently particularized to prove that Meier's statement that Triumph had been successfully integrated was materially false or misleading.  Meier qualified the statement about which plaintiffs complain, *i.e.*, "[t]he integration of Triumph into Flotek has been very successful" (FACAC ¶ 52), with the explanation that Flotek had "leveraged off [Triumph's] expertise to help roll out [Flotek's] RTMS to [its] drilling locations this year which [Flotek] will further [use to] increase the utilization of [its] expansive tool inventory." (FACAC ¶ 52)  Meier did not state that every aspect of Triumph's business had been successfully integrated but only that Triumph had successfully been integrated into Flotek's RTMS.[39]   None of the statements

_____

[39]See May 8, 2007, News Release, Exhibit C attached to Motion to Dismiss, Docket Entry No. 36. ("We are actively integrating

attributed to CW4 would contradict this statement, or prove that
Triumph had not been successfully integrated into Flotek's RTMS.

The statements attributed to CW1, CW2, CW3, and CW4 are
insufficient to raise an inference that the defendants' statements
about Flotek's 2007 efforts to integrate its newly acquired
companies were materially false and/or misleading because they are
hearsay lacking specificity required by Rule 9(b) and the PSLRA and
lacking indicia of reliability required by case law. See ABC
Arbitrage, 291 F.3d at 353. Missing from plaintiffs' allegations
about defendants' statements concerning Flotek's 2007 efforts to
integrate its new acquisitions is any factual description by
plaintiffs of Flotek's integration efforts, any explanation of why
those efforts were unreasonable, and/or why those efforts could not
be expected to accomplish the task of integrating Flotek's
acquisitions within a reasonable period of time. Moreover,
plaintiffs' allegations that defendants' statements about Flotek's
efforts to integrate its acquisitions in 2007 contained material
misstatements and/or actionable omissions are contradicted by the
statements attributed to CW3 that before Flotek hired CW3 in April
of 2008, Flotek paid consultants hundreds of thousands of dollars
in an effort to integrate its acquisitions. Accordingly, the court
concludes that plaintiffs have failed to allege particularized

Triumph Drilling Tools into our existing drilling tool segment and
have begun the process of rolling out Rental Tool Management
Software (RTMS) to better utilize our extensive inventory of rental
tools.")

facts that if true would show that statements attributed to Dumas and Meier about Flotek's efforts to integrate newly acquired companies contained material misstatements and/or actionable omissions.

### (3)  Inventory Accounting

Plaintiffs allege that "[i]n order to inflate the price of Flotek's stock, defendants caused the Company to falsely report its results for the first three quarters of 2007 by improperly accounting for its inventory, including its valuation for excess and obsolete inventory, which misstated the Company's reported inventory, gross margin and net income." (FACAC ¶ 73)  Plaintiffs allege that the "results for interim 2007 were included in Form 10-Q's filed with the SEC . . . [and] included in press releases disseminated to the public" (FACAC ¶ 74), and that "[d]ue to Flotek's failure to properly account for excess and obsolete inventory, the Company's financial statements were not a fair presentation of Flotek's results and were presented in violation of . . . [GAAP] and SEC rules." (FACAC ¶ 75)

However, plaintiffs do not support their allegation with cites to any specific misstatements of reported inventory, gross margin, or net income.  Instead, plaintiffs support their allegations that Flotek's failure to accurately account for its inventory caused Flotek to misstate its interim financial results for 2007 by alleging that Flotek had "huge volumes of old, unusable inventory

throughout several of the acquired companies, including Triumph"
(FACAC ¶ 49(c)), and that "Flotek did not adequately reserve for
this obsolete inventory during the Class Period." (FACAC ¶ 55(c))
Plaintiffs' allegations about Flotek's failure to properly account
for its inventory are based primarily on observations attributed to
CW2, "a Fixed Asset Accountant who worked for the Company from July
2008 through February 2009, performing inventory counts at most of
Flotek's tool yards" (FACAC ¶ 49(b)(iv)) and CW3, an accountant who
began working for Flotek in April of 2008 and did on-site
inspections.  (FACAC ¶ 49(b)(vii))

   Plaintiffs allege that "[d]uring inventory at the Spidle
Turbeco tool yards, CW2 found large volumes of old, rusting and
otherwise unusable tools which were scheduled to sit on Flotek's
books for as many as seven years as usable assets being
depreciated." (FACAC ¶ 49(c)(i))  Plaintiffs allege that while CW2
was employed by Flotek, *i.e.*, July 2008 through February 2009,
Flotek's former Controller, Julie Schwendimann, told CW2 that
Reeves and McGovern could not understand why the plants in their
division were keeping obsolete tools on their books for up to seven
years, that according to McGovern, Flotek executives wanted to
maintain the obsolete inventory as assets on Flotek's books under
the rationale that the tools could be cut up or changed in a way
that would make them usable, but that CW2 never observed that
practice.  (FACAC ¶ 49(c)(ii) and (viii))

-44-

Plaintiffs allege that CW3 learned from Meier "that tool inventory accounting and tracking was intended to be performed on Flotek's RTMS that had begun implementation in 2006 or 2007 . . . [but that] there had been an inventory accounting performed in early 2007 that demonstrated the RTMS was seriously inadequate . . . because too many plant level personnel had direct access to input or change information . . . [and t]his created an array of problems, including failures to show that a tool had been transferred to another facility or a customer site." (FACAC ¶ 49(b)(ix))  Plaintiffs allege that Meier told CW3 "that the 2007 inventory accounting project was the result of concerns that assets may have been overstated and thus they wanted to 'get it cleaned up,' and get integrated" (FACAC ¶ 49(b)(xiv), and that "when the inventory team went out in early 2007, the RTMS was so inaccurate they had to perform physical counts by hand[, and that t]he same was true again during the 2008 count."  (FACAC ¶ 49(b)(xix)) According to CW3, these inventory accounting concerns "resulted in material variations and inconsistencies that necessitated yet another, and more comprehensive physical inventory count in 2008[, and that t]his count was performed sometime in May or June 2008." (FACAC ¶ 49(b)(ix))  Plaintiffs allege that Schwendimann told CW3 that

> the dollar value of old and unusable tools, determined
> through the inventory counts and efforts to reconcile the
> RTMS with actual inventories at the various locations,
> equated to millions of dollars that would eventually come

off of Flotek's books.  Schwendimann explained that this
was one component of an "impairment charge" that Flotek
was going to take in 2008.  Schwendimann told CW3 that
these were assets that should not be on the books, and
that there were things on the books that were "very
inaccurate" and this was to be "part of the goodwill
write-off."

(FACAC ¶ 49(b)(xvii))

According to CW3, Flotek's inventory problems were
particularly acute at CAVO.  Plaintiffs allege that "CW3 personally
saw large volumes of junk inventory strewn around CAVO yards,
clearly unusable and rusting" (FACAC ¶ 49(b)(xi)), and that in the
fall to latter part of 2008, RTMS expert contractor, Michelle Hill,
discovered what amounted to "two sets of books" at CAVO, and
learned that Flotek's Controller, Schwendimann, "was well aware of
the two sets of books."  (FACAC ¶ 49(b)(xii))  According to CW3,
Schwendimann confirmed that accounting entries from prior periods
dating back to the time of the CAVO acquisition had been changed to
remove certain inventory as assets, but that "reclassifications"
were performed to inflate CAVO's value to a level that supported
its acquisition price.  (FACAC ¶ 49(b)(xiii))

Plaintiffs allege that "[u]ltimately, at year-end 2007, during
a quarter in which Flotek's financial statements were audited, the
company increased its allowance of excess and obsolete inventory to
above 10% of gross inventory, up from less than 8% in each of the
prior quarters."  (FACAC ¶ 81)

On March 16, 2009, Flotek issued a press release announcing
that the Company had recorded a goodwill impairment of $67.7

-46-

million,[40] which caused Flotek to breach a minimum net worth covenant associated with its credit arrangements with various banks, and forced Flotek to amend its credit arrangements in ways that limited its revolving credit line and imposed capital expenditure limitations.[41]   (FACAC ¶ 66)   In the press release Flotek explained that

> [t]he impairment charge resulted from management's comparison of the current asset carrying values to their fair-value.  The economic outlook in 2009 caused management to reach the conclusion that the fair market value of those identified assets had been lowered, or "impaired".[42]

Plaintiffs allege that in August of 2009 Flotek reported another goodwill impairment of $18.5 million, amended its credit arrangements, conducted a non-public offering to repay its debt and fund its working capital needs, and announced the departure of defendant Dumas.  (FACAC ¶ 66)

The statements attributed to CW2 and CW3 are insufficient to raise an inference that problems associated with Flotek's inventory accounting caused Flotek's financial reports for the first three quarters of 2007 to be materially false and/or misleading because they lack factual particularity and specificity required by Rule 9(b) and the PSLRA.  None of the statements attributed to either CW2 or CW3 explain (1) why either of these CWs, one a fixed

---

[40]March 16, 2009, Press Release, Exhibit Q attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[41]Id.

[42]Id. at p. 2.

asset accountant and the other an IT director, was competent and/or
capable of identifying tools that were old, obsolete, or unusable,
(2) why seven years was an unreasonable amount of time for Flotek
to keep tools on its books, or (3) why Flotek should not hold old
and obsolete tools on its books until they could be sold as scrap.
Moreover, although CW3 says that the RTMS inventories were
inaccurate because too many plant-level personnel had direct access
to input and change information, and that the RTMS inaccuracies
prompted hand counts of inventory in 2007 and again in 2008,
neither CW2 nor CW3 provides particularized facts showing that the
hand counts were inaccurate, or that Flotek did not adjust its
allowance for excess and obsolete inventory to above 10% of gross
inventory, up from 8%, as soon as the data on which that adjustment
was based became available.  Nor does either of these two CWs
provide any facts demonstrating the amounts by which Flotek's
allegedly improper accounting for its inventory caused the Company
to misstate its reported inventory, gross margin, or net income.
Accordingly, the court concludes that plaintiffs have failed to
allege particularized facts that if true would show that any
problems Flotek had with its inventory accounting during the Class
Period caused Flotek's 2007 interim financial statements to contain
material misstatements and/or actionable omissions.

### (4)  Product Demand

Plaintiffs allege that the defendants made materially false
statements regarding continuing demand for Flotek's products by

stating that sales had been "deferred" and/or "delayed" when, in fact, the defendants knew that the sales in question had been lost. Plaintiffs allege that during a conference call with analysts held on May 9, 2007,[43] Dumas stated "we have not seen a slow down in any of our three operating segments exclusive of the weather that just delayed some of our activities." (FACAC ¶ 46)  Plaintiffs allege that during a conference call with analysts held on November 1, 2007, Dumas explained during a question and answer session that Flotek had actually anticipated a sales decline during the third quarter but, nevertheless, assured investors that the decline was only temporary.   In response to a question posed by Joe Hill of Wachovia Capital about the weekly run rate of sales for an emulsion chemical, Dumas stated:

> . . . I visited with our people, and I said[,] I see that July numbers were moving up.  We had the second largest month that we had in and it looked like August is going to be better.  And do you see this as a trend?  ***And their comment is no, I don't think so.  Because we were beginning to hear from our customers that we sell . . . the microemulsion to[,] that some of the operators are taking a pause, a time out, on some of fracing and sure enough, we had about a $1.5 million drop in sales in the chemical division in September over August.***  Then we had a pickup in October.  I am certainly hopeful and right now it appears that we are still moving forward, so we could have about a $2 million increase in sales in the chemical division or more in the fourth quarter.  Because it appears that they are beginning to do a little more fracing.
>
> . . .

---

[43]05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

> We saw a pause in the fracing work.  But that seems to
> some how or another, based on what we're seeing right
> now, that pause seems to have been eliminated . . . But
> we clearly had a reduction in their proprietary
> chemicals, which is our — primarily our microemulsion.
> And that was the reason we have a small decrease in the
> gross profit margin in the chemical group.  But we do not
> consider that a trend.  It was only a short-term
> adjustment.

(FACAC ¶ 58 (emphasis in original))

Plaintiffs allege that unbeknownst to investors, Dumas's statements about product demand were materially false and misleading because "defendants knew by early 3Q07 that sales had not been 'delayed,' but that decreasing drilling and fracing activity would further erode sales throughout 2007 and impact the Company's margins by 30%."[44]  Plaintiffs support these allegations with statements attributed to CW1, a "Flotek Human Resources Director from August of 2007 through May of 2009." (FACAC ¶¶ 9 and 49(a)(i))  Plaintiffs allege that

> [w]ith respect to the Drilling Products segment,
> defendants knew that the pricing pressure would continue
> to negatively impact both sales and margins.  According
> to CW1, McGovern confided in CW1 that he felt Dumas had
> unfairly committed the Drilling Products segment to
> positive results for 4Q07 and to meet 2007 expectations.
> According to CW1, the very problems Dumas admitted to
> having in 3Q were not going to be clearing up, yet the
> CEO assured the market problems were already "eliminated"
> by the end of 3Q07.  McGovern told CW1 that Dumas could
> not be reasoned with, that the CEO would not listen to
> what he and the other operating division thought "was
> realistic."

(FACAC ¶ 62(d))

---

[44]Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 9 (citing FACAC ¶¶ 49(d), 55(d), 58-59).

CW1's statements about Flotek's product demand are insufficient to raise an inference that the statements about which plaintiffs complain were materially false and/or misleading because those statements are neither sufficiently particularized nor sufficiently reliable to prove that Dumas's statements were materially false and/or misleading.  CW1 states that McGovern confided that he felt Dumas had unfairly committed the Drilling Products segment to positive results for 4Q07 and to meet 2007 expectations, but fails to allege facts that show the basis for McGovern's opinion or that he had communicated it to defendants. CW1 states that "the very problems Dumas admitted to having in 3Q were not going to be clearing up," but fails to allege any facts showing why those problems were not going to clear up, or why CW1's belief that they were not going to clear up was reasonable. Accordingly, the court concludes that plaintiffs have failed to allege particularized facts that if true would show that Dumas's statements about Flotek's product demand made during the Class Period contained material misstatements and/or actionable omissions.

### (5)  Conclusions as to False Statements

Because plaintiffs have not alleged any particularized facts capable of establishing that Flotek (1) could not reasonably estimate 2007 annual earning of $1 per share; (2) did not actively

attempt to integrate newly acquired companies; (3) did not accurately report Flotek's financial results, including inventory, gross margin, and net income; and (4) did not reasonably expect that demand for its products would remain stable, the court concludes that plaintiffs have failed to plead facts that if true would prove that the statements attributed to the defendants about Flotek's earnings guidance, integration of new acquisitions, inventory accounting, and product demand contained any material misstatements and/or actionable omissions.

(b)  Safe Harbor for Forward-Looking Statements

The PSLRA creates a safe harbor for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A).  Citing <u>ABC Arbitrage</u>, 291 F.3d at 336, defendants contend that plaintiffs' Exchange Act claims are barred under both the PSLRA and common law prohibitions on liability for forward-looking statements because "Flotek did not 'guarantee' anything and consistently warned that actual results could differ from guidance."[45]  <u>Id.</u> at 359 (quoting <u>Krim</u>, 989 F.2d at 1446) ("[P]rojections of future performance not worded as guarantees are

---

[45]Defendants' Motion to Dismiss, Docket Entry No. 36, p. 19.

-52-

generally not actionable under the federal securities laws.")). Plaintiffs respond that the statutory safe harbor provided for forward-looking statements does not apply to any of the allegedly false statements pleaded in the FACAC because "the alleged misrepresentations and omissions concerned present facts and the 'cautionary language' was insufficient to afford protection to defendants' statements."[46]   For the reasons explained below, the court concludes that all but one of the statements regarding earnings guidance, integration of acquired companies, and product demand about which plaintiffs complain are protected by the safe harbor provision because they are forward-looking statements that were accompanied by specific cautionary disclosures.   The single exception is Meier's August 3, 2007, statement that "[t]he integration of Triumph into Flotek has been very successful.   We have leveraged off their expertise to help roll out our RTMS to our drilling locations this year which we will further [use to] increase the utilization of our expansive tool inventory." (FACAC ¶ 52)   However, for the reasons explained in § III.B.1(a)(2) above and in § III.B.1(c) below, the court concludes that the statement Meier made on August 3, 2007, is not actionable.

---

[46]Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 11.

### (1)  Earnings Guidance

Plaintiffs allege that during conference calls with investors and analysts on March 13, 2007,[47] May 9, 2007,[48] August 3, 2007,[49] and November 1, 2007,[50] defendants stated that based on the Company's performance projections their earnings guidance for 2007 was $1.00 earnings per diluted share.  (FACAC ¶¶ 42, 46, 52, 57) These earnings guidance statements were forward-looking and were accompanied by both general statements of caution and by specific cautionary disclosures.  The March statements were accompanied by specific cautionary disclosures that Flotek had recently undergone an "exorbitant" audit process in 2006 due to the first year of Sarbanes-Oxley compliance, would not raise per share earnings guidance above $1 per share for fiscal year 2007, and could not give guidance regarding its margins because Flotek had a lot of acquisitions to integrate.[51]  The May statements were accompanied by specific cautionary disclosures that weather adversely affected

---

[47]03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[48]05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[49]08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[50]Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[51]03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 1 (audit), 6 (EPS estimate), and 7-8 (inability to give guidance on margins).

activity levels, that Flotek had experienced a significant increase in administrative costs, and that information provided about Triumph and CAVO were based on only two months of experience.[52]  The August statements were accompanied by specific cautionary disclosures that Flotek's major customers had experienced a slowdown, that the weekly run rate in July was "not good," and that revenue was "hopefully delayed rather than lost."[53]  The November statements were accompanied by specific cautionary statements from Dumas that he was "hopeful" that Flotek was still moving forward and could have a $2 million sales increase in October, but that Flotek's costs were increasing due, in part, to expansion of accounting and support personnel, and that Flotek could only "guesstimate" the Sarbanes-Oxley expenses, which Meier predicted to be approximately $1 million in 2007.[54]  Moreover, Dumas candidly opined that there had been "some irrational exurberance" in the marketplace about Flotek's stock price, and that the $50-$55 peak price during the third quarter was "pretty rich."[55]

---

[52]05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 1 (weather), 4 (costs), 3 and 6 (Triumph and CAVO).

[53]08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 4 (slowdown and weekly run rate), and 13 (revenue "hopefully" delayed).

[54]Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 2 and 6 (costs), 7 ("hopeful" about sales), and 11 (Sarbanes-Oxely "guesstimate").

[55]Id. at 11.

## (2)  Integration of Acquired Companies

Plaintiffs allege that defendants made statements in press releases and/or conference calls with investors and analysts on March 13, 2007,[56] May 8, 2007,[57] August 2, 2007,[58] and October 31, 2007,[59] touting Flotek's efforts to integrate its recently acquired companies.  (FACAC ¶¶ 41-42, 45, 52, and 59)  The integration statements made on each of these dates were forward-looking and accompanied by both general statements of caution and by specific cautionary disclosures.  The March statements were accompanied by specific cautionary disclosures that Flotek would need to spend significant efforts integrating recently acquired companies.[60]  The May statements were accompanied by specific cautionary disclosures that statements about Triumph and CAVO were based on only two months of experience.[61]  Moreover, when asked about the integration of Flotek's previously acquired companies during the November 1,

---

[56]03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[57]05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[58]08/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[59]Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36.

[60]03/13/2007 Flotek Earnings Call, Exhibit B attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 3.

[61]05/09/2007 Flotek Earnings Call, Exhibit D attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 6.

2007, conference call, Dumas stated that "we are going to continue to work on it.  I hope that we will see and I think we will see an improvement in the fourth quarter over the third quarter."[62]

### (3)  Product Demand

Plaintiffs allege that defendants made materially false statements during conference calls with investors and analysts on May 9, 2007,[63] and November 1, 2007,[64] about continuing demand for Flotek's products by stating that sales had been "deferred" and/or "delayed" when, in fact, they knew that the sales in question had been lost.  (FACAC ¶¶ 46 and 58)  The product demand statements made on each of these dates were forward-looking statements that were accompanied by both general statements of caution and by specific qualifying and/or cautionary disclosures.  Specific disclosures in May cautioned that statements about Triumph were based on only two months' experience,[65] and specific cautionary statements made in November disclosed that low gas prices and pipeline capacity constraints significantly reduced activity, that

---

[62]Q3 2007 Earnings Call, Exhibit H attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 4.

[63]05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36.

[64]Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36.

[65]05/09/2007 Flotek Earnings Call, Exhibit D attached to Motion to Dismiss, Docket Entry No. 36, p. 6.

25% fewer drilling rigs were operating during the third quarter of 2007 than during the same quarter of 2006, that competitors were cutting prices, and that the market was showing some "irrational exuberance" about Flotek's expectations and stock price.[66]

(c)  Scienter

The critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate." Goldstein, 340 F.3d at 249.  In determining whether a plaintiff's allegations support a strong inference of scienter, the court must consider all facts, circumstances, and allegations in toto.  Goldstein, 340 F.3d at 246; Abrams, 292 F.3d at 431 ("the allegations should not be read in isolation, but taken together as a whole to see if they raise the necessary strong inference of scienter").  See also Nathenson, 267 F.3d at 425.  Under the Supreme Court's decision in Tellabs, 127 S. Ct. at 2510, "a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter.  Id.  The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible.'"  Indiana Electrical Workers Pension Trust Fund IBEW

---

[66]Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, pp. 2, 4, 10, and 11.

v. Shaw Group, Inc., 537 F.3d 527, 533 (5th Cir. 2008) (quoting Tellabs, 127 S. Ct. at 2510).

### (1)  Dumas

Dumas argues that the Exchange Act claims asserted against him should be dismissed because plaintiffs have failed to allege with particularity facts showing that he made any misrepresentations about Flotek's earnings guidance, integration efforts, inventory accounting, product demand, or finances; or that he made any misrepresentations with scienter.  Plaintiffs respond that the Exchange Act claims asserted against Dumas should not be dismissed because his public admissions, knowledge of Flotek's false financial projections and GAAP violations, and his stock sales all show that he acted with scienter when he knowingly or recklessly certified the following false and misleading financial statements during the Class Period:  First Quarter Form 10-Q filed on May 10, 2007, Second Quarter Form 10-Q filed on August 9, 2007, and Third Quarter Form 10-Q filed on September 30, 2007.

### (i)  Public Admissions

Plaintiffs contend that

Dumas' admissions reveal that in August 2007 he was aware of facts that directly contradicted statements he made to the public at that time.  During the August 2007 earnings call, Dumas reassured investors that Flotek "had not seen a reduction in demand for [its] products" and that despite "$4 million in total revenue" that was not booked due to inclement weather, "[w]e are very confident that a vivid portion of that was delayed, and [that we] will pick it up" . . . Although Dumas did not admit it until

October 2007, he knew at the time he made those statements that customers were advising Flotek that "some of the operators are taking a pause, a time out, on some of [the] fracing" and that Flotek was expecting a further sales decline — not a "pick up" — of deferred sales. . . . Indeed, as customers were advising defendants of a slowdown in drilling, defendants were bracing for the imminent price cutting, as evidenced by Dumas' admission that "we made a decision; we were not going to cut prices.  No question about it, we knew what we did.  And we knew that we were absolutely going to lose some market share, because we've actually seen price discounts up to 28% and we made a decision to ignore that and it has cost us some revenue."[67]

Plaintiffs contend that Dumas's admissions demonstrate his knowledge that Flotek expected diminished sales in 3Q07 and that he intended to deceive investors to capitalize on Flotek's inflated stock price.

Defendants contend, and the court agrees, that there is no inconsistency between Dumas's statements in August and November. During the August 3, 2007, conference call Dumas stated that inclement weather shut down drilling activity and delayed dramatically the amount of frac activity that was going on in Texas and Oklahoma, that the July run rate was not good, that customers were taking pauses in fracing, that Flotek had experienced a slowdown, and that Flotek had "determined by talking to . . . customers [in the mid-continent region that there was] . . . a ten week backlog of frac jobs."[68]  Dumas also disclosed on August 3,

---

[67]Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 15–16.

[68]8/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 4.

2007, that these delays reduced Flotek's second-quarter earnings by $3-4 million, and that the revenue from these jobs was "hopefully delayed rather than lost."[69]

Although plaintiffs attempt to create an inference that Dumas already knew at the beginning of August that there would be an additional slowdown and price cutting in September, the evidence does not support such an inference.   Dumas's August 3, 2007, statement that revenues were "hopefully delayed rather than lost" appears to have had a reasonable basis because Flotek's total revenues and chemical sales undisputedly increased during the third quarter:

> Flotek generated total revenues in the third quarter of $42 million compared to . . . 38 million in the second quarter of '07. . . During the third quarter sales of our green chemical grew 5% over the prior quarter.   While total sales for the Chemical and Logistics segment grew 10%.[70]

The fact that Flotek's total revenues and chemical sales actually increased during the third quarter substantiate Dumas's August 3, 2007, statement that "we have not seen a reduction in demand for our products."[71]   The court concludes that the discrepancies that plaintiffs contend exist between Dumas's August and November statements neither exist nor create a strong inference of scienter.

---

[69]Id. at 13.

[70]Q3 2007 Earnings Call, Exhibit H attached to Motion to Dismiss, Docket Entry No. 36, p. 1.

[71]8/03/2007 Flotek Earnings Call, Exhibit F attached to Defendants' Motion to Dismiss, Docket Entry No. 36, p. 3.

(ii) <u>Knowledge of Flotek's Financial Projections and GAAP Violations</u>

Plaintiffs contend that the following allegations contained in the FACAC establish a strong inference that Dumas acted with scienter because they show that Dumas knew or recklessly disregarded that Flotek's financial projections were false and in violation of GAAP:

> Defendant Dumas spoke directly with executives in the Divisions to discuss . . . reports and financial projections (¶49(b)(ii)), but intentionally ignored the projections that were stated to him, and touted false projections to the market in May, August and October of 2007, because Dumas "never wanted to hear any bad news" and would tell the divisions to "just go out and find it" if they were not projecting the numbers Dumas wanted. ¶¶49(a)(i), 49(a)(iv), 55(d)(ii)-(iii), 62(a)(i)-(v), 62(d) . . .

> At a minimum, Dumas' "egregious refusal to see the obvious, or to investigate the doubtful" demonstrates his severe recklessness with respect to giving guidance to investors . . . Indeed, Defendant Dumas' severe recklessness is demonstrated by the Division presidents' consensus that he should be "[kept] away from the analysts" because he "had a habit" of overstating financial projections to Wall Street (¶49(a)(i)) and touting guidance that the Division presidents told him was "impossible" to achieve and "not fair" to investors (¶62(a)(i)-(ii)). *See also* ¶49(a)(iii)-(iv) (management "cringed" at projections Dumas stated to the market that were contrary to actual performance because he would just "make it up as he went").[72]

These allegations fail to establish a strong inference of scienter that is cogent and at least as compelling as the inference that Dumas's conduct was not fraudulent because they fail to identify

_____

[72]Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 17-19.

any specific communications or reports that directly contradicted Dumas's public statements, fail to identify any individual who provided such communications or reports to Dumas, and fail to establish that such communications or reports had been provided to Dumas before he made any of the public statements about which the plaintiffs complain.  Nor do plaintiffs allege any facts showing that any of Flotek's financial projections were false or in violation of GAAP, or that Dumas knew that Flotek's financial projections were false or in violation of GAAP.  See Abrams, 292 F.3d at 432 (dismissing complaint where plaintiffs could "point to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them"); Shaw Group, 537 F.3d at 539 (allegation that executive was "informed, in great detail, by a former . . . project controls manager, of all the problems associated with the use of Shaw-Tac" insufficient); Southland, 365 F.3d at 376 (allegation that individual defendants were told by programmers of alleged problems insufficient).  The court concludes that the allegations against Dumas on which plaintiffs rely to establish that Dumas acted with scienter do not create a strong inference of scienter.

### (iii) Stock Sales

Plaintiffs allege that in May and August of 2007 while in possession of adverse, material, undisclosed information about the Company, Dumas sold 186,816 shares of his Flotek stock for over $5

million in illegal insider-trading proceeds. (FACAC ¶ 90) Plaintiffs argue that the size and timing of Dumas's sale is probative of scienter. (FACAC ¶ 91)

Plaintiffs allege that Dumas made sales on two days in May of 2007, shortly after the beginning of the Class Period, at prices that ranged from $22.25 to $22.57, and sales on four days in August of 2007 at prices that ranged from $31.00 to $33.00 -- prices that were far below the alleged Class Period high of $53.49. (FACAC ¶ 101) Far from being suspiciously timed or calculated to maximize personal benefit from allegedly undisclosed information, the timing of Dumas's sales is not consistent with fraudulent intent. See Nathenson, 267 F.3d at 420-421 (sales well below the class period high were "so inauspiciously timed" that they "do not meet this test"); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1093-1096 (9th Cir. 2002) (sales made at $20 to $25 were not suspicious -- even if in substantial quantities -- where stock price peak was several months later at $39). Moreover, although plaintiffs allege that Dumas's sales were made while Dumas possessed undisclosed information about the Company (FACAC ¶ 89), plaintiffs fail to plead particularized facts showing what undisclosed information about the Company Dumas possessed.

The court concludes that Dumas's stock sales are not sufficient to raise any inference of scienter because plaintiffs fail to allege facts that connect the sales to any alleged fraud or that show that the sales were extraordinary or otherwise

-64-

suspicious.  Although plaintiffs allege that Dumas's 2007 stock sales "well exceeded [his] pre-Class Period sales," plaintiffs fail to allege any facts about Dumas's trading history.  Plaintiffs' failure to plead facts showing Dumas's trading history negates any inference of scienter.  See Silicon Graphics, 183 F.3d at 986 (defendant's trading history is a critical element in analyzing whether a sale is unusual or suspicious); Abrams, 292 F.3d at 435 (insider selling must be unusual to have meaningful probative value); Nathenson, 267 F.3d at 420-421 (same).

### (iv)   Conclusions

The Fifth Circuit has stated that the critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate."  Goldstein, 340 F.3d at 249.  When considered in toto, the allegations asserted against Dumas fail either to state a claim or to raise a strong inference of scienter because they are no more than conclusory assertions of wrongdoing unsupported by particularized facts that connect him to any alleged fraud.

### (2)  Meier

Meir argues that the Exchange Act claims asserted against her should be dismissed because plaintiffs have failed to allege with particularity facts showing that she made any misrepresentations

about Flotek's earnings guidance, integration efforts, inventory accounting, product demand, or finances or that she made any misrepresentations with scienter.   Plaintiffs respond that the Exchange Act claims asserted against Meier should not be dismissed because her knowledge of Flotek's false financial projections and GAAP violations, and her stock sales all show that she acted with scienter when she knowingly or recklessly certified the following false and misleading financial statements during the Class Period: First Quarter Form 10-Q filed on May 10, 2007, Second Quarter Form 10-Q filed on August 9, 2007, and Third Quarter Form 10-Q filed on September 30, 2007.

> (i)   <u>Knowledge of Flotek's Financial Projections and GAAP Violations</u>

Plaintiffs contend that the following allegations in the FACAC establish a strong inference of Meier's scienter because they show that she knew that Flotek's financial projections were false and that Flotek's financial statements for the first three quarters of 2007 were false:

> . . . Meier received financial results and projections from the Division presidents through conversations and through monthly profit and loss reports, and participated in meetings to discuss financial results and prospects prior to quarterly closing . . .

> . . . Defendant Meier — the CFO — was acutely aware of Dumas' inaccurate forecasting to the market and his recitation of lofty numbers that did not correspond to those prepared by the operating divisions.  ¶62(a)(i)-(v).   Despite her duty to shareholders and her opportunity to correct Dumas during quarterly earnings

calls, Meier not only failed to correct the CEO, but she also knowingly reiterated the same false guidance projections touted by Dumas. ¶¶55(a)(i), 62(a)(i)-(ii). Accordingly, plaintiffs have adequately alleged that [Meier] knew [her] public statements concerning guidance were false and issued with utter disregard for internal reports and management consensus demonstrating $1.00 EPS was unachievable.[73]

Plaintiffs' allegations fail to establish a strong inference of scienter that is cogent and at least as compelling as the inference that Meier's conduct was not fraudulent because they fail to identify any specific communications or reports that directly contradicted Dumas's and/or Meier's public statements, fail to identify any individual who provided such communications or reports to Meier, and fail to establish that such communications or reports had been provided to Meier before she made any of the public statements about which plaintiffs complain. See Abrams, 292 F.3d at 432; Shaw Group, 537 F.3d at 539; Southland, 365 F.3d at 375-76. Accordingly, the court concludes that the allegations against Meier on which plaintiffs rely to establish that she acted with scienter, do not create a strong inference of scienter.

(ii)   Stock Sales

Plaintiffs allege that in May, August, and December of 2007 while in possession of undisclosed information about the Company, Meier sold 40,000 shares of Flotek stock for over $1 million in illegal insider-trading proceeds. (FACAC ¶ 90) Plaintiffs argue

---

[73]Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 17-18.

that the amount and timing of Meier's stock sales are probative of scienter.  (FACAC ¶ 91)

Plaintiffs allege that Meier made sales on three days in May of 2007, shortly after the beginning of the Class Period, at prices that ranged from $22.31 to $23.80, a sale on one day in August of 2007 at the price of $32.30, and sales on two days in December of 2007 at prices of $35.20 and $36.10; prices that were all far below the alleged Class Period high of $53.49.  (FACAC ¶ 101)  Far from being suspiciously timed or calculated to maximize personal benefit from allegedly undisclosed information, the timing of Meier's stock sales is not consistent with fraudulent intent.  See Nathenson, 267 F.3d at 420-421 (sales well below the class period high were "so inauspiciously timed" that they "do not meet this test"); In re Vantive Corp., 283 F.3d at 1093-1096 (sales made at $20 to $25 were not suspicious -- even if in substantial quantities -- where stock price peak was several months later at $40).  Moreover, although plaintiffs allege that Meier's sales were made while Meier possessed undisclosed information about the Company (FACAC ¶ 89), plaintiffs fail to plead particularized facts showing what undisclosed information about the Company Meier possessed.

The court concludes that Meier's stock sales are not sufficient either to state a claim or to raise any inference of scienter because plaintiffs fail to allege facts that connect the sales to any alleged fraud or that show that the sales were extraordinary or otherwise suspicious.  Although plaintiffs allege

that Meier's 2007 stock sales "well exceeded [her] pre-Class Period sales," plaintiffs fail to allege any facts about Meier's trading history.  Plaintiffs' failure to plead facts showing Meier's trading history negates any inference of scienter.  See Silicon Graphics, 183 F.3d at 986 (defendant's trading history is a critical element in analyzing whether a sale is unusual or suspicious); Abrams, 292 F.3d at 435 (insider selling must be unusual to have meaningful probative value); Nathenson, 267 F.3d at 420-421 (same).

### (iii)  Conclusions

The Fifth Circuit has stated that the critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate."  Goldstein, 340 F.3d at 249.  When considered in toto, the allegations asserted against Meier fail either to state a claim or to raise a strong inference of scienter because they are no more than conclusory assertions of wrongdoing unsupported by particularized facts that connect her to any alleged fraud.

### (d)  Loss Causation

Plaintiffs allege that during the Class Period the defendants engaged in a scheme to deceive the market into believing that Flotek could meet guidance for fiscal year 2007, that Flotek was

successfully integrating its new acquisitions, and that sales would not decrease.    Plaintiffs allege that defendants' scheme artificially inflated the price of Flotek common stock and operated as a fraud or deceit on Class Period purchases of that stock by failing to disclose materially adverse facts.  (FACAC ¶¶ 99-105) Asserting that plaintiffs have identified only two sets of "corrective disclosures," neither of which revealed the falsity of any prior alleged misstatements, defendants contend that they are entitled to dismissal because plaintiffs have failed to allege facts that if true would establish that the defendants' acts or omissions caused the losses for which the plaintiffs seek to recover.[74]  For the reasons explained above in section III.B.1(a) pursuant to which the court has already concluded that plaintiffs have failed to allege particularized facts showing that the statements about which they complain contained any material misstatements or actionable omissions, the court agrees that the plaintiffs have failed to properly allege loss causation.

2.    <u>Section 20(a) Control Person Claims</u>

Plaintiffs allege that Dumas and Meier

    acted as controlling persons of Flotek within the meaning
    of §20(a) of the Exchange Act. . . By reason of their
    positions as officers and/or directors of Flotek, and
    their ownership of Flotek stock, the Individual
    Defendants had the power and authority to cause Flotek to

---

[74]Defendants' Motion to Dismiss, Docket Entry No. 36, pp. 29-30.

> engage in the wrongful conduct complained of herein.  By
> reason of such conduct, the Individual Defendants are
> liable pursuant to §20(a) of the Exchange Act.

(FACAC ¶ 113)

Section 20(a) of the 1934 Act imposes liability on anyone "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a).  Because the plaintiffs have failed to plead a violation of section 10(b) and Rule 10b-5 against the controlled person, *i.e.*, Flotek, there can be no liability against Dumas or Meier under § 20(a).  In re Capstead Mortgage Corp. Securities Litigation, 258 F.Supp.2d 533, 566 (N.D. Tex. 2003).  Accordingly, the § 20(a) claims alleged against Dumas and Meier will be dismissed.

3.  Conclusions

Plaintiffs allege violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), against Dumas, Meier, and Flotek.  For the reasons explained above, the court concludes that the plaintiffs have failed to allege particularized facts showing that any of the statements about which plaintiffs complain contained a material misstatement or actionable omission, and that instead, plaintiffs' allegations show that all but one of those statements is subject to protections afforded by the safe harbor provision.  The court also concludes that plaintiffs have failed to allege particularized

-71-

facts establishing a strong inference of scienter against Dumas or Meier, or that any of the defendants' acts and/or omissions about which the plaintiffs complain caused the losses for which the plaintiffs seek to recover.  Accordingly, the § 10(b) and Rule 10b-5 claims asserted against Dumas, Meier, and Flotek will be dismissed.

Plaintiffs allege violations of § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against Dumas and Meier.  Because the court has concluded that plaintiffs have failed to state a claim against any of the defendants under § 10(b) or Rule 10b-5, there can be no liability against Dumas or Meier under § 20(a). Accordingly, the § 20(a) claims alleged against Dumas and Meier will be dismissed.

### IV.  <u>Plaintiffs' Request to Amend</u>

Plaintiffs end their response to the defendants' motion to dismiss by requesting leave to amend "[i]n the event that the Court grants defendants' motion in whole or in part."[75]

The Fifth Circuit recognizes that leave to amend shall be freely granted when justice so requires, <u>Goldstein</u>, 340 F.3d at 254, and that Rule 15 evinces a bias in favor of granting leave to amend.  <u>Id.</u> (citing <u>Southern Constructors Group, Inc. v. Dynalectric Co.</u>, 2 F.3d 606, 611 (5th Cir. 1993)).  However, the

---

[75]Plaintiffs' Opposition to Defendants' Motion to Dismiss, Docket Entry No. 40, p. 30.

Fifth Circuit has also stated that leave to amend under Rule 15 is by no means automatic, <u>Southern Constructors</u>, 2 F.3d at 612, and has upheld the denial of leave to amend when the moving party attempted to present theories of recovery serially to the district court. <u>Southern Constructors</u>, 2 F.3d at 612. The Supreme Court has sanctioned bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment as plausible reasons for a district court to deny a party's request for leave to amend. <u>See</u> <u>Foman v. Davis</u>, 83 S. Ct. 227 (1962).

Plaintiffs have filed two complaints in this action: a Class Action Complaint for Violation of the Federal Securities Laws filed on August 7, 2009 (Docket Entry No. 1), and the First Amended Class Action Complaint (FACAC) filed on February 4, 2010 (Docket Entry No. 32). The FACAC is 65-pages long. In addition to being repetitive, the FACAC is legally deficient in many respects. Yet, almost as an afterthought, plaintiffs have tacked a general curative amendment request to the end of each of their responses in opposition to the defendants' motion to dismiss. Plaintiffs are certainly aware of the defendants' objections to the FACAC as written because they appeared in the defendants' motion to dismiss. Despite this awareness, plaintiffs have not demonstrated how they would replead their claims with greater specificity if given the opportunity, have not proffered a proposed second amended class

action complaint, and have not suggested in their opposition to defendants' motion to dismiss any additional facts not initially pleaded that could cure the pleading defects raised by the defendants.  See Goldstein, 340 F.3d at 254-255.  Under these circumstances the court is not persuaded that plaintiffs should receive yet another opportunity to amend their complaint.  See McKinney v. Irving Independent School Dist., 309 F.3d 308, 315 (5th Cir. 2002), cert. denied, 123 S. Ct. 1332 (2003) (no abuse of discretion in denying leave to amend where the plaintiffs failed to alert the court to the substance of any proposed amendment).  Accordingly, plaintiffs' request for leave to amend will be denied.

### V.  Conclusions and Order

For the reasons stated above, Defendants' Motion to Dismiss (Docket Entry No. 36) is **GRANTED**, and plaintiffs' request for leave to amend is **DENIED**.

**SIGNED** at Houston, Texas, this 29th day of September, 2010.

```
                        _____
                              SIM LAKE
                   UNITED STATES DISTRICT JUDGE
```